DAVID C. SHONKA
Acting General Counsel

ADAM M. WESOLOWSKI
GREGORY A. ASHE
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20850
Telephone: 202-326-3068 (Wesolowski)
Telephone: 202-326-3719 (Ashe)
Facsimile: 202-326-3768
Email: awesolowski@ftc.gov; gashe@ftc.gov

STEVEN W. MYHRE
Acting United States Attorney
BLAINE T. WELSH
Assistant United States Attorney
Nevada Bar No. 4790
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

**2:18-cv-00030-GMN-PAL**

FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

CONSUMER DEFENSE, LLC, *et. al.*,

    Defendants.

**FTC'S EMERGENCY *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

**FILED UNDER SEAL**



FILED
ENTERED
_____ RECEIVED
_____ SERVED ON
COUNSEL/PARTIES OF RECORD

JAN - 8 2018

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

1

**TABLE OF CONTENTS**

I.   THE PARTIES ...................................................................................................... 2

  A.   The Federal Trade Commission .................................................................... 2

  B.   Defendants ...................................................................................................... 2

    1.   The Corporate Defendants ...................................................................... 2

    2.   The Individual Defendants ....................................................................... 5

II.   DEFENDANTS' UNLAWFUL BUSINESS PRACTICES ............................... 8

  A.   Defendants Use False, Deceptive, or Misleading Representations to Market Mortgage Assistance Relief Services. ................................................................................................. 8

    1.   Defendants Make False Promises about Obtaining Loan Modifications. ...................... 10

    2.   Defendants Make False Claims of Government and Lender Affiliation and Endorsement. ......................................................................................... 14

    3.   Defendants Make False Claims that Consumers Are Not Obligated to Pay Their Mortgages and Should Not Contact or Communicate with Their Lenders or Servicers. ........ 17

  B.   Defendants Fail to Make Required Disclosures. ......................................... 18

  C.   Defendants Illegally Collect Advance Fees for their Services. .................... 19

  D.   Defendants' Practices Have Squeezed Millions of Dollars from Consumers and Generated Hundreds of Complaints. ....................................................................... 22

III.   A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST DEFENDANTS. .................................................................................................. 23

  A.   This Court Has the Authority to Grant the Requested Relief. .................... 24

  B.   The FTC Meets the Standard for Granting a Government Agency's Request for a Temporary Restraining Order. ........................................................................... 26

    1.   The FTC Is Likely to Succeed on the Merits. ...................................... 27

    2.   The Equities Tip Decidedly in the Public's Favor. ............................... 27

  C.   Defendants Are Jointly and Severally Liable Because They Operate as a Common Enterprise. ........................................................................................... 28

  D.   The Individual Defendants Are Individually Liable for Monetary and Injunctive Relief. 29

IV.   THE SCOPE OF THE PROPOSED *EX PARTE* TRO IS APPROPRIATE IN LIGHT OF DEFENDANTS' CONDUCT ...................................................................... 31

  A.   Conduct Relief .............................................................................................. 31

  B.   An Asset Preservation Order Is Necessary to Preserve the Possibility of Final Effective Relief. ........................................................................................ 31

  C.   A Receiver Is Necessary to Protect the Public and Injured Consumers. ........ 35

  D.   Preservation of Records. .............................................................................. 35

  E.   Expedited Discovery. .................................................................................... 36

ii

1

F.    The TRO Should Be Issued *Ex Parte* to Preserve the Court's Ability to Fashion
Meaningful Relief..................................................................................................... 36

2  V.    CONCLUSION............................................................................................................. 37

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1

2

**TABLE OF AUTHORITIES**

**CASES**

*Am. Can Co. v. Mansukhani,*
    742 F.2d 314 (7th Cir. 1984) ................................................................ 36

*AT&T Broadband v. Tech Commc'ns.,*
    381 F.3d 1309 (11th Cir. 2004) ............................................................ 37

*Benham Jewelry Corp. v. Aron Basha Corp.,*
    1997 U.S. Dist. LEXIS 15957 (S.D.N.Y. July 18, 1997) ....................... 36

*Boardman v. Pac. Seafood Grp.,*
    822 F.3d 1011 (9th Cir. 2016) .............................................................. 27

*Cenergy Corp. v. Bryson Oil & Gas P.L.C.,*
    657 F. Supp. 867 (D. Nev. 1987) .......................................................... 37

*CFTC v. Hunt,*
    591 F.2d 1211 (7th Cir. 1979) .............................................................. 28

*Cmty. Blood Bank of the Kan. City Area v. FTC,*
    405 F.2d 1011 (8th Cir. 1969) .............................................................. 25

*Deckert v. Independence Shares Corp.,*
    311 U.S. 282 (1940) ............................................................................. 32

*Del. Watch Co. v. FTC,*
    332 F.2d 745 (2d Cir. 1964) ................................................................. 29

*Exposition Press, Inc. v. FTC,*
    295 F.2d 869 (2d Cir. 1961) ................................................................... 9

*Fed. Express Corp. v. Fed. Expresso, Inc.,*
    1997 U.S. Dist. LEXIS 19144 (N.D.N.Y. Nov. 24, 1997) ...................... 36

*Flynt Distrib. Co., Inc. v. Harvey,*
    734 F.2d 1389 (9th Cir. 1984) .............................................................. 27

*FSLIC v. Dixon,*
    835 F.2d 554 (5th Cir. 1987) ................................................................ 36

*FTC v. Affordable Media, LLC,*
    179 F.3d 1228 (9th Cir. 1999) ............................................. 24, 26, 28, 30, 32

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*FTC v. Ameridebt,*
    343 F. Supp. 2d 451 (D. Md. 2004) ..................................................................26

*FTC v. Amy Travel Service, Inc.,*
    875 F.2d 564 (7th Cir. 1989) ..........................................................................33

*FTC v. A to Z Mktg., Inc.,*
    2014 WL 12479617 (C.D. Cal. Sept. 17, 2014) ...............................................21

*FTC v. City W. Advantage, Inc.,*
    2008 WL 2844696 (D. Nev. July 22, 2008) .....................................................10

*FTC v. Cyberspace.com, LLC,*
    453 F.3d 1196 (9th Cir. 2006) .......................................................................8, 9

*FTC v. D Squared Sols., LLC,*
    2003 WL 22881377 (D. Md. Oct. 30, 2003) ...................................................35

*FTC v. Direct Mktg. Concepts, Inc.,*
    624 F.3d 1 (1st Cir. 2010) ...............................................................................9

*FTC v. Figgie Int'l, Inc.,*
    994 F.2d 595 (9th Cir. 1993) .......................................................................8, 9

*FTC v. Five-Star Auto Club,*
    97 F. Supp. 2d 502 (S.D.N.Y. 2000) ...........................................................9, 28

*FTC v. Grant Connect, LLC,*
    827 F. Supp. 2d 1199 (D. Nev. 2011), *aff'd in part, vacated in part*, 763 F.3d
    1094 (9th Cir. 2014)) .................................................................................9, 29

*FTC v. H.N. Singer, Inc.,*
    668 F.2d 1107 (9th Cir. 1982) ...................................................................24, 31

*FTC v. J.K. Publ'ns, Inc.,*
    99 F. Supp. 2d 1176 (C.D. Cal. 2000) ...........................................................29

*FTC v. John Beck Amazing Profits, LLC,*
    865 F. Supp. 2d 1052 (C.D. Cal. 2012) ..........................................................28

*FTC v. Kennedy,*
    574 F. Supp. 2d 714 (S.D. Tex. 2008) ...........................................................29

*FTC v. Mallett,*
    818 F. Supp. 2d 142 (D.D.C. 2011) ...............................................................28

v

1
*FTC v. Medicor, LLC*,
    217 F. Supp. 2d 1048 (C.D. Cal. 2002) ...................................................29

2

3
*FTC v. Nat'l Urological Grp., Inc.*,
    645 F. Supp. 2d 1167 (N.D. Ga. 2008)...................................................30

4

5
*FTC v. Network Servs. Depot, Inc.*,
    617 F.3d 1127 (9th Cir. 2010) ...............................................................29

6
*FTC v. OMICS Grp. Inc.*,
    2017 U.S. Dist. LEXIS 161910 (D. Nev. Sep. 29, 2017) .........................8, 9, 24, 27, 28, 29

7

8
*FTC v. Pantron I. Corp.*,
    33 F.3d 1088 (9th Cir. 1994) ...................................................2, 8, 24

9

10
*FTC v. Publ'g Clearing House, Inc.*,
    104 F.3d 1168 (9th Cir. 1997) ...................................................29, 30

11
*FTC v. SlimAmerica, Inc.*,
    77 F. Supp. 2d 1263 (S.D. Fla. 1999) ...................................................8

12

13
*FTC v. Stefanchik*,
    559 F.3d 924 (9th Cir. 2009) ...................................................8

14

15
*FTC v. Stout*,
    1999 WL 34833240 (D.N.J. Dec. 8, 1999)...................................................35

16

17
*FTC v. Think Achievement Corp.*,
    144 F. Supp. 2d 993 (N.D. Ind. 2000)...................................................28, 29

18

19
*FTC v. USA Fin., LLC*,
    415 Fed. Appx. 970 (11th Cir. Feb. 25, 2011)...................................................30

20
*FTC v. U.S. Oil & Gas Corp.*,
    748 F.2d 1431 (11th Cir. 1984) ...................................................24, 35

21

22
*FTC v. Warner Commc'ns, Inc.*,
    742 F.2d 1156 (9th Cir. 1984) ...................................................26

23

24
*FTC v. Windward Mktg. Ltd.*,
    1997 U.S. Dist. LEXIS 17114 (N.D. Ga. Sep. 30, 1997) ...................................................29

25
*FTC v. World Travel Vacation Brokers*,
    861 F.2d 1020 (7th Cir. 1988) ...................................................9

26

27
*FTC v. World Wide Factors, Ltd.*,
    882 F.2d 344 (9th Cir. 1989) ...................................................26, 27, 28, 31

1

*Granny Goose Foods, Inc. v. Bhd. of Teamsters,*
    415 U.S. 423 (1974)...........................................................................36

2

3

*Heideman v. S. Salt Lake City,*
    348 F. 3d 1182 (10th Cir. 2003) .....................................................27

4

5

*Johnson v. Couturier,*
    572 F.3d 1067 (9th Cir. 2009) .........................................................32

6

*Kraft, Inc. v. FTC,*
    970 F.2d 311 (7th Cir. 1992) ........................................................8, 9

7

8

*In the Matter of McGaughey,*
    24 F.3d 904 (7th Cir. 1997) .............................................................35

9

10

*Ohio Christian Coll.,*
    80 F.T.C. 815 (1972)........................................................................25

11

12

*Porter v. Warner Holding Co.,*
    328 U.S. 395 (1946)..........................................................................36

13

*Reebok Int'l, Ltd. v. McLaughlin,*
    49 F.3d 1387 (9th Cir. 1995) ...........................................................32

14

15

*Removatron Int'l Corp. v. FTC,*
    884 F.2d 1489 (1st Cir. 1989)............................................................9

16

17

*Resort Car Rental Sys., Inc. v. FTC,*
    518 F.2d 962 (9th Cir. 1975) .............................................................9

18

19

*SEC v. Bankers All. Corp.,*
    881 F. Supp. 673 (D.D.C. 1995).......................................................35

20

*SEC v. First Fin. Group of Texas,*
    645 F.2d 429 (5th Cir. Unit A May 1981) .........................................35

21

22

*SEC v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082 (2d Cir. 1972)......................................................32, 33

23

24

*SEC v. Parkersburg Wireless LLC,*
    156 F.R.D. 529 (D.D.C. 1994)..........................................................35

25

*SEC v. R.J. Allen & Assoc., Inc.,*
    386 F. Supp. 866 (S.D. Fla. 1974) ...................................28, 32, 35

26

27

*SEC v. Unifund SAL,*
    910 F.2d 1028 (2d Cir. 1990)..........................................................................................36

*Southwest Sunsites, Inc.,*
    105 F.T.C. 7 (1985), *aff'd*, 785 F.2d 1431 (9th Cir. 1986).....................................8

*In re Thompson Med. Co.,*
    104 F.T.C. 648 (1984))...............................................................................................9

*United States v. First Nat'l City Bank,*
    379 U.S. 378 (1965)....................................................................................................32

*United States v. Odessa Union Warehouse Co-op,*
    833 F.2d 172 (9th Cir. 1987) .....................................................................................27

*In re Vuitton et Fils, S.A.,*
    606 F.2d 1 (2d. Cir. 1979) ..........................................................................................37

## STATUTES & REGULATIONS

15 U.S.C. §§ 48 – 51 .......................................................................................................2

15 U.S.C. § 45.................................................................................................................1

15 U.S.C. § 45(a) .......................................................................................................2, 8

15 U.S.C. § 53(b) .....................................................................................................2, 24

12 C.F.R. Part 1015........................................................................................................1

12 C.F.R. § 1015.2 .......................................................................................................19

12 C.F.R. § 1015.3(a)...............................................................................................10, 18

12 C.F.R. § 1015.3(b) ..................................................................................................10

12 C.F.R. § 1015.3(b)(1)..............................................................................................14

12 C.F.R. § 1015.3(b)(3)(i), (ii), (iii), and (v)..............................................................17

12 C.F.R. § 1015.3(b)(4)..............................................................................................18

12 C.F.R. § 1015.4(a)...................................................................................................18

12 C.F.R. § 1015.4(b)(1), (2), (3) ...............................................................................19

12 C.F.R. § 1015.4(c) ........................................................................................19

12 C.F.R. § 1015.5(a) ........................................................................................19

12 C.F.R. § 1015.7 ............................................................................................21

12 C.F.R. § 1015.7(a) ........................................................................................21

12 C.F.R. § 1015.7(a)(2) ...................................................................................21

12 C.F.R. § 1015.7(a)(3) ...................................................................................21

12 C.F.R. § 1015.7(b) ........................................................................................22

Utah Code Ann. § 16-6a-110(4) ......................................................................25

**MISCELLANEOUS**

S. Rep. No. 130, 103rd Cong., 2d Sess. 15-16, reprinted in 1994 U.S. Code Cong.
& Admin. News 1776 ........................................................................................37

1    Since at least October 2011, Defendants have operated an unlawful mortgage assistance
2    relief services ("MARS") scam that has bilked consumers out of more than $11 million.
3    Defendants have targeted distressed homeowners with false promises that their team of expert
4    attorneys and legal professionals will obtain mortgage loan modifications that will make
5    consumers' mortgages more affordable and will stop or prevent foreclosure.  Defendants have
6    enticed consumers with numerous deceptive claims, including that they have a nearly perfect or
7    perfect track record of success (98-100%) in obtaining mortgage loan modifications and are
8    affiliated with or endorsed by the government or consumers' lenders.  Defendants have
9    instructed consumers to not pay their mortgages and not contact or respond to their lenders, and
10    have collected hefty illegal advance fees from consumers, typically six months of $650 payments
11    for a total of $3,900.  Despite their lofty promises and the extraction of thousands of dollars from
12    individual consumers, Defendants typically have not obtained mortgage loan modifications that
13    make consumers' mortgages more affordable.  Many victimized consumers have found
14    themselves with months of penalties, interest, and missed payments added to their mortgages,
15    and in some cases, have faced foreclosure, bankruptcy, and the loss of their homes.  Defendants
16    have violated Section 5 of the FTC Act, 15 U.S.C. § 45, and numerous provisions of the MARS
17    Rule (Regulation O), 12 C.F.R. Part 1015.

18    To stop this scam, the Federal Trade Commission ("FTC") hereby moves the Court,
19    pursuant to Fed. R. Civ. P 65(b), for an *ex parte* Temporary Restraining Order to halt
20    Defendants' unlawful conduct, freeze Defendants' assets to prevent dissipation and preserve
21    funds for consumer redress, appoint a temporary receiver over the Corporate Defendants to
22    preserve and marshal assets, grant the FTC and the receiver immediate access to Defendants'
23    business premises, permit limited expedited discovery, and require Defendants to show cause
24    why this Court should not issue a preliminary injunction extending such temporary relief
25    pending a final adjudication on the merits.

26

27

1

## I.   THE PARTIES

### A.   The Federal Trade Commission

The FTC is an independent agency of the United States Government created by the FTC Act. 15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC, through its own attorneys, to initiate federal district court proceedings to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  *See, e.g., FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994).

### B.   Defendants

Defendants run their mortgage relief scam as a common enterprise of eleven interrelated corporations controlled by three principals.

#### 1.   The Corporate Defendants

Corporate Defendants have gone by numerous corporate names over the years, and the companies have played varying roles in the common enterprise.  The latest iteration of the scheme centers on two Nevada companies, and an identically-named Utah company:

- **Consumer Defense, LLC ("Consumer Defense – Nevada")** is a Nevada limited liability company, formed on July 18, 2016.  (PX20 ¶ 16 at 9, Att. A at 48-49.) Consumer Defense – Nevada is one of the consumer-facing components of the common enterprise, placing its name and logo on Defendants' websites, and marketing Defendants' MARS services online and over the phone.  (*See, e.g.*, PX01 ¶ 9 at 3; PX09 ¶ 5 at 2, Att. A at 5-6, 8-13; PX11 ¶¶ 2-5 at 1-2; PX22 Att. C at 77-79.)  Defendants' representatives have begun more recently referring to themselves as employees of Consumer Defense – Nevada.  (*See, e.g.*, PX01 ¶¶ 6, 9 at 2-3, Att. B at 13 (consumer signed up with Preferred Law but then began interacting with employees with a "consumerdefense.com" email address); PX05 ¶ 3 at 1, Att. A at 9-11 (consumer signed up with Preferred Law and had to request a refund from Consumer Defense); PX11 ¶¶ 2-5 at 1-2, Att. A at 6; PX20 Att. S at 179:12-180:17.)  The company lists a Nevada address and phone number on Defendants' websites and contracts.  (*See, e.g.*, PX13 Att. A at 9-16; PX22 Att. H at 403.)

2

1

2

3

- **Consumer Link, Inc. ("Consumer Link")** is a Nevada corporation, incorporated purportedly as a non-profit on September 7, 2016.  (PX20 ¶ 17 at 9, Att. B at 55.) Consumer Link works in tandem with Consumer Defense – Nevada. (*See, e.g.*, PX13 Att. A at 15-17.)

4

5

6

- **Consumer Defense, LLC ("Consumer Defense – Utah")** is a Utah limited liability corporation, formed on February 11, 2016.  (PX20 ¶ 20 at 10, Att. H at 107-108).  It appears to be indistinguishable from Consumer Defense – Nevada with which it shares the same address and bank accounts. (*Id.* Table 4 at 5-6, ¶ 21 at 11, Att. HHH at 1277.)

7

8

9

10

     Prior to the rise of Consumer Defense and Consumer Link, Defendants more regularly presented themselves to consumers as the companies Preferred Law, American Home Loan Counselors, and Modification Review Board, although, as described below, consumers report that Defendants have still continued to use these names in some instances:

11

12

13

14

15

16

17

18

19

20

21

- **Preferred Law, PLLC ("Preferred Law")** is a Utah professional limited liability company, formed on October 26, 2011. (*Id.* Att. K at 132-33.)  Defendant Benjamin Horton filed its statement of dissolution on November 16, 2016, (*id.* at 138), although Defendants have continued to use the name "Preferred Law" in interactions with some consumers, (*see* PX07 Att. D at 25 (December 2016 email to consumer); PX16 Att. E at 20 (listing consumer payments to Preferred Law after November 16, 2016); PX23 Att. F at 41-42 (emails to consumer after November 16, 2016 stating that payments could be withdrawn in name of Preferred Law)).  Preferred Law evolved out of another purported law firm offering MARS in exchange for advance fees, Compass Law. (*See* PX10 ¶ 4 at 1, Att. A at 14 (listing individual defendants Jonathan and Sandra Hanley as authorized representatives of Compass Law); PX20 ¶ 37 at 17-18, Att. FF at 1015-17.)  Preferred Law has described itself to consumers as a law firm, (*see* PX02 ¶ 3 at 1; PX18 ¶ 7 at 3; PX22 ¶ 22 at 8, Att. I at 405), and has operated as the initial hub of Defendants' MARS operation.  Many consumers' MARS service contracts with Defendants are provided in the name of Preferred Law, (*see, e.g.*, PX02 ¶ 7 at 2, Att. A at 9-10; PX04 ¶ 9 at 2, Att. A at 6-15), and consumers report interacting with numerous representatives with preferredlawteam.com email addresses, (*see, e.g.*, PX03 Att. D at 19, Att. E at 21; PX12 Att. A at 7-11).

22

23

24

25

- **American Home Loan Counselors** is a Utah corporation, incorporated as a purported non-profit on September 21, 2012. (PX20 Att. E at 82-85.)  Defendant Jonathan Hanley filed its articles of dissolution on June 26, 2016.  (*Id.* at 90.)  American Home Loan Counselors has purported to be a non-profit MARS provider that works with Preferred Law, similar to Consumer Link and Consumer Defense. (*See, e.g.*, PX04 ¶ 10 at 2, Att. B at 17; PX20 Att. Y at 439:23-440:22, Att. Z at 559:25-561:18.)

26

27

- **Consumer Defense Group, LLC, f/k/a Modification Review Board, LLC ("Modification Review Board")** is a Utah limited liability company, formed under the

3

name Modification Review Board, LLC on October 26, 2011. (PX20 Att. J at 124-25.) It changed its name to Consumer Defense Group, LLC on January 12, 2017. (*Id.* Att. J at 130.) Modification Review Board has operated as one of the marketing and consumer intake components of the common enterprise, (*see* PX01 ¶ 6 at 2; PX20 Att. Z at 608:8-21), and has also provided many of the performance guarantee letters to consumers (*see, e.g.*, PX03 Att. A at 10-11; PX07 Att. A at 6).

Several corporations have primarily operated as payment collectors for the common enterprise:

- **American Home Loans, LLC ("American Home Loans")** is a Utah limited liability company, formed on August 20, 2012. (PX20 ¶ 19 at 10, Att. F at 92-93.) American Home Loans has operated as a payment collector for the Defendants, as some consumers have reported making some payments to American Home Loans for Defendants' mortgage assistance relief services. (PX06 ¶ 8 at 3, Att. A at 12-13; PX16 ¶ 20 at 7, Att. E at 20; PX19 Att. A at 10; *see* PX20 Table 9 at 26-27, Table 10 at 27-28 (American Home Loans merchant accounts and summary of consumer payments).) Defendants' call center representatives have also at times referred to themselves as employees of American Home Loans. (PX19 ¶¶ 3-5 at 1-2, Att. A at 7-8, 10-17; PX22 Att. J at 423:3-9.)

- **AM Property Management, LLC ("AM Property")** is a Utah limited liability company, formed on November 1, 2011. (PX20 ¶ 18 at 9-10, Att. D at 68-69.) AM Property has collected consumer payments on behalf of the common enterprise. (*See, e.g.*, PX02 ¶¶ 15-16 at 4, Att. G at 44-45, Att. H at 52; PX20 Table 9 at 26-27, Table 10 at 27-28 (AM Property merchant accounts and summary of consumer payments).)

- **FMG Partners, LLC ("FMG Partners")** is a Utah limited liability company, formed on October 31, 2011. (PX20 Att. I at 113-15.) FMG Partners has collected consumer payments on behalf of the common enterprise. (PX02 ¶ 15 at 4, Att. G at 44-45; PX20 Table 9 at 26-27, Table 10 at 27-28 (FMG Partners merchant accounts and summary of consumer payments), ¶ 68 at 31, Att. SS at 1185.) It has paid employees of the operation, (PX20 ¶ 86 at 39), and has also transferred money among the Corporate Defendants, (*id.* ¶ 94 at 43, Att. NNN at 1296-1302).

Finally, two other corporations also have acted as integral parts of the common enterprise, facilitating Defendants' scam by acting as financial conduits for the other companies and paying for services, including websites and office space:

- **Brown Legal, Inc. ("Brown Legal")** is a Utah corporation, incorporated on May 4, 2001. (*Id.* Att. G at 103-05.) Many of Defendants' websites have been registered in the name of Brown Legal, (*id.* Table 6 at 20-21, ¶ 77 at 35), and it has been a conduit for hundreds of thousands of dollars between other Defendants' bank accounts, (*id.* ¶ 94 at 43).

4

- **Zinly, LLC ("Zinly")** is a Utah limited liability company, formed on July 13, 2016. (*Id.* Att. L at 140-41.) Zinly owns one of the locations where Defendants' boiler rooms are located, (*id.* ¶ 24 at 12, Att. M at 144-46), and has also signed up for the delivery of mail to the virtual offices for Consumer Defense, LLC and Consumer Link, (*id.* ¶¶ 26-28 at 13-14, Att. O at 153, Att. P at 160).

### 2. The Individual Defendants

- **Jonathan P. Hanley** controls and operates most of the Corporate Defendants, and has been involved in the MARS business for years.[1] He is a manager of Preferred Law, American Home Loan Counselors, American Home Loans, Modification Review Board, Consumer Defense, Consumer Link, Brown Legal, AM Property, and Zinly, and is listed on most of the corporate papers for Corporate Defendants. (*Id.* Table 1 at 3-4.) He is a signatory on many of the corporate bank accounts, (*id.* Table 9 at 26-27 (merchant accounts), Table 11 at 38-39 (bank accounts), Table 12 at 40-41 (bank accounts)), and is the contact for many of Corporate Defendants' service providers, such as web domains, (*id.* ¶ 44, Table 6 at 20-21). Jonathan Hanley has responded to consumer complaints to the Better Business Bureau ("BBB") on behalf of Consumer Defense, Preferred Law, and Modification Review Board. (PX25 ¶ 4 at 1-2.) Jonathan Hanley paid for the Nevada mail drop and arranged for mail forwarding for Consumer Defense – Nevada and Consumer Link, the latest consumer-facing iteration of Defendants' MARS scam. (PX20 ¶¶ 26-28 at 13-14.)

- **Benjamin R. Horton** is an attorney employed by Defendants who is currently licensed only in the State of Texas. (PX26 ¶¶ 4-5 at 1-2.) Since September 15, 2016, Horton has been subject to a three-year suspension of his Utah bar license for violating bar ethics rules while employed by Defendants. (PX20 Att. FF at 1013-31.) Horton has served as a front for Defendants' claim that they will provide expert legal assistance to consumers to negotiate mortgage loan modifications, although he has been the only attorney employed by Defendants and the only quasi-legal service provided has been sending a form Qualified Written Request ("QWR") letter. (*See* PX02 Att. B at 11-26; PX04 ¶ 11 at 2; PX20 Att. Z at 496:9-18 (Horton claiming that submitting a QWR creates "an atmosphere in which a modification could take place"), Att. DD at 780:11-25, 785:13-787:9.) Horton is a manager of Preferred Law and has also been listed as a director and supervisor at American Home Loan Counselors. (PX20 Table 3 at 4-5, Att. DD at 823:16-17.) He has also been listed as an email contact on the virtual office leases for Consumer Defense and Consumer Link and the client contact for the virtual office leases for American Home Loans and Preferred Law. (*Id.* ¶¶ 26-29 at 13-14.) Horton has signed QWRs to

---

[1] Jonathan Hanley stated in his 2014 bankruptcy deposition that prior to starting Defendants' MARS business, he worked for The Law Offices of C.C. Brown, (PX20 Att. X at 306:25-307:12, 346:13-17; *see also id.* Att. T at 210-11, 214 (private consumer lawsuit in federal court against Hanley that references his involvement with C.C. Brown and alleges that the websites for Preferred Law and Modification Review Board were the same as the website for C.C. Brown)). He also worked for Compass Law, another Utah MARS provider. (PX10 Att. A at 14; PX20 ¶ 37 at 17-18, Att. X at 365:3-19.)

consumers' lenders on behalf of Preferred Law. (PX02 Att. B at 12-13; PX20 Att. Z at 496:9-18, Att. DD at 780:11-25, 785:13-787:9; *see also* PX04 Att. D at 29.) In some instances when challenged about their services, Defendants have claimed that consumers are paying for Horton's assistance with rights under federal laws or other phases of services and not loan modifications. (*See* PX04 Att. D at 29; PX13 ¶ 20 at 4, Att. G at 37-38; PX20 Att. Z at 558:18-559:15, 572:2-24, Att. DD at 785:13-786:8.)

- **Sandra X. Hanley** is the wife of Jonathan Hanley and a manager or director of Preferred Law, American Home Loan Counselors, Modification Review Board, Consumer Defense, Consumer Link, AM Property, and Zinly. (PX20 Table 2 at 4.) She is a signatory on numerous corporate bank accounts, (*id.* Table 11 at 38-39, Table 12 at 40-41), is in charge of employee payroll for the operation, (*id.* ¶¶ 50-51 at 23, Att. DD at 790:24-791:2), and has responded to chargebacks on many of Defendants' merchant accounts, (*id.* ¶ 66 at 30-31, Att. RR at 1170-1174). Sandra Hanley also appears on numerous consumer contracts as Defendants' representative who is authorized to negotiate with consumers' lenders or servicers for mortgage loan modifications. (*See, e.g.*, PX02 Att. A at 9; PX19 Att. A at 9.)

Corporate Defendants operate as a common enterprise to perpetuate their mortgage assistance relief services scheme. Payroll records indicate that Corporate Defendants have shared numerous employees, who have also referred to themselves as employees of different Corporate Defendants during the same transaction with the same consumer. (*See, e.g.*, PX03 ¶ 8 at 2; PX20 ¶ 54, Table 7 at 24-25; PX22 ¶ 13 at 4.) Bank records have demonstrated routine commingling of funds, with regular transfers between the various companies. (PX20 ¶¶ 93-94, Table 14 at 43.) Corporate Defendants have used identical or nearly identical contracts.[2] (*Compare* PX02 Att. D at 30-37 (Preferred Law contract) *with* PX14 Att. B at 12-14 (Consumer Defense contract) *and* PX19 Att. A at 12-17 (American Home Loans contract); *compare* PX04 Att. B at 17 (American Home Loan Counselors Borrower's Authorization) *with* PX13 Att. A at 17 (Consumer Link Borrower's Authorization).) Most importantly, Corporate Defendants have blurred corporate distinctions when interacting with consumers. Consumers often call one company, such as Preferred Law or Consumer Defense; receive contracts and forms from others, such as Modification Review Board, American Home Loan Counselors, or Consumer Link; and make payments to yet others, such as AM Property or FMG Partners. (*See, e.g.*, PX01 ¶¶ 3, 6, 9

---

[2] As described below, Corporate Defendants have also provided consumers with identical or nearly identical guarantee letters.

1    at 1-3, Att. A at 9-11, B at 13; PX02 ¶¶ 15-16 at 4-5, Att. G at 44-45, Att. H at 47-54; PX06 ¶ 8

2    at 3, Att. A at 12-13.)

3        Defendants have often represented to consumers that they are located in Nevada, using

4    mail drops located at 500 N. Rainbow Blvd., Suite 300, Las Vegas, Nevada and 200 S. Virginia,

5    8th Floor, Reno, Nevada in their communications and contracts. (*See, e.g.*, PX13 Att. A at 9-17;

6    PX16 Att. A at 11; PX19 ¶ 12 at 4, Att. A at 9; PX20 Table 4 at 6-7.) Defendants have also

7    listed as addresses—on corporate papers, bank statements, and consumer correspondence and

8    contracts—2825 E. Cottonwood Pkwy., Suite 500, Salt Lake City, Utah (a virtual office) and

9    P.O. Box 949, Sandy, Utah. (*See, e.g.*, PX04 Att. A at 6-12 (listing address of Preferred Law as

10   2825 E. Cottonwood Pkwy.); PX06 Att. F at 27-28 (address to send documents to Defendants is

11   P.O. Box 949); PX19 Att. A at 10-17 (listing address of American Home Loans as 2825 E.

12   Cottonwood Pkwy.); PX20 Table 4 at 6-7.) Property and service provider records and deposition

13   testimony from Horton's bar investigation proceeding, however, indicate that Defendants operate

14   out of two boiler rooms located at 41 West 9000 South, Sandy, Utah (a property owned by

15   Defendant Zinly) and 8180 South 700 East, Suite 110, Sandy, Utah. (*See* PX20 Table 4 at 5, Att.

16   M at 144-46, Att. DD at 793:10-14, 800:6-12; PX22 Att. C at 78 (Consumer Defense website

17   listing 8180 South 700 East as address).)

18       The FTC's action is not Defendants' first tangle with law enforcement for their deceptive

19   activities. Preferred Law is subject to a July 2016 Order to Cease and Desist issued by the

20   Connecticut Department of Banking. (PX20 Att. Z at 659-77.) Preferred Law, Modification

21   Review Board, and American Home Loan Counselors are subject to a November 2015 Final

22   Order to Cease and Desist issued by the Oregon Department of Consumer and Business Services,

23   (*id.* Att. AA at 699-706), and Defendant Horton is subject to a similar December 2016 Final

24   Order to Cease and Desist, (PX26 Att. B at 18-46). Meanwhile, Mr. Horton is subject to an

25   order by the Utah State Bar arising out of his activities with Defendants. On September 15,

26   2016, Mr. Horton agreed to a three-year suspension of his Utah bar license for violating bar

27   ethics rules, including when providing services to out-of-state consumers, (PX20 Att. FF at

7

1   1013-31), but has continued participating in the enterprise, receiving tens of thousands of dollars

2   in payments from Corporate Defendants, (*id.* Table 8 and n.12 at 25).

3   **II. DEFENDANTS' UNLAWFUL BUSINESS PRACTICES**

4         Since late 2011, Defendants have deceptively marketed mortgage assistance relief

5   services online and through mailers and radio ads.  Defendants' unlawful business practices fall

6   into three main categories:  (1) using false and misleading representations to market their

7   mortgage assistance relief services; (2) failing to make required disclosures during their

8   marketing presentations; and (3) collecting prohibited advance fees for their services.

9         **A. Defendants Use False, Deceptive, or Misleading Representations to Market**

10            **Mortgage Assistance Relief Services.**

11        Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting

12  commerce."  15 U.S.C. § 45(a).  An act or practice is deceptive if it involves a material

13  representation or omission that is likely to mislead consumers acting reasonably under the

14  circumstances.  *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *FTC v. OMICS*

15  *Grp. Inc.*, 2017 U.S. Dist. LEXIS 161910, at *5 (D. Nev. Sep. 29, 2017).  A misrepresentation is

16  material if it "involves information that is important to consumers and, hence, likely to affect

17  their choice of, or conduct regarding, a product."  *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196,

18  1201 (9th Cir. 2006).  Express claims are presumed material, so consumers are not required to

19  question their veracity to be deemed reasonable.  *See Pantron I Corp.*, 33 F.3d at 1095-96 (9th

20  Cir 1994).  Implied claims also are presumed material if there is evidence that the seller intended

21  to make the claim, *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992), or if the claims go to

22  the heart of the solicitation or the central characteristics of the product or service offered.

23  *Southwest Sunsites, Inc.*, 105 F.T.C. 7, 149 (1985), *aff'd*, 785 F.2d 1431 (9th Cir. 1986); *see also*

24  *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) (no loophole for implied deceptive

25  claims).

26        The FTC need not prove reliance by each consumer misled by Defendants.  *FTC v.*

27  *SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1275 (S.D. Fla. 1999).  "Requiring proof of subjective

8

1   reliance by each individual consumer would thwart effective prosecutions of large consumer

2   redress actions and frustrate the statutory goals of [Section 13(b)]." *Figgie Int'l*, 994 F.2d at 605.

3           In determining whether a representation is deceptive, courts examine its "net impression"

4   on consumers. *Cyberspace.com LLC*, 453 F.3d at 1200; *FTC v. Five-Star Auto Club, Inc.*, 97 F.

5   Supp. 2d 501, 528 (S.D.N.Y. 2000) ("[T]he Court must consider the misrepresentations at issue,

6   by viewing them as a whole without emphasizing isolated words or phrases apart from their

7   context." (brackets and internal quotation marks omitted)).  Further, the FTC need not prove that

8   Defendants make misrepresentations with the intent to deceive.  *See, e.g., Removatron Int'l*

9   *Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989); *FTC v. World Travel Vacation Brokers, Inc.*,

10  861 F.2d 1020, 1029 (7th Cir. 1988).

11          A representation is also deceptive if the maker of the representation lacks a reasonable

12  basis for the claim. *See FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010). Where

13  the maker lacks adequate substantiation evidence, they necessarily lack any reasonable basis for

14  their claims.  *Id.*; *Removatron Int'l Corp.*, 884 F.2d at 1498; *OMICS Grp. Inc.*, 2017 U.S. Dist.

15  LEXIS 161910, at *5.

16          Any disclaimers must be prominent and unambiguous to change the apparent meaning

17  and leave an accurate impression. *Kraft*, 970 F.2d at 325; *Removatron Int'l Corp.*, 884 F.2d at

18  1497. A qualification must be likely to come to the attention of the person who sees the basic

19  claim, and a qualification in small print or its equivalent is unlikely to be effective. *See FTC v.*

20  *Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1214 (D. Nev. 2011), *aff'd in part, vacated in part*,

21  763 F.3d 1094 (9th Cir. 2014).  Statements used to qualify otherwise deceptive statements must

22  be sufficiently clear and conspicuous. *See, e.g., In re Thompson Med. Co.*, 104 F.T.C. 648, 789

23  n.9 (1984).

24          Finally, it is well established that "[t]he Federal Trade Act is violated if [a seller] induces

25  the first contact through deception, even if the buyer later becomes fully informed before

26  entering the contract." *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975)

27  (per curiam) (citing *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961)); *OMICS*

1  | *Grp. Inc.*, 2017 U.S. Dist. LEXIS 161910, at *6; *FTC v. City W. Advantage, Inc.*, 2008 WL

2  | 2844696, at *2 (D. Nev. July 22, 2008).

3  |      Similarly, Section 1015.3(b) of the MARS Rule prohibits misrepresenting "any material

4  | aspect of any mortgage assistance relief service."  12 C.F.R. § 1015.3(b).  Meanwhile, Section

5  | 1015.3(a) of the MARS Rule prohibits any representation that "a consumer cannot or should not

6  | contact or communicate with his or her lender or servicer."  12 C.F.R. § 1015.3(a).

7  |      Here, Defendants make three core misrepresentations in order to market their purported

8  | mortgage assistance relief services.  In particular, Defendants misrepresent that:  (1) they will

9  | obtain loan modifications for consumers that will make consumers' payments substantially more

10 | affordable, substantially lower consumers' interest rates, or help consumers avoid foreclosure;

11 | (2) they are affiliated with or endorsed by the government or consumers' lenders; and (3)

12 | consumers are not obligated to pay their mortgages.  In addition, Defendants represent to

13 | consumers that they should not contact or communicate with their lenders or servicers.

14 |     **1.  Defendants Make False Promises about Obtaining Loan Modifications.**

15 |      Defendants' core promise to distressed homeowners is that they will provide expert legal

16 | assistance to obtain mortgage loan modifications that will result in substantial payment and

17 | interest rate reductions and will help homeowners avoid foreclosure.  Defendants have often

18 | attracted consumers through internet advertising, and then follow up with sales calls with strong

19 | claims of success, including guarantees.  But in many cases, Defendants have failed to deliver on

20 | their promises, and consumers are left facing financial ruin.

21 |      Defendants' websites have often provided the gateway for consumers to learn about

22 | Defendants' purported services and receive the sales pitch.[3]  One of Defendants' websites,

23 | attorneyloanmodifications.com, directs consumers to submit their contact information and states:

24 | "**Fill the form** below to handle your home loan modification application, it might be your only

25 | ──────────────────────

26 | [3] Defendants' websites are similar in form and content.  (*See* PX22 ¶¶ 5-6, Table 1 at 2-3.)  In addition to their English-language websites, Defendants market to consumers through a Spanish-language website, similar to its English-language analogue and likely produced through Google

27 | Translate or another auto-translation program.  (PX21 ¶¶ 4-5 at 1-2.)

1   chance to get what you deserve! *We can help you <u>keep</u> your home!*" (PX22 Att. C at 77.)

2           On another page, the website also urges consumers to contact Defendants' attorneys for

3   assistance with loan modifications because consumers are less likely to be able to obtain one on

4   their own:

5           The only consistently good way to deal with a bad home loan situation is by

6           consulting a lawyer to handle the home loan modification application. Getting
            good legal representation is the best method for ensuring one's interests are

7           protected in often tense negotiations. This is not something to do alone.

8   (*Id.* at 117.) Defendants have also specifically cited examples of their success in obtaining loan

9   modifications. Another website, homerelief.com, contains several purported examples of

10  consumers who obtained loan modifications, such as the following:

11          **Borrower was 7 months behind. MONTHLY PAYMENT CUT OVER 60%!**
            **Borrower now saving over $24,000.00 a year!**
12          Lender: IndyMac
            Old Payment: $3,496.21
13          Old Rate: 8.00%
            New Payment: $1,474.26
14          New Rate: 2.50%

15  (*Id.* Att. H at 403.) When consumers have responded to Defendants' advertising and spoken

16  with Defendants' representatives on the phone, they have received the same types of pitches

17  visible online, and even stronger claims of success. In many instances, Defendants'

18  representatives guarantee to consumers that Defendants will obtain loan modifications that will

19  result in payment reductions of hundreds of dollars a month and will cut interest rates in half, and

20  tout perfect or near perfect (98%) track records of success in obtaining modifications.[4] (PX01 ¶

21  3 at 1; PX02 ¶ 3 at 1-2; PX03 ¶¶ 3-4 at 1; PX04 ¶¶ 4-5, 7 at 1-2; PX05 ¶ 3 at 1; PX06 ¶ 3 at 1;

22  PX07 ¶¶ 2, 4-5 at 1; PX08 ¶ 3 at 1; PX09 ¶¶ 3-5 at 1-2; PX11 ¶¶ 3-4, 8 at 1-2, Att. A at 6 (email

23  to consumer stating Defendants "***consistently*** receive approvals with the best terms and

24  ────────────────

25  [4] Defendants provided a money-back guarantee in a recent undercover consumer call conducted
    by FTC staff ("So we do guarantee our work 100 percent," and "worst case scenario, yeah, if
26  we're not able to do it, then we do refund any funds that we've charged you."). (PX22 Att. J at
    424:12-13, 425:24-25.)

27

1    conditions because of their small case load and strong negotiating position) (emphasis in

2    original); PX12 ¶¶ 3, 6 at 1-2; PX13 ¶¶ 7, 11 at 1-3, Att. A at 15, Att. B at 19; PX14 ¶¶ 12, 13 at

3    2-3, Att. A at 8; PX15 ¶¶ 4-5 at 1-2; PX16 ¶¶ 3-4, 1-2; PX17 ¶ 4 at 1; PX18 ¶ 4 at 2; PX19 ¶ 3 at

4    1-2; PX20 Att. T at 215, Att. Y at 427:11-24, 445:1-13, 455:27-31 to 456:3, 459; PX22 ¶¶ 23,

5    36, 48, 57 at 8, 12, 15, 17; PX23 ¶¶ 3, 5 at 1-2.)  And in many cases, Defendants have actually

6    provided this guarantee in writing:

7

8          Based on the past performance of American Home Loan Counselors with the
          assistance of Preferred Law's federal legal services, and our knowledge of your
          factual situation, MRB [Modification Review Board] hereby GUARANTEES that

9          a modification or home foreclosure alternative pursuant to the HAFA program
          will be secured for you conditioned upon the following terms . . .

10

11    (PX03 ¶ 7 at 2, Att. A at 10-11; PX 07 ¶ 5 at 1, Att. A at 6; PX08 ¶ 7 at 2-3, Att. B at 22

12    (similar guarantee form); PX09 ¶ 5 at 2, Att. A at 5 to 6 (similar guarantee form and

13    consumer instructed in email to cross out "N/A" on another contract form that stated "no

14    guarantee"); PX13 Att. A at 15 (similar guarantee form); PX16 ¶ 8 at 4, Att. A at 11

15    (similar guarantee form); PX19 Att. A at 11 (similar guarantee form); PX22 Att. N at 449

16    to 450, Att. T at 496 to 497; PX23 Att. A at 28.)  The "conditions" have consisted of

17    items easily satisfied by Defendants' customers such as timely returning documents and

18    paying fees to Defendants and ensuring that any information provided to Defendants is

19    and remains accurate and complete.[5]  (PX03 Att. A at 10-11; PX07 Att. A at 6-7; PX08

20    Att. B at 22; PX09 Att. A at 6; PX13 Att. A at 15; PX16 Att. A at 11; PX19 Att. A at 11;

21    PX23 Att. A at 28.)

22

---

23    [5] The list of conditions also states: that consumers "allow American Home Loan Counselors to
     process the modification and [consumers] promptly cooperate with Preferred Law and American

24    Home Loan Counselors at all times"; that consumers immediately forward any communications
     from lenders to Preferred Law; that consumers will have "no significant changes to [their]

25    current circumstances"; that consumers "recognize that this guarantee is from MRB"; that
     disputes will be resolved by binding arbitration in Salt Lake City, Utah; and that the guarantee

26    agreement constitutes the "entire agreement" between the parties. (*See, e.g.*, PX03 Att. A at 10-
     11.)

27

1    Despite their strong promises, Defendants have generally failed to obtain any loan
2    modifications for consumers.  (PX02 ¶ 23 at 6; PX03 ¶¶ 14, 19 at 4-5; PX04 ¶ 20 at 4; PX05 ¶¶
3    9, 12 at 2-3; PX06 ¶¶ 22, 27 at 8-9; PX07 ¶ 14 at 3; PX08 ¶¶ 11, 15 at 4-5; PX09 ¶¶ 7, 10 at 3;
4    PX11 ¶ 15 at 3-4; PX13 ¶ 14 at 3; PX14 ¶¶ 19, 22, at 4-5; PX15 ¶¶ 12, 16 at 3-4; PX16 ¶ 23 at 8;
5    PX17 ¶ 16 at 4; PX18 ¶¶ 14, 16 at 5; PX19 ¶ 14 at 4; PX20 ¶ 41 at 19; PX22 Table 2 at 6.)  In
6    many cases, after months of paying Defendants, consumers have learned that they have been
7    denied for modifications, (PX06 ¶¶ 16, 18, 27 at 5-6, 9; PX09 ¶ 7 at 3; PX11 ¶ 15 at 3-4; PX13 ¶
8    14 at 3; PX14 ¶ 19 at 4), that the lenders have not received complete modification packages from
9    Defendants, (PX04 ¶ 14 at 3; PX05 ¶¶ 7-8 at 2; PX06 ¶ 16 at 6; PX07 ¶¶ 10-11 at 2; PX20 ¶ 41
10   at 19), or that the lenders have not been contacted at all by Defendants, (PX01 ¶ 12 at 4; PX02 ¶
11   19 at 5; PX08 ¶¶ 11-12 at 4; PX15 ¶ 12 at 3 (lender said it did not receive any documents from
12   Defendants); PX16 ¶ 17 at 6; PX17 ¶¶ 8, 12 at 2-3; PX18 ¶¶ 11, 16 at 4-5).  In the rare case
13   where Defendants have obtained a modification offer, it has contained worse terms than
14   consumers' original loans, such as a higher monthly payment.  (PX12 ¶ 9 at 2-3; PX23 ¶¶ 18, 23
15   at 6, 8 (Defendants entered consumer into modification with higher monthly payment without
16   her consent).)  Most victimized consumers have fallen further behind on their loans, fallen into
17   foreclosure or bankruptcy, or have actually lost their homes.  (PX01 ¶ 16 at 5 (foreclosure);
18   PX02 ¶ 23 at 6 (three years behind on mortgage payments); PX03 ¶ 19 at 5 (bankruptcy and
19   facing foreclosure); PX06 ¶ 27 at 9 (further in debt); PX07 ¶ 14 at 3 (facing foreclosure); PX08 ¶
20   15 at 5 (two years behind on mortgage payments); PX09 ¶¶ 9-10 (months behind on mortgage,
21   foreclosure initiated for a period, consumer filed for bankruptcy, and monthly mortgage
22   payments increased); PX11 ¶¶ 15, 17 at 4-5 (behind on mortgage, monthly mortgage payments
23   increased); PX12 ¶¶ 14-15 at 4 (foreclosure); PX13 ¶ 27 at 6 (short sale); PX16 ¶¶ 22-23
24   (foreclosure); PX17 ¶¶ 16-17 at 4-5 (bankruptcy and damaged credit); PX18 ¶¶ 12-14 at 4-5
25   (foreclosure initiated); PX22 Table 2 at 6-7.)  Despite its guarantees of success, in many
26   instances, Defendants have failed to provide full refunds for consumers who request them.
27   (PX01 ¶ 13 at 4; PX02 ¶ 21 at 6; PX03 ¶¶ 15-18 at 4-5, Att. E at 21; PX04 ¶ 19 at 4; PX05 ¶ 10

1    at 2-3; PX06 ¶¶ 23-24 at 9; PX07 ¶ 12 at 3; PX08 ¶ 14 at 4-5, Att. E at 29-38; PX09 ¶ 8 at 3;

2    PX12 ¶ 12 at 4; PX13 ¶¶ 26-27 at 6, Att. J at 46-48 (Defendant Jonathan Hanley blaming

3    consumer for failure to get a modification and refusing to provide refund unless consumer agrees

4    to sign a release), Att. L at 52 (Defendant Jonathan Hanley refusing to provide refund because of

5    consumer's threats to file complaints); PX14 ¶ 25 at 5; PX15 ¶¶ 15-19 at 3-5, Att. F at 29; PX16

6    ¶ 18 at 7; PX17 ¶¶ 11, 13 at 3-4; PX18 ¶ 14 at 5; PX19 ¶¶ 11, 14 at 3-4, Att. B at 20-21.)

7            Thus, Defendants violate Section 5 of the FTC Act, as alleged in Count I of the

8    Complaint, and Section 1015.3(b)(1) of the MARS Rule,[6] as alleged in Count V.a of the

9    Complaint.

10           **2.  Defendants Make False Claims of Government and Lender Affiliation and
11               Endorsement.**

12           In order to convince consumers to sign up with them, Defendants have falsely claimed

13    that they are affiliated or associated with the government, the consumers' lenders, or certain

14    government loan modification programs, including the Making Home Affordable (MHA)

15    program and Home Affordable Modification Program (HAMP).  These government programs

16    have been widely publicized by numerous major mortgage lenders and servicers, non-profit and

17    community-based organizations, the federal government, and the news media.  In numerous

18    instances, Defendants' representatives have also frequently referred to MHA and HAMP during

19    calls with consumers and on their websites, reinforcing consumers' awareness of these programs.

20    (*See, e.g.*, PX22 Att. A at 58-59, Att. C at 85; PX24 at 19:16-21.)

21           Defendants' representatives have frequently claimed that they are affiliated with these

22    programs in telemarketing calls.  (PX01 ¶¶ 3, 15 at 1, 5; PX14 ¶ 12 at 2; PX16 ¶¶ 3-4 at 1-2.)  To

23    reinforce that false claim, Defendants send follow-up letters to consumers with a doctored

24    government logo that asserts Defendants are "FRIENDS OF" the MHA program.

25

26    _____

27    [6] Section 1015.3(b)(1) of the MARS Rule prohibits misrepresenting the "likelihood of
      negotiating, obtaining, or arranging any represented service or result."  12 C.F.R. § 1015.3(b)(1).



(official MHA logo)[7]

(Defendants' doctored MHA logo)

(PX09 Att. A at 6; PX13 Att. A at 15-16; PX16 ¶ 8 at 4, Att. A at 11; PX19 ¶ 5 at 2, Att. A at 11; *see also* PX22 ¶ 35 at 11-12 (consumer initially thought Modification Review Board was affiliated with the government); PX23 ¶ 6 at 2 (Defendants' paperwork referencing government housing counseling specialists led consumer to believe Defendants may have been affiliated with the government); PX26 ¶¶ 22-23 at 5-6 (consumer thought Consumer Defense was affiliated with "Hardest Hit" government program), ¶¶ 31d-f, p. at 8-9, 11 (same).)  In fact, while the Department of Housing and Urban Development maintains a list of approved housing counselors, Defendants are not on that list.  (PX20 ¶¶ 22-23 at 11-12.)

Similarly, Defendants have misrepresented to many consumers that they have a track record of success with particular lenders or some sort of special "in" that will make it more likely to negotiate a loan modification.  (PX08 ¶¶ 3, 10 at 1-2, 10; PX11 ¶ 3 at 1; PX12 ¶ 4 at 1; PX13 ¶ 7 at 1-2; PX14 ¶ 12 at 2; PX16 ¶ 4 at 2; PX17 ¶ 4 at 1; PX19 ¶ 3 at 1; PX20 Att. Y at 440:8-10; PX22 Table 2 at 7, Att. J at 421:8-11; PX23 ¶ 3 at 1-2; PX24 Att. A at 21:19-21.)  In response to questions about particular lenders' receptiveness to loan modification requests, Defendants have assured consumers that they have special contacts at the lenders.  (PX22 Att. C at 106-07.)

---

[7] The official logo is on the homepage of the MHA Program at www.makinghomeaffordable.gov.

1   Defendants' representatives have also made such representations on sales calls to consumers:  for
2   example, one consumer declarant reported that Defendants' representatives told her that they had
3   special contacts with her lender.  (PX13 ¶ 7 at 1-2.)  Another consumer declarant was told by
4   Defendants' representatives that Defendants had special knowledge about his lender, Bank of
5   America, and that Defendants were the only loan modification negotiators that were able to have
6   success with Bank of America.  (PX08 ¶ 3 at 1-2.)  A recorded undercover call with one of
7   Defendants' representatives is illustrative of these claims:

> ...we work with Wells Fargo all the time.  They are difficult to work with;
> however, we know how to work with them.  And so we're literally talking to, you
> know, the underwriter.  So we talk to somebody completely different than what
> [sic] you would talk to.

11  (PX22 Att. J at 428:6-11.)  Despite their claims, Defendants are neither affiliated with nor
12  endorsed by any governmental entity or program, (PX20 ¶¶ 22-23 at 11-12), nor do they have
13  any particular special relationship with specific lenders, (PX04 ¶ 15 at 3; PX14 ¶ 19 at 4; *see*
14  PX11 ¶ 15 at 3-4 (Defendants later told consumer that Deutsche Bank does not do
15  modifications); PX19 ¶ 13 at 4 (consumer's lender said it normally does not refer consumers to
16  third-party modification companies)).  In contrast, to the extent they do anything at all and in the
17  best possible light, Defendants simply collect and forward standard modification application
18  documents to consumers' lenders.  (*See* PX02 ¶ 14 at 4, Att. F at 41; PX12 ¶¶ 7, 11, 15 at 2, 4.)
19  Indeed, some lenders have explicitly told consumers that they do not work with third party
20  modification negotiators like Defendants.  (PX04 ¶ 15 at 3; PX14 ¶ 19 at 4; *see* PX11 ¶ 15 at 3-4
21  (Defendants later told consumer that Deutsche Bank does not do modifications); PX19 ¶ 13 at 4
22  (consumer's lender said it normally does not refer consumers to third-party modification
23  companies).)

24      By falsely claiming affiliation with the government and consumer's lenders, Defendants
25  violate Section 5 of the FTC Act, as alleged in Counts II.a and II.b of the Complaint, and

26
27

16

Sections 1015.3(b)(3)(i), (ii), (iii), and (v) of the MARS Rule,[8] as alleged in Count V.b of the Complaint.

### 3. Defendants Make False Claims that Consumers Are Not Obligated to Pay Their Mortgages and Should Not Contact or Communicate with Their Lenders or Servicers.

To reassure struggling homeowners who are wary about paying Defendants' hefty fees in addition to their mortgages, Defendants in many cases have explicitly told consumers that they do not have to pay their mortgages or have actually instructed consumers to not pay their mortgages. (*See* PX01 ¶ 4 at 2 (consumer told that payments to Defendants would be forwarded to mortgage lender); PX02 ¶ 6 at 2; PX03 ¶ 6 at 2; PX04 ¶ 5 at 1; PX05 ¶ 3 at 1; PX06 ¶ 4 at 1; PX07 ¶ 4 at 1; PX08 ¶ 3 at 1; PX09 ¶ 4 at 1; PX11 ¶¶ 4-5 at 1-2, Att. A at 6; PX13 ¶ 7 at 2; PX14 ¶ 13 at 3, Att. A at 8; PX15 ¶ 4 at 1; PX16 ¶ 5 at 2; PX17 ¶ 5 at 2; PX18 ¶ 7 at 3; PX20 Att. Y at 426:15-23, 443:29 to 444:9; PX22 Att. J at 420:15-24; PX23 ¶ 4 at 2; PX24 Att. A at 23:8-9, 26:17-27:6.) Defendants have often justified this advice by stating that because Defendants will obtain loan modifications that will result in a new loan, consumers should not make regular monthly mortgage payments. (*See* PX02 ¶ 6 at 2; PX05 ¶ 3 at 1; PX06 ¶ 4 at 1; PX07 ¶ 4 at 1; PX08 ¶ 3 at 1; PX09 ¶ 4 at 1-2.) In other cases, Defendants have said that lenders will not accept payments while a modification is in process, (PX17 ¶ 5 at 2; PX22 Att. J at 420:15-24), or that consumers will not be eligible for a loan modification unless they are behind on mortgage payments, (PX20 Att. Y at 443:29-444:9; PX22 Att. J at 426:14-17; PX24 Att. A at 27:10-11). For example, in a written "Explanation of Why You Should Do the Modification," Defendants claimed "You have to be 61 days behind on your mortgage to be eligible for any modification. You may continue to pay on your loan after that but it really will make no difference. Please reconsider your options." (PX26 Att. A at 16.) In many cases, Defendants

---

[8] Section 1015.3(b)(3) of the MARS Rule prohibits misrepresenting that "a mortgage assistance relief service is affiliated with, endorsed or approved by, or otherwise associated with: (i) The United States government, (ii) Any governmental homeowner assistance plan, (iii) Any Federal, State, or local government agency, unit, or department, . . . (v) The maker, holder, or servicer of the consumer's dwelling loan." 12 C.F.R. § 1015.3(b)(3)(i), (ii), (iii), and (v).

1    have also told consumers that they should not contact or communicate with their lenders or

2    servicers.  (PX02 ¶ 6 at 2; PX03 ¶ 6 at 2; PX06 ¶ 4 at 1; PX08 ¶ 6 at 2; PX09 ¶ 4 at 1-2; PX11 ¶

3    4 at 1; PX12 ¶¶ 4, 8 at 1-2; PX14 ¶ 15 at 3; PX16 ¶ 5 at 1-2; PX17 ¶ 5 at 2; PX22 ¶ 36 at 12;

4    PX23 ¶ 7 at 2-3.)  As a result, many consumers have fallen months behind on their loans,

5    accrued penalties and interest, and have gone into or are facing foreclosure.  (PX01 ¶ 16 at 5;

6    PX03 ¶ 19 at 5; PX07 ¶ 14 at 3; PX12 ¶¶ 14-15 at 4; PX13 ¶ 27 at 6 (short sale); PX16 ¶¶ 22-23;

7    PX22 Table 2 at 6-7.)

8            By advising consumers not to contact their lenders, Defendants violate Section 1015.3(a)

9    of the MARS Rule,[9] as alleged in Count IV of the Complaint, and by misrepresenting that

10   consumers are not obligated to pay their mortgage, Defendants violate Section 5 of the FTC Act,

11   as alleged in Count II.c, and Section 1015.3(b)(4) of the MARS Rule,[10] as alleged in Count V.c

12   of the Complaint.

13           **B.  Defendants Fail to Make Required Disclosures.**

14           Defendants compound their false statements by failing to make affirmative disclosures

15   required under the MARS Rule.  Under the Rule, all general commercial communications must

16   disclose clearly and prominently: (1) "(Name of company) is not associated with the

17   government, and our service is not approved by the government or your lender" and (2) "Even if

18   you accept this offer and use our service, your lender may not agree to change your loan."  12

19   C.F.R. § 1015.4(a).  Similarly, all consumer-specific commercial communications must state in a

20   clear and prominent manner: (1) "You may stop doing business with us at any time.  You may

21   accept or reject the offer of mortgage assistance we obtain from your lender [or servicer].  If you

22   reject the offer, you do not have to pay us.  If you accept the offer, you will have to pay us (insert

23   amount or method for calculating the amount) for our services," (2) "(Name of company) is not

24   _____

25   [9] Section 1015.3(a) of the MARS Rule prohibits representing "that a consumer cannot or should not contact or communicate with his or her lender or servicer."  12 C.F.R. § 1015.3(a).

26   [10] Section 1015.3(b)(4) of the MARS Rule prohibits misrepresentations regarding a "consumer's obligation to make scheduled periodic payments or any other payments pursuant to the terms of

27   the consumer's dwelling loaning."  12 C.F.R. § 1015.3(b)(4).

1    associated with the government, and our service is not approved by the government or your

2    lender," (3) "Even if you accept this offer and use our service, your lender may not agree to

3    change your loan," and (4) where the provider has represented that the consumer should

4    temporarily or permanently discontinue payments, in whole or in part, on a dwelling loan, "If

5    you stop paying your mortgage, you could lose your home and damage your credit rating."  12

6    C.F.R. § 1015.4(b)(1), (2), (3), and 1015.4(c).

7         Here, Defendants have failed to clearly and prominently make these required disclosures,

8    both in their general and consumer-specific commercial communications.  Defendants' websites

9    either do not contain the required general commercial disclosures at all, or bury them in small

10   footnotes at the bottom of the page or through a small hyperlink located at bottom of the page.[11]

11   (*See* PX22 ¶ 12 at 3-4, Att. C at 78, 360, Att. H at 403.)  In many cases, Defendants'

12   representatives also never provided the required consumer-specific commercial disclosures on

13   consumer calls.  (PX01 ¶ 15 at 4; PX05 ¶ 3 at 1 (no warning of consequences from failing to pay

14   mortgage); PX06 ¶ 6 at 2; PX16 ¶ 23 at 8-9; PX17 ¶ 16 at 4-5; PX19 ¶ 14 at 4-5; PX22 ¶¶ 24, 57

15   at 9, 17 (no warning of consequences from failing to pay mortgage); PX23 ¶ 22 at 7-8.)  Thus,

16   Defendants violate Section 1015.4 of the MARS Rule, as alleged in Count VI of the Complaint.

17        **C. Defendants Illegally Collect Advance Fees for their Services.**

18        In all or nearly all cases, Defendants have collected illegal advance fees for their

19   purported mortgage assistance relief services.   Under the MARS Rule, providers are prohibited

20   from requesting or receiving "payment of any fee or other consideration until the consumer has

21   executed a written agreement between the consumer and the consumer's loan holder or servicer

22   that incorporates the offer that the provider obtained from the loan holder or servicer."  12 C.F.R.

23   § 1015.5(a).

24

25

26

27   [11] The MARS Rule specifically defines "clear and prominent" to "be unavoidable, *i.e.*, visible to consumers without requiring them to scroll down a webpage."  12 C.F.R. § 1015.2.

Here, Defendants' typical service contract requires consumers to make six months of payments of $650, for a total of $3,900.[12] (*See* PX02 Att. B at 10 ($3,900 in five months); PX03 Att. A at 12; PX 04 Att. B at 24; PX05 ¶ 4 at 1; PX07 ¶ 5 at 1; PX08 ¶ 4 at 2, Att. A at 19; PX09 Att. A at 8; PX11 Att. B at 13-14 (four months at $974); PX13 ¶ 9 at 2, Att. A at 9 ($3,900 in three months); PX14 ¶ 14 at 3, Att. B at 16; PX15 ¶ 6 at 2 (around $700/month for six months); PX16 ¶ 5 at 2; PX17 ¶ 5 at 2 (total of $3,900); PX18 ¶ 8 at 3; PX19 ¶ 3 at 1, Att. A at 10 (three monthly payments of $1,300); PX22 ¶ 26 at 9, Att. W at 518 ($3,900 in eight months); PX23 ¶ 6 at 2, Att. A at 16.)  Defendants have begun charging consumers' credit or debit cards immediately after consumers sign up, and have continued to make monthly charges even though they have not presented consumers with loan modification offers to which consumers subsequently agree. (PX01 ¶¶ 7, 10, 16 at 3, 5; PX02 ¶ 5 at 2; PX03 ¶¶ 6, 19 at 2, 5; PX04 ¶¶ 5, 9, 16, 20 at 1-4; PX05 ¶¶ 4-5, 8, 12 at 1-3; PX06 ¶ 27 at 9; PX07 ¶¶ 5, 14 at 1, 3; PX08 ¶¶ 13, 15 at 4-5; PX09 ¶¶ 6, 7, 10 at 2-3, Att. A at 8; PX11 ¶ 17 at 4, Att. I at 54-59; PX12 ¶¶ 5, 8, 13, 15 at 2, 4; PX13 ¶¶ 13-14, 17 at 3; PX14 ¶ 25 at 5, Att. G at 52 to 53; PX15 ¶ 13 at 3; PX16 ¶ 23 at 8; PX17 ¶ 7 at 2; PX18 ¶¶ 7-8, 16 at 3, 5; PX19 ¶ 3 at 1 to 2; PX23 ¶ 4 at 2.)  In some cases, Defendants have bizarrely asserted that their fees are not "up-front" because they purportedly start working on consumers' files soon after consumers sign up with Defendants, and that consumers should watch out for "scammers" who do charge up-front fees:

> You know, another good thing, we don't take any money up-front from you.  And I should warn you of that.  If anyone does want money up-front from you, I would definitely run away.  That's a red flag.  There are a lot of scammers out there.  So do not take -- let them take money from you up-front. . . . We don't take money up-front.  We give you about two weeks and we're already working on your file as soon as we get documents back from you in order to work with your lender.

(PX22 Att. J at 424:16-21, 23-25-425:1; *see also* PX13 Att. B at 19-20 (email from employee stating "nothing [no payments needed] upfront.  Just the payments notated on the scheduled payment form."); PX20 Att. Y at 444:11-16 (sales representative advising to not pay

---

[12] Some consumers have reported signing up to pay much more than $3,900.  (PX01¶ 4 at 2 ($5,000); PX06 ¶ 4 at 1 ($6,000); PX22 ¶ 38 at 13 (consumer ended up paying close to $5,000).)

1  modification companies "money up front because they're frauds," but that Defendants "earn our

2  money monthly"); PX23 Att. A at 10 (email from employee stating that "[t]here are no upfront

3  fees for legal services").)  Despite Defendants' disingenuous mischaracterization of the meaning

4  of "up-front" in this instance, Defendants have admitted in at least one case on a merchant

5  account application that they charge "upfront application fees."  (PX20 ¶ 78 at 36, Att. AAA at

6  1233.)  Also, in many cases, consumers have stated that Defendants explicitly told them that no

7  work would be done until Defendants received payment.  (PX01 ¶ 4 at 2; PX02 ¶ 5 at 2; PX04 ¶

8  5 at 1; PX17 ¶ 7 at 2; PX19 ¶ 3 at 1 to 2; PX23 ¶ 4 at 2.)  And in numerous cases when

9  consumers have fallen behind on their payments to Defendants, they have been told that

10  Defendants will cease working on their files until they have caught up.  (PX02 ¶ 12 at 3-4, Att. E

11  at 39; *see also* PX06 ¶ 13 at 4 and Att. C at 17 (consumer file on hold until consumer updated

12  payment information); PX16 Att. B at 13 (describing fee to remove "payment hold" on file if

13  incurred); PX18 ¶ 7 at 3.)

14      Defendants' collection of advance fees is in clear violation of Section 1015.5(a) of the

15  MARS Rule, as alleged in Count III of the Complaint.[13]

16  _____

[13] The MARS Rule includes an exemption for attorneys under certain, narrow circumstances. 12

17  C.F.R. § 1015.7. However, the exemption does not apply to any Defendant in this action. The
corporate defendants and individual defendants Jonathan Hanley and Sandra Hanley, who are not

18  attorneys, cannot avail themselves of the exemption because, under the plain language of the
Rule, only individual attorneys can be exempted. 12 C.F.R. § 1015.7(a) ("An attorney is exempt

19  from this part . . . if the attorney . . ."); *see also FTC v. A to Z Mktg., Inc.*, 2014 WL 12479617, at
*4 (C.D. Cal. Sept. 17, 2014)) (finding law firm defendants and non-attorney defendant

20  associated with the mortgage assistance law firms are liable for violations under the MARS

21  Rule). Individual defendant Horton also does not qualify for the exemption. Although he is
licensed to practice law in Texas (his Utah license is currently revoked), (PX26 ¶¶ 4-5 at 1-2),

22  Defendants have signed up consumers around the country, and the exemption applies only if the
attorney, *inter alia*, "is licensed to practice law in the state in which the consumer for whom the

23  attorney is providing mortgage assistance relief services resides or in which the consumer's
dwelling is located." 12 C.F.R. § 1015.7(a)(2). Additionally, as he admitted in his September

24  2016 agreement with the Utah State Bar to suspend his Utah bar license for three years, Horton
did not comply with Utah bar ethics rules, a requirement for an attorney to be exempt from the

25  MARS Rule. (PX20 Att. FF at 1013-31; *see* 12 C.F.R. § 1015.7(a)(3) (attorney must "compl[y]

26  with state laws and regulations that cover the same type of conduct the rule requires"). Further,
even if Horton met the attorney exemption, Defendants would still be barred from collecting

27  advance fees unless they: (1) deposited fees in client trust accounts and (2) maintained those

**D. Defendants' Practices Have Squeezed Millions of Dollars from Consumers and Generated Hundreds of Complaints.**

Defendants' scam has caused substantial consumer losses, and has been correspondingly lucrative for Defendants.  Defendants' corporate bank records indicate that, between January 2012 and the present, they have extracted more than $11 million in illegal advance fees from deceived consumers.  (PX20 ¶¶ 58-59, Table 10 at 27-28.)  A review of bank records indicates that essentially none of the advance fees are deposited in client trust accounts.  (*Id.* ¶ 91 at 42; *see also id.* Att. DD at 895:5-896:11.)  Despite their guarantee of success, Defendants often refuse or ignore requests for refunds by the many consumers they have failed.  (PX02 ¶ 21 at 6; PX03 ¶¶ 15-18 at 4-5, Att. E at 21; PX04 ¶ 19 at 4; PX06 ¶ 23 at 9; PX07 ¶ 12 at 3; PX08 ¶ 14 at 4-5, Att. E at 29-38; PX09 ¶ 8 at 3; PX12 ¶ 12 at 4; PX13 ¶¶ 26-27 at 6, Att. J at 46-48, Att. L at 52; PX14 ¶ 25 at 5; PX15 ¶¶ 15-19 at 3-5, Att. F at 29; PX16 ¶ 18 at 7; PX17 ¶¶ 11, 13 at 3-4; PX18 ¶ 14 at 5; PX19 ¶¶ 11, 14 at 3-4, Att. B at 20-21.)  Defendants have personally profited immensely from the enterprise, as the individuals have frequently used corporate funds to pay for massive unrelated expenses and have used the corporate accounts as their personal piggybanks.  (PX20 Table 8 at 25, ¶¶ 95-96, Table 15 at 96.)  For example, Defendants Jonathan and Sandra Hanley have transferred a net of approximately $500,000 from corporate accounts to their personal accounts, and have spent over $300,000 in corporate funds on personal credit card expenditures.  (*Id.* Tables 14, 15 at 44-45.)  The Hanleys also have spent over $100,000 in home-related expenditures, including payments on a 3,300-square-foot home in Park City, Utah, and home-renovation expenses, including landscaping and a pool, as well as tens of thousands of

---

accounts in accordance with state regulations.  12 C.F.R. § 1015.7(b).  Here, bank records show that funds were not deposited in client trust accounts and that Defendants transferred and spent consumers' money at a rapid pace.  (PX20 ¶¶ 90-91 at 41-42; *see also id.* Att. DD at 895:5-896:11.)  Additionally, all consumers report Defendants took advance fees and, when refunds were sought, Defendants often could not substantiate what modification work, if any, was done for them.  (*See, e.g.,* PX14 Att. G at 49; PX15 ¶¶ 15-19 at 3-5, Att. F at 29 (referring generically to services rendered "in accordance with the fee agreement on file"); PX20 Att. DD at 833:11-15, 834:12-15.)

1   dollars on luxury goods and services and casino tabs in Las Vegas and Atlantic City. (*Id.* ¶ 35 at

2   16, Table 15 at 44-45, Att. N at 148-49.)

3         More than 250 consumers have filed complaints against Defendants with the FTC, the

4   BBB, state authorities, and non-profit consumer advocacy groups.[14]  (PX22 ¶¶ 15-17 at 5-6.)

5   Defendants have dismal "F" ratings with the BBB. (PX20 ¶¶ 47-48 at 22.)  Defendants Preferred

6   Law, Modification Review Board, American Home Loan Counselors, Jonathan Hanley, and

7   Benjamin Horton have also faced private consumer lawsuits, (*id.* Att. T at 182-248, U at 250-77),

8   and state law enforcement investigations and proceedings, including Cease and Desist Orders

9   entered by the Connecticut Department of Banking, (*id.* Att. Z at 659-77 (Preferred Law)), and

10  the Oregon Department of Consumer and Business Services, (*id.* Att. AA at 399 - 706 (Preferred

11  Law, Modification Review Board, and American Home Loan Counselors)); PX26 Att. B at 18-

12  46 (Horton).  Defendant Benjamin Horton had his Utah bar license suspended for his activities

13  with Defendants due to violating bar ethics rules relating to, *inter alia*, competence, diligence,

14  and sharing fees with non-attorneys. (PX20 Att. FF at 1013-31.)  In addition, at least one

15  payment processor has terminated Defendants' account because a high percentage of consumers

16  requested chargebacks[15] of funds they paid to Defendants, (*id.* ¶¶ 62-63 at 29).  Another payment

17  processor closed Defendants' accounts because of "concerns with type of business." (*Id.* ¶¶ 74-

18  75 at 34.)

19  **III. A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST**

20  **DEFENDANTS.**

21  _____

22  [14] These complaints are likely just the tip of the iceberg.  In the FTC's experience, the raw
    number of complaints actually reported to government and consumer protection agencies

23  represent only a fraction of consumer harm. *See* Keith Anderson, *Consumer Fraud in the United States: An FTC Survey* 80 (Aug. 2004), *available at*

24  https://www.ftc.gov/sites/default/files/documents/reports/consumer-fraud-united-states-ftc-
    survey/040805confraudrpt.pdf (FTC Bureau of Economics report noting that only 8.4% of

25  consumer fraud victims complain to an "official source" such as the federal government or the

26  BBB).
    [15] A chargeback is the refund a credit card issuer pays to a customer after the customer

27  successfully disputes a fraudulent transaction on his or her credit card statement.

**A. This Court Has the Authority to Grant the Requested Relief.**

The second proviso of Section 13(b) of the FTC Act authorizes the FTC to seek, and gives the Court the authority to grant, permanent injunctive relief to enjoin practices that violate any law enforced by the FTC.[16]  15 U.S.C. § 53(b); *H.N. Singer*, 668 F.2d at 1111-13.  Incident to its authority to issue permanent injunctive relief, this Court has the inherent equitable power to grant all temporary and preliminary relief necessary to effectuate final relief, including a TRO, an asset freeze, expedited discovery, a preliminary injunction, and other necessary remedies. *See, e.g.*, *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1232 & n.2 (9th Cir. 1999) (*ex parte* TRO and preliminary injunction including asset freeze); *Pantron I Corp.*, 33 F.3d at 1102 (holding that section 13(b) "gives the federal courts broad authority to fashion appropriate remedies for violations of the [FTC] Act"); *H.N. Singer*, 668 F.2d at 1113 ("We hold that Congress, when it gave the district court authority to grant a permanent injunction against violations of any provisions of law enforced by the Commission, also gave the district court authority to grant any ancillary relief necessary to accomplish complete justice . . . ."); *OMICS Grp. Inc.*, 2017 U.S. Dist. LEXIS 161910, at *4.[17]

---

[16] This action is not brought pursuant to the first proviso of Section 13(b), which addresses the circumstances under which the FTC can seek preliminary injunctive relief before or during the pendency of an administrative proceeding.  Because the FTC brings this case pursuant to the second proviso of Section 13(b), its complaint is not subject to the procedural and notice requirements in the first proviso. *H.N. Singer, Inc.*, 668 F.2d at 1111 (holding that routine fraud cases may be brought under second proviso, without being conditioned on the first proviso requirement that the FTC institute an administrative proceeding); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984) ("Congress did not limit the court's powers under the [second and] final proviso of § 13(b) and as a result this Court's inherent equitable powers may be employed to issue a preliminary injunction, including a freeze of assets, during the pendency of an action for permanent injunctive relief.").

[17] Numerous courts in this district have granted or affirmed injunctive relief similar to that requested here. *See, e.g.*, *FTC v. RevMountain, LLC*, Case No. 2:17-cv-02000-APG-GWF (D. Nev. July 25, 2017); *FTC v. Health Formulas, LLC*, Case No. 2:14-cv-01649-JAD-GWF (D. Nev. Oct. 9, 2014); *FTC v. Philip Danielson, LLC*, Case No. 2:14-cv-00896-GMN-VCF (D. Nev. June 23, 2014); *FTC v. Ideal Fin. Solutions, Inc.*, Case No. 2:13-cv-00143-JAD-GWF (D. Nev. Jan. 30, 2013); *FTC v. Dayton Family Prods., Inc.*, Case No. 2:97-cv-00750-GMN-VCF (D. Nev. Jan. 28, 2013); *FTC v. Moneymaker*, Case No. 2:11-cv-00461-JCM-CWH (D. Nev. Mar. 29, 2011); *FTC v. Ivy Capital, Inc.*, Case No. 2:11-cv-00283-JCM-GWF (D. Nev. Feb. 22,

1    In addition, the Court has jurisdiction over Defendants American Home Loan Counselors
2    and Consumer Link notwithstanding their purported non-profit status. Section 4 of the FTC Act
3    defines "corporations" subject to the FTC's jurisdiction as "any company . . . which is organized
4    to carry on business for its own profit or that of its members." This definition does not restrict
5    the FTC's regulatory authority over non-profit corporations merely because of the charter of
6    such corporations, but rather requires an analysis that looks beyond the technical form of a
7    corporation's organization.[18] In conducting this analysis, courts have considered whether the
8    corporation at issue is organized as a non-profit, whether it has been granted tax exempt status by
9    the IRS, whether funds are distributed or inure to the profit of members or shareholders, or
10   whether profit realized in the corporation's operations is devoted exclusively to charitable
11   purposes. *Cmty. Blood Bank*, 405 F.2d at 1019. Utah law expressly states that acceptance of an
12   organization's designation as a non-profit is solely "ministerial" and "does not create a
13   presumption that the document is valid or invalid or that information contained in the document
14   is correct or incorrect." Utah Code Ann. § 16-6a-110(4). Here, neither entity has provided any
15   sort of charitable service that they have promised in their articles of incorporation, such as "the
16   promotion of housing development for the relief of the poor, indigent, underprivileged, and
17   distressed." (*See* PX20 Att. E at 82.) Further, neither entity has obtained federal non-profit
18   status, (*id.* ¶ 21 at 10 to 11), and both have operated as part of the common enterprise to profit
19   from consumer deception, and thus are not exempt from FTC jurisdiction, (*see id.* ¶¶ 90-96 at 41
20   to 45 (detailing Defendants collection of consumer payments, frequent transfers of money
21   between corporate accounts, and use of corporate money for substantial personal expenses)). *See*
22
23   2011); *FTC v. Johnson*, Case No. 2:10-cv-02203-RLH-GWF (D. Nev. Jan. 13, 2011); *FTC v.*
     *Grant Connect, LLC*, Case No. 2:09-cv-1349-PMP-RJJ (D. Nev. July 28, 2009).
24   [18] *Cmty. Blood Bank of the Kan. City Area v. FTC*, 405 F.2d 1011, 1017-18 (8th Cir. 1969)
     ("Congress did not intend to provide a blanket exclusion of all non-profit corporations, for it was
25   also aware that corporations ostensibly organized not-for-profit...were merely vehicles through
     which a pecuniary profit could be realized for themselves or their members"); *Ohio Christian*
26   *Coll.*, 80 F.T.C. 815, 849 (1972) (Commission has jurisdiction over a corporation that exists as a
     mere shell, cloaking for-profit activities).
27

1  *FTC v. AmeriDebt, Inc.*, 343 F. Supp. 2d 451, 460 (D. Md. 2004) ("Although AmeriDebt is

2  incorporated as a non-stock corporation with tax-exempt status, the Court finds this insufficient

3  to insulate it from the regulatory coverage of the FTC Act."). Indeed, when challenged by

4  aggrieved consumers and the authorities, Defendants have tried to use the purported non-profit

5  entities as an obfuscation tactic by claiming that the purported non-profits are the companies that

6  are actually providing MARS, not the formally for-profit entities, and that consumers' payments

7  to Defendants are actually for ancillary services.[19]  In short, the entities are sham non-profits

8  designed to help the scam to profit from the deception at issue.

9
10  **B. The FTC Meets the Standard for Granting a Government Agency's Request for a Temporary Restraining Order.**

11  In determining whether to grant a preliminary injunction under Section 13(b), a court

12  "must 1) determine the likelihood that the Commission will ultimately succeed on the merits and

13  2) balance the equities." *Affordable Media, LLC*, 179 F.3d at 1233 (quoting *FTC v. Warner*

14  *Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)); *see also FTC v. World Wide Factors,*

15  *Ltd.*, 882 F.2d 344, 346 (9th Cir. 1989) (holding same).  Unlike private litigants, the FTC need

16  not prove irreparable injury, *Affordable Media, LLC*, 179 F.3d at 1233, which is presumed in a

17  statutory enforcement action, *World Wide Factors, Ltd.*, 882 F.2d at 347.  Because irreparable

18  injury is presumed, the burden of establishing success on the merits is decreased, and the district

19  court "need only to find some chance of probable success on the merits" in order to award

20

21  [19] Defendant Benjamin Horton claimed in a deposition conducted as part of his State of Utah disbarment proceedings that American Home Loan Counselors provided MARS to consumers,

22  but that, in order to comply with the MARS Rule, American Home Loan Counselors did not charge fees. (*See* PX20 Att. DD at 848:16-850:4, 864:3-19, 886:13-20.)  Instead, he asserted that

23  a different entity, Preferred Law, collected fees for its purported provision of services related to consumers' "federal rights" under various statutes, but admitted that Preferred Law then paid

24  employees of American Home Loan Counselors for their work. (*See id.* ¶¶ 52-54 and Table 7 at 23-25 (payroll paid to Corporate Defendants' employees, including those of American Home

25  Loan Counselors and Consumer Link), Att. Y at 439:30-31 to 444:3 (Defendants' representative stating that there is a fee for the modification services provided by American Home Loan

26  Counselors, a non-profit), Att. DD at 790:10-18, 850:5-13, 889:1-23.)

27

26

1   preliminary relief. *Id.* (quoting *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172,

2   176 (9th Cir. 1987)). Moreover, in balancing the equities, the public interest should receive

3   greater weight than private interests. *Id.* As set forth in this memorandum, the FTC has amply

4   demonstrated that it will ultimately succeed on the merits of its claims and that the balance of

5   equities favors injunctive relief.[20]

6          **1.  The FTC Is Likely to Succeed on the Merits.**

7        To demonstrate a likelihood of success on the merits, the FTC need only present evidence

8   showing that it will likely prevail, rather than evidence that would justify a final determination

9   on the merits. *World Wide Factors, Ltd.*, 882 F.2d at 347 ("Because irreparable injury must be

10  presumed in a statutory enforcement action, the district court need only to find some chance of

11  probable success on the merits." (quoting *Odessa*, 833 F.2d at 176)); *OMICS Grp. Inc.*, 2017

12  U.S. Dist. LEXIS 161910, at *6. That evidence can include hearsay evidence, such as

13  declarations. *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (stating that

14  the court may give inadmissible evidence some weight when doing so "serves the purpose of

15  preventing irreparable harm before trial"); *see also Heideman v. S. Salt Lake City*, 348 F.3d

16  1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary

17  injunction hearings."). As set forth in Section II above, the FTC has presented ample evidence

18  showing that it is likely to succeed on the merits of its claims that Defendants violated Section 5

19  of the FTC Act and multiple provisions of the MARS Rule.

20         **2.  The Equities Tip Decidedly in the Public's Favor.**

21       The public interest in halting Defendants' unlawful conduct, preserving evidence, and

22  preserving assets to provide redress to consumers far outweighs any interest Defendants may

23  have in continuing to operate their fraudulent business. In balancing public and private interests,

---

24   [20] Although not required to do so, the FTC also meets the Ninth Circuit's four-part test for
25   private litigants to obtain injunctive relief. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1020
     (9th Cir. 2016). Without the requested relief, the public and the FTC will suffer irreparable harm
26   from the continuation of Defendants' scheme and the likely destruction of evidence and
     dissipation of assets. Many victimized consumers have already faced irreparable harm, such as
27   foreclosure, and more are likely to face such financial disaster if Defendants' scam is not halted.

1    "public equities receive far greater weight than private equities." *OMICS Grp. Inc.*, 2017 U.S.

2    Dist. LEXIS 161910, at *15; *Affordable Media, LLC*, 179 F.3d at 1236.  This principle is

3    especially important in the context of enforcement of consumer protection laws. *FTC v. Mallett*,

4    818 F. Supp. 2d 142, 149 (D.D.C. 2011) ("The public interest in ensuring the enforcement of

5    federal consumer protection is strong . . . .").

6        Here, the balance of equities justifies the relief sought.  The evidence demonstrates that

7    the public equities—protection of consumers from Defendants' deceptive practices; effective

8    enforcement of the law; and the preservation of Defendants' assets for consumer redress and

9    disgorgement—weigh heavily in favor of granting the proposed injunctive relief.  Granting such

10    relief is also necessary because Defendants' conduct indicates that they will likely continue to

11    deceive the public. *See Five-Star Auto Club*, 97 F. Supp. 2d at 536 ("[P]ast illegal conduct is

12    highly suggestive of the likelihood of future violations."); *SEC v. R.J. Allen & Assocs., Inc.*, 386

13    F. Supp. 866, 877 (S.D. Fla. 1974); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).

14        By contrast, the private equities in this case are not compelling.  Compliance with the law

15    is hardly an unreasonable burden. *See World Wide Factors, Ltd.*, 882 F.2d at 347 (holding that

16    "there is no oppressive hardship to defendants in requiring them to comply with the FTC Act,

17    refrain from fraudulent representation or preserve their assets from dissipation or concealment").

18    Because the injunction will preclude only harmful, illegal behavior, the public equities

19    supporting the proposed injunctive relief far outweigh any burden imposed by such relief on

20    Defendants. *See id.*

21        **C. Defendants Are Jointly and Severally Liable Because They Operate as a**
22        **Common Enterprise.**

23        Where the same individuals transact business through a "maze of interrelated

24    companies," the whole enterprise may be held liable as a joint enterprise. *FTC v. John Beck*

25    *Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012) (quoting *FTC v. Think*

26    *Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000)).  In deciding whether a

27    common enterprise exists, courts may consider such factors as whether the companies were

1   under common ownership and control; whether they pooled resources and staff; whether they

2   shared phone numbers, employees, and email systems; and whether they jointly participated in a

3   "common venture" in which they benefited from a shared business scheme or referred customers

4   to one another. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010); *OMICS*

5   *Grp. Inc.*, 2017 U.S. Dist. LEXIS 161910, at \*11; *Grant Connect,* 827 F. Supp. 2d at 1216; *FTC*

6   *v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000).  No single factor is dispositive,

7   and not all factors need be present to justify a finding of common enterprise. *FTC v. Kennedy*,

8   574 F. Supp. 2d 714, 722 (S.D. Tex. 2008); *Think Achievement Corp.*, 144 F. Supp. 2d at 1011.

9   Rather, "the pattern and frame-work of the whole enterprise must be taken into consideration."

10  *Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) (per curiam).

11         As discussed in Section I.B above, Defendants form a classic common enterprise, the

12  touchstone of which is operating through a "maze of interrelated companies" with shared control,

13  office space, employees, and services, and routine commingling of funds.  Accordingly, each

14  Defendant can be held liable for the actions of the whole.

### D. The Individual Defendants Are Individually Liable for Monetary and Injunctive Relief.

17         As the controlling forces behind Defendants' scheme, Individual Defendants Jonathan

18  Hanley, Benjamin Horton, and Sandra Hanley are also liable for the law violations committed by

19  Corporate Defendants.  Under the FTC Act, individual defendants may be liable for injunctive

20  relief for corporate acts or practices if they: (1) participated directly in the challenged conduct or

21  (2) had the authority to control it.  *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th

22  Cir. 1997).  In general, an individual's status as a corporate officer and his or her authority to

23  sign documents on behalf of the corporation gives rise to a presumption of control of a small,

24  closely-held corporation.  *See id.* at 1170-71.  Even where an individual is not officially

25  designated as an officer, courts consider the actual level of control the individual has over

26  corporate activities.  *See FTC v. Medicor, LLC*, 217 F. Supp. 2d 1048, 1055-56 (C.D. Cal. 2002);

27  *FTC v. Windward Mktg., Ltd.*, 1997 U.S. Dist. LEXIS 17114, at \*15 (N.D. Ga. Sept. 30, 1997)

1    (holding that defendant did not have to be an officer or even an employee to control corporate

2    activities).  Bank signatory authority or acquiring services on behalf of a corporation also

3    evidences authority to control.  *See FTC v. USA Fin., LLC*, 415 F. App'x. 970, 974-75 (11th Cir.

4    Feb. 25, 2011).

5           An individual may be held liable for monetary redress for corporate practices if he or she

6    had, or should have had, knowledge of the corporate defendant's misrepresentations.  *Publ'g*

7    *Clearing House, Inc.*, 104 F.3d at 1170.  But this knowledge element does not need to rise to the

8    level of subjective intent to defraud consumers.  *Id.*  Instead, the FTC need only demonstrate that

9    the individual defendant had actual knowledge of material misrepresentations, reckless

10   indifference to the truth or falsity of such representations, or had an awareness of a high

11   probability of fraud with an intentional avoidance of the truth.  *Id.*  Participation in corporate

12   affairs is probative of knowledge.  *Id.*  "[T]he extent of an individual's involvement in a

13   fraudulent scheme alone is sufficient to establish the requisite knowledge for personal

14   restitutionary liability."  *Affordable Media, LLC*, 179 F.3d at 1235.  When a common enterprise

15   is present, an individual's liability for monetary relief is joint and several with all entities

16   participating in the enterprise.  *See FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167,

17   1213-14 (N.D. Ga. 2008).

18          Here, Individual Defendants Jonathan Hanley, Benjamin Horton, and Sandra Hanley are

19   all individually liable for injunctive and monetary relief.  As discussed above, each has had a

20   position of authority with one or more Corporate Defendants, including acting as a corporate

21   officer, possessing bank signatory authority, and acquiring services such as web domains and

22   merchant accounts for the companies.  Additionally, each Individual Defendant has had

23   knowledge of the unlawful conduct.  Their companies have faced legal action numerous times by

24   aggrieved consumers and state authorities, and the Individual Defendants have been referenced,

25   if not directly named, in the legal complaints, (*see, e.g.*, PX20 Att. T at 193 (referencing Sandra

26   Hanley).)  Their companies have had many complaints filed against them at the BBB and with

27   the companies themselves. (*See* PX01 to 19, 23; PX22 ¶ 16 at 6.)  And Horton lost his Utah bar

30

1    license for the very conduct at issue in this case.  (PX20 Att. FF at 1013-31.)  Accordingly, each

2    Individual Defendant is liable for injunctive and monetary relief.

3    **IV. THE SCOPE OF THE PROPOSED *EX PARTE* TRO IS APPROPRIATE IN
4    LIGHT OF DEFENDANTS' CONDUCT.**

5        As the evidence has forcefully shown, the FTC is likely to succeed in proving that

6    Defendants are engaging in deceptive practices in violation of the FTC Act and the MARS Rule,

7    and that the balance of equities strongly favors the public.  Preliminary injunctive relief is thus

8    justified.

9        **A.  Conduct Relief**

10       To prevent ongoing consumer injury, the proposed TRO prohibits Defendants from

11   making future misrepresentations concerning the marketing of mortgage assistance relief

12   services and prohibits the collection of advance fees.  The proposed order also requires

13   Defendants to make disclosures required by the MARS Rule.

14       As discussed above, this Court has broad equitable authority under Section 13(b) of the

15   FTC Act to grant ancillary relief necessary to accomplish complete justice.  *H.N. Singer*, 668

16   F.2d at 1113.  These requested prohibitions and disclosures do no more than order that

17   Defendants comply with the FTC Act and the MARS Rule.

18       **B.  An Asset Preservation Order Is Necessary to Preserve the Possibility of Final
19       Effective Relief.**

20       As part of the permanent relief in this case, the FTC will seek equitable monetary relief,

21   including consumer redress and/or disgorgement of ill-gotten gains.  To preserve the availability

22   of funds for such equitable monetary relief, the FTC requests that the Court issue an order

23   requiring the preservation of assets and evidence.  Such an order is well within the Court's

24   authority, *World Wide Factors, Ltd.*, 882 F.2d at 347 ("Since the FTC has shown a probability of

25   success on the merits, the district court did not abuse its discretion in granting the injunction to

26   freeze World Wide's assets."); *H.N. Singer*, 668 F.2d at 1113 ("13(b) provides a basis for an

27

31

1   order freezing assets."), and similar to the equitable relief granted in prior FTC cases in this

2   District. *See supra* note 17.

3        "A party seeking an asset freeze must show a likelihood of dissipation of the claimed

4   assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v.*

5   *Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). In *Johnson*, the Ninth Circuit upheld an asset

6   freeze because plaintiffs had established they were "likely to succeed in proving that [Defendant]

7   impermissibly awarded himself tens of millions of dollars." *Id.* at 1085. A defendant's prior

8   attempt to hide assets establishes the likelihood that, without an asset freeze, the plaintiff will be

9   unable to recover any funds. *Affordable Media, LLC*, 179 F.3d at 1236 (likelihood of dissipation

10   existed "[g]iven the [defendants'] history of spiriting their commissions away to a Cook Islands

11   trust"). Courts have also concluded that an asset freeze is justified where a Defendant's business

12   is permeated with fraud. *See, e.g., SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2nd

13   Cir. 1972); *R.J. Allen & Assocs. Inc.*, 386 F. Supp. at 881.

14        This Court has the authority to direct third parties to effectuate the purpose of the TRO.

15   *See, e.g., Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940) (holding that courts

16   have authority to direct third parties to preserve assets); *United States v. First Nat'l City Bank*,

17   379 U.S. 378, 385 (1965); *Reebok Int'l, Ltd. v. McLaughlin*, 49 F.3d 1387, 1391 (9th Cir. 1995).

18   Further, the Court can order Defendants' assets to be frozen whether the assets are inside or

19   outside the United States.[21] *First Nat'l City Bank*, 379 U.S. at 384 ("Once personal jurisdiction

20   of a party is obtained, the District Court has authority to order it to 'freeze' property under its

21   control, whether the property be within or without the United States."). In addition to freezing

22   company assets, courts have frozen individual defendants' assets where the individual defendants

23   controlled the deceptive activity and had actual or constructive knowledge of the deceptive

24

25   [21] The proposed TRO also includes a provision that restrains Defendants from taking any action
     that may result in the encumbrance or dissipation of foreign assets, including taking any action
26   that would invoke a duress clause. This provision is important because Defendants may have
     created offshore asset protection trusts that could frustrate the Court's ability to provide
27   consumer redress. *See Affordable Media, LLC*, 179 F.3d at 1239-44.

1    nature of the practices in which the companies were engaged. *FTC v. Amy Travel Serv. Inc.*, 875

2    F.2d 564, 574 (7th Cir. 1989).

3            A freeze of Defendants' assets is appropriate here to preserve the status quo, ensure that

4    funds do not disappear during the course of this action, and preserve Defendants' assets for final

5    relief. Defendants have taken in gross deposits of approximately $11 million in revenue in a

6    little over three years. (PX20 ¶ 59 at 28.) As discussed in Section II.D, bank records show that

7    Defendants make frequent transfers between their various corporate and personal bank accounts.

8    Defendants also use corporate funds to make personal payments for their private residences and

9    home-related expenses, luxury goods, and other personal items. (*Id.* ¶ 96 and Table 15 at 44-45.)

10   A temporary asset freeze is required to preserve the Court's ability to order disgorgement of

11   profits.

12           Without an asset freeze, the dissipation and misuse of assets is likely. Defendants who

13   have engaged in illegal activities are likely to waste assets prior to resolution of the action. *See*

14   *Manor Nursing Ctrs. Inc.*, 458 F.2d at 1106. In the FTC's experience, defendants engaged in

15   similarly serious unlawful practices have secreted assets and destroyed documents upon learning

16   of an impending law enforcement action. (Decl. Pl.'s Counsel Supp. Pl. Mot. TRO ¶¶ 9-10.) As

17   discussed above, the evidence here demonstrates that Defendants' enterprise is permeated by

18   deception and unlawful activity. Moreover, Defendants go to great lengths to hide their base of

19   operations. Although operating out of boiler rooms in Sandy, Utah, Defendants represent to

20   consumers that they are located in Las Vegas, Nevada, as discussed above. They utilize a

21   network of corporate entities and numerous mail-receiving entities as their business addresses

22   and typically do not provide consumers any physical addresses where they may be found.

23   Starting in mid-2016, after a state law enforcement action by the Connecticut Department of

24   Banking and in the midst of the Utah State Bar disciplinary investigation of Individual Defendant

25   Horton, Defendants began accelerating these efforts by switching brick-and-mortar corporate

26   addresses to virtual offices and removing the names of Individual Defendants on the corporate

27   papers and replacing them with "Appointed Manager" or "Signing Manager." (PX20 ¶¶ 15-20,

1  27-28 at 9-10, 13-14.)  Shortly thereafter, in 2017, instead of receiving payroll in his own name,

2  Horton also began receiving payments from the Corporate Defendants sent to another company,

3  Capitalism, LLC.  (*Id.* Table 12, n.12 at 25.)  Defendants also began transitioning to the use of

4  new corporate names that were previously not on the radar of state authorities.  Whereas

5  previously Defendants had been using the names Preferred Law, Modification Review Board,

6  and American Home Loan Counselors, they have more regularly begun using the names

7  Consumer Defense, Consumer Link, and American Home Loans.  (*See, e.g.*, PX01 ¶¶ 6, 9 at 2-3,

8  Att. B at 13 (consumer signed up with Preferred Law but then began interacting with employees

9  with a "consumerdefense.com" email address); PX05 ¶ 3 at 1, Att. A at 9-11 (consumer signed

10  up with Preferred Law and had to request a refund from Consumer Defense); PX11 ¶¶ 2-5 at 1-2,

11  Att. A at 6; PX20 Att. S at 179:12-180:17.)  These efforts to obscure their true operating

12  locations and hide their individual involvement suggest that Defendants are anticipating future

13  law enforcement action and do not want authorities to know where they might be located.

14  Defendants have also shown they are likely to disregard court orders, as they have continued to

15  serve consumers in states such as Connecticut that have entered orders against Defendants to

16  cease and desist operating without a valid debt negotiation license.  (*See* PX11 ¶¶ 1, 6, 16 at 1-2,

17  4 (Connecticut consumer signed up in August 2016 and made payments until February 2017);

18  PX20 Att. Z at 659-77 (Connecticut cease and desist order entered in July 2016); PX26 ¶ 6 at 2

19  (Defendants currently do not have required CT license); *see also* PX20 Att. AA at 699-706

20  (Oregon cease and desist order entered in November 2015); PX22 Att. L at 441-42 (BBB

21  complaint from Oregon consumer stating that the consumer signed up in October 2015 and made

22  payments until January 2017); PX26 ¶ 7 at 2 (Defendants currently do not have required OR

23  license).)  Therefore, an asset freeze is required to preserve the funds derived from Defendants'

24  unlawful activities so that the Court can retain its ability to fashion meaningful final relief.

25       The FTC also requests that the Court order Defendants to complete and return to the FTC

26  financial statements on the forms attached to the proposed TRO.  Financial statements, combined

27  with an asset freeze, will increase the likelihood of preserving existing assets pending final

1    determination of this matter. *See, e.g., FTC v. D Squared Sols., LLC*, 2003 WL 22881377, at *4

2    (D. Md. Oct. 30, 2003) (ordering immediate accounting of assets); *FTC v. Stout*, 1999 WL

3    34833240, at *3 (D.N.J. Dec. 8, 1999) (same); *see also SEC v. Bankers All. Corp.*, 881 F. Supp.

4    673, 676 (D.D.C. 1995); *SEC v. Parkersburg Wireless LLC*, 156 F.R.D. 529, 532 n.3 (D.D.C.

5    1994).

6    **C. A Receiver Is Necessary to Protect the Public and Injured Consumers.**

7    The appointment of a receiver is a sound equitable remedy in cases involving deception.

8    *In the Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1997); *see also U.S. Oil & Gas Corp.*,

9    748 F.2d at 1432. A receiver is necessary to take control of the corporate defendants' operations;

10   prevent the destruction of documents and computer records; help identify injured consumers and

11   the extent of consumer harm; determine the corporate defendants' financial status; and locate,

12   marshal, and safeguard corporate assets. *See SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 438

13   (5th Cir. Unit A May 1981). *See also McGaughey*, 24 F.3d at 907; *U.S. Oil & Gas Corp.*, 748

14   F.2d at 1432.

15   A receiver is necessary here because, as shown above, Defendants' business is permeated

16   by deceptive activities. *See R.J. Allen & Assoc.*, 386 F. Supp. at 878 ("the appointment of a

17   receiver is necessary to prevent diversion or waste of assets to the detriment of those for whose

18   benefit, in some measure, the injunction action is brought"). A receiver would be able to secure

19   multiple locations, as well as perform standard functions such as ensuring corporate compliance

20   with any order, tracing and securing assets, and taking possession of computers, documents, and

21   other evidence of Defendants' illegal practices. The FTC has identified a qualified candidate for

22   the Court's consideration in the pleading entitled "FTC's Recommendation for Temporary

23   Receiver," filed simultaneously with this memorandum.

24   **D. Preservation of Records.**

25   In addition, the proposed order contains a provision directing Defendants to preserve

26   records, including electronic records, and evidence. It is appropriate to enjoin Defendants

27   charged with deception from destroying evidence, and doing so would place no significant

35

1   burden on them. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1040 n.11 (2d Cir. 1990)

2   (characterizing such orders as "innocuous"). In the FTC's experience, defendants engaged in

3   similarly serious unlawful practices have destroyed documents upon learning of an impending

4   law enforcement action. (Decl. Pl.'s Counsel Supp. Pl. Mot. TRO ¶ 10.)

5        **E. Expedited Discovery.**

6        The FTC seeks leave of Court for limited discovery to locate and identify documents and

7   assets. District courts are authorized to depart from normal discovery procedures and fashion

8   discovery to meet discovery needs in particular cases. Federal Rules of Civil Procedure 26(d),

9   33(a), and 34(b) authorize the Court to alter the standard provisions, including applicable time

10  frames, that govern depositions and production of documents. This type of discovery order

11  reflects the Court's broad and flexible authority in equity to grant preliminary emergency relief

12  in cases involving the public interest. *See Porter v. Warner Holding*, 328 U.S. 395, 398 (1946);

13  *FSLIC v. Dixon*, 835 F.2d 554, 562 (5th Cir. 1987); *Fed. Express Corp. v. Fed. Expresso. Inc.*,

14  1997 U.S. Dist. LEXIS 19144, at * 6 (N.D.N.Y. Nov. 24, 1997) (early discovery "will be

15  appropriate in some cases, such as those involving requests for a preliminary injunction")

16  (quoting commentary to Fed. R. Civ. P. 26(d)); *Benham Jewelry Corp. v. Aron Basha Corp.*,

17  1997 U.S. Dist. LEXIS 15957, at *58 (S.D.N.Y. July 18, 1997) (courts have broad powers to

18  grant expedited discovery).

19       **F. The TRO Should Be Issued *Ex Parte* to Preserve the Court's Ability to Fashion**
20           **Meaningful Relief.**

21       The substantial risk of asset dissipation and document destruction in this case, coupled

22  with Defendants' ongoing and deliberate statutory violations, justifies *ex parte* relief without

23  notice. Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders upon a

24  clear showing that "immediate and irreparable injury, loss, or damage will result" if notice is

25  given. *Ex parte* orders are proper in cases where "notice to the defendant would render fruitless

26  the further prosecution of the action." *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir.

27  1984); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974);

1  *AT&T Broadband v. Tech Commc'ns.*, 381 F.3d 1309, 1319 (11th Cir. 2004); *In re Vuitton et*

2  *Fils, S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979).  The court noted in *Cenergy Corp. v. Bryson Oil & Gas*

3  *P.L.C.*, 657 F. Supp. 867, 870 (D. Nev. 1987), that given the pervasive deception in the case, "it

4  [is] proper to enter the TRO without notice, for giving notice itself may defeat the very purpose

5  for the TRO."  Mindful of this problem, courts have regularly granted the FTC's request for *ex*

6  *parte* temporary restraining orders in Section 13(b) cases.[22]

7      As discussed above, Defendants' business operations are permeated by, and reliant upon,

8  unlawful practices.  The FTC's past experiences have shown that defendants engaged in

9  fraudulent schemes, upon discovery of impending legal action, withdrew funds from bank

10 accounts and destroyed records.  (Decl. Pl.'s Counsel Supp. Pl. Mot. TRO ¶¶ 9-10.)  Defendants'

11 conduct – including moving large sums from Corporate Defendants' coffers to Individual

12 Defendants' accounts – and the nature of Defendants' illegal scheme provide ample evidence

13 that it is highly likely that Defendants would conceal or dissipate assets absent *ex parte* relief.

14 Thus, this case fits squarely into the narrow category of situations where *ex parte* relief is

15 appropriate to make possible full and effective final relief.

16   **V. CONCLUSION**

17      For the foregoing reasons, the FTC respectfully requests that the Court enter the proposed

18 temporary restraining order.

19

20 Dated: January 8, 2018                    Respectfully submitted,

21

22                    /s/ Adam M. Wesolowski *Adam M. Wesolowski*

23                    ADAM M. WESOLOWSKI
                      GREGORY A. ASHE

24                    Federal Trade Commission

25 [22] *See supra* note 17 and the cases cited therein.  Indeed, Congress has looked favorably on the
   availability of *ex parte* relief under the FTC Act: "Section 13 of the FTC Act authorizes the FTC

26 to file suit to enjoin any violation of the FTC [Act].  The FTC can go into court *ex parte* to obtain
   an order freezing assets, and is also able to obtain consumer redress."  S. Rep. No. 130, 103rd

27 Cong., 2d Sess. 15-16, *reprinted in* 1994 U.S. Code Cong. & Admin. News 1776, 1790-91.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

600 Pennsylvania Ave, N.W., CC-10232
Washington, DC 20580
Telephone: 202-326-3068 (Wesolowski)
Telephone: 202-326-3719 (Ashe)
Facsimile: 202-326-3768
Email: awesolowski@ftc.gov, gashe@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION