Thomas W. McNamara
info@regulatoryresolutions.com
655 West Broadway, Suite 1600
San Diego, California 92101
Tel.:    619-269-0400
Fax:    619-269-0401
*Court-Appointed Temporary Receiver*

Abran E. Vigil (NV 7548)
vigila@ballardspahr.com
BALLARD SPAHR LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
Tel.:    702-471-7000
Fax:    702-471-7070

Edward Chang (NV 11783)
echang@mcnamarallp.com
MCNAMARA SMITH LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Tel.:    619-269-0400
Fax:    619-269-0401
*Attorneys for Court-Appointed Temporary Receiver*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>CONSUMER DEFENSE, LLC, et al.,<br><br>    Defendants. | Case No. 2:18-cv-00030-JCM-PAL<br><br>**PRELIMINARY REPORT OF TEMPORARY RECEIVER**<br><br>JUDGE:    Hon. James C. Mahan |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ....................................................................................................................1
II. STEPS TAKEN TO IMPLEMENT TRO ............................................................................1
    A.    Immediate Access ......................................................................................................1
    B.    Facilities ......................................................................................................................2
    C.    Documents/Information/Electronic Data ...............................................................3
    D.    Compliance with TRO ...............................................................................................4
    E.    Obstruction and Contempt by Defendants Jonathan and Sandra Hanley................5
III. ASSETS AND LIABILITIES OF RECEIVERSHIP ENTITIES .........................................10
    A.    Bank Accounts .........................................................................................................10
    B.    Vehicles .....................................................................................................................11
    C.    Real Property ............................................................................................................11
    D.    AHL Fundings ..........................................................................................................11
IV. SUMMARY OF BUSINESS OPERATIONS .....................................................................12
    A.    Structure – the Bifurcation Fiction .........................................................................12
    B.    Marketing .................................................................................................................16
    C.    Sales ..........................................................................................................................16
    D.    Processing .................................................................................................................19
    E.    Operating Results .....................................................................................................20
V. CAN THIS BUSINESS BE OPERATED  LAWFULLY AND PROFITABLY?...................22
    A.    Legally ......................................................................................................................22
    B.    Profitably ..................................................................................................................22

# I.

## INTRODUCTION

I was appointed Temporary Receiver of Receivership Entities[1] by the Temporary Restraining Order entered January 10, 2018 (ECF No. 12) ("TRO").  I submit this Preliminary Report in compliance with Paragraph XXII of the TRO and to advise the Court of my initial actions and preliminary observations.

# II.

## STEPS TAKEN TO IMPLEMENT TRO

### A.        Immediate Access

We implemented the immediate access provisions of the TRO (Section XXIII) beginning at approximately 10:30 a.m. on Thursday, January 11, 2018 when we took possession of the offices of Receivership Entities at 41 West 9000 South, Sandy, Utah 84070.  We coordinated our efforts with agents of the Utah Attorney General's office who were present to keep the peace.  We also inspected the offices at 8180 South 700 East, Suite 110, Sandy, Utah 84070, a previous location used by some Receivership Entities, and confirmed that those offices had been vacated.

We also confirmed service of the TRO on four virtual offices in Nevada and Utah[2] where Receivership Entities received mail.

At the time of our arrival at the building in Sandy, Utah, 12 personnel were on site – Defendant Jonathan Hanley, who was in his office immersed in a video game; the office manager; the billing assistant; one sales person; and eight processors.  Two additional sales personnel arrived after our arrival.  Despite Mr. Hanley's instructions that employees leave and

---

[1]  Receivership Entities are defined to include the following:  Consumer Defense, LLC (a Nevada LLC); Consumer Defense, LLC (a Utah LLC); Consumer Defense Group, LLC; Consumer Link, Inc.; Preferred Law, PLLC; American Home Loan Counselors; American Home Loans, LLC; Brown Legal, Inc.; AM Property Management, LLC; FMG Partners, LLC; Zinly, LLC; and each of their subsidiaries, affiliates, successors, and assigns (TRO, Definitions, ¶¶ E and N, pages 4-6).

[2]  2825 E. Cottonwood Pkwy, Suite 500, Salt Lake City, UT 84121 (American Home Loans, LLC); 9980 South 300 West, Suite 200, Sandy, UT 84070 (Zinly, LLC); 500 North Rainbow Blvd., Suite 300, Las Vegas, NV, 89107 (Consumer Defense, LLC); and 200 S. Virginia, 8th Floor, Reno, NV 89501 (Consumer Link, Inc.).

not speak with us, they were ultimately cooperative, completed questionnaires, responded to our questions, and were excused.  The office manager returned the next day for follow-up questions.

Defendant Sandra Hanley was not present at our arrival, but arrived later in the day to pick up Mr. Hanley.  At that time, the Receiver spoke with her through the window of the 2016 GMC Yukon she was driving (the only vehicle not titled in the name of a Receivership Entity), handed her a copy of the TRO, and briefly described the FTC case and the role of the Receiver. The conversation was short, as Mr. Hanley (who was in the passenger seat) instructed Mrs. Hanley to "roll up the window and drive downtown" several times before they drove off.  We have had no further contact with Mrs. Hanley.

The lack of cooperation, overt obstruction, and multiple acts in violation of the TRO by Defendants Jonathan Hanley and Sandra Hanley are detailed in Section II.E below.  The Hanleys' conduct has caused a great deal of unnecessary work and otherwise delayed our ability to ensure compliance with the TRO and secure Receivership estate assets.

Defendant Benjamin Horton was not present when we took possession of the offices. Within a few hours after our initial entry, we emailed him a copy of the TRO and left a voicemail requesting an interview.  Mr. Horton did not respond until January 17, 2018 when he requested authorization to serve pleadings on the Receiver electronically.  He has not responded to our requests for an interview.

After securing the premises, we provided access to counsel for the Federal Trade Commission ("FTC"), as provided for in the TRO.  We arranged for the external locks to be changed, after which only my agents have had unsupervised access to the offices.

**B.     <u>Facilities</u>**

The site at 41 West 9000 South in Sandy, Utah (the "Sandy Office"), a suburb of Salt Lake City, is a two-story stand-alone building, owned by Defendant Zinly, LLC, with approximately 5,820 square feet of useable space in a suburban office park.  The building had no external or internal signage, except for a barely-visible sign above the front door for a travel agency, which had apparently been a prior owner or tenant of the building.

///

2

The first floor was unoccupied when we arrived and appeared to be mostly inactive space except for work spaces for Mr. Horton, Mrs. Hanley, and a sales representative on maternity leave.  The second floor was the primary location of Defendants' current active business, operating under the names of Receivership Entities American Home Loans, LLC ("AHL") and Consumer Link, Inc. ("Consumer Link") which are the latest corporate iterations of the loan modification business conducted by Defendants through the various Receivership Entities back to 2011.  As to two Receivership Entities – Brown Legal, Inc. ("Brown Legal") and FMG Partners, LLC ("FMG") – our review to date has not discerned their role in loan modification services, but Brown Legal is the titled owner of two vehicles used by the Hanleys and FMG, an entity linked to Mrs. Hanley's father, did previously secure a merchant account to process consumer payments for a Receivership Entity.

The second floor included a large office suite for Mr. Hanley (sometimes also used by Mrs. Hanley), four smaller individual offices (one vacant and three for sales personnel), and 12 cubicles with computers and phones.

Exhibit 1 is a schematic of the office space and an inventory of furniture and equipment on site.

The four virtual office facilities, two in Nevada (Las Vegas and Reno) and two in Utah (Sandy and Salt Lake City) were used as mail drops.  They were key components of the thinly-veiled fiction that Defendants' various entities were separate and independent with operational offices in two states.  In the latest two operational iterations, Defendants portrayed to consumers that the businesses had actual operations in Reno and Las Vegas, Nevada; indeed, the employee rosters pinned up in each cubicle in the Sandy Office reflected that operations took place in Reno and Las Vegas.  The reality, however, was that this business was one co-located single interdependent operation.

### C.    Documents/Information/Electronic Data

Upon taking possession, we confirmed that all hard copy documents were secure.  We retained a computer forensics firm to supervise the forensic imaging of selected desktop

///

computers and the telephone server, which was principally conducted by IT personnel from the FTC. Mr. Hanley's smartphone was also imaged.

We immediately secured two cloud-based data storage programs: LoanPost, the CRM database on which customer information and account status were maintained; and Smartsheet, an online spreadsheet collaboration program, on which some financial activity was recorded.

Defendants utilized Google "G Suite" for email communications (Gmail) and document sharing (Google Drive) and maintained multiple email domains to coincide with frequent business name changes, generally implemented when complaints became too numerous. To date, we have discovered six domains: americanhomeloans.com, ampropertyinc.com, consumerdefense.com, defaultsupport.com, modificationreviewboard.com, and preferredlawteam.com. Our ability to secure and review emails and documents on these Google accounts has been compromised and delayed by Mr. Hanley's repeated failures to provide accurate administrative passwords. *See* further details on this obstruction at Section II.E *infra.*

Defendants currently maintain at least 13 websites, most hosted by GoDaddy. Mr. Hanley has not provided login information for any of these websites. *See* Section II.E *infra*.

**D.    <u>Compliance with TRO</u>**

Once we secured the premises and completed a basic review of the business, we took immediate steps to comply with the TRO as follows:

1.    Our overriding goal was to take all steps needed to achieve compliance, while also trying to protect consumers.

2.    We immediately suspended all sales activities – "intake" – by excusing sales personnel and temporarily deactivating the telephone system. We later placed a telephone greeting on the incoming lines to include a "notice to consumers" to alert them to the suspension of operations, direct them to contact their lender, a government-sponsored non-profit loan modification service, such as Hope Now, or a local attorney, and to access the Receiver's website.

3.    We have sought to install a global auto-reply to incoming emails which would include the same notice to consumers, but have been hampered by Mr. Hanley's

refusal to promptly provide administrative email passwords.  We have, to date, placed auto replies on the emails connected to the three domains for which we have administrative control.  Our inability to control the email systems, has resulted in at least one employee of Receivership Entities accessing her email account and installing her own auto-reply on one of the three domains over which we do not have control (americanhomeloans.com).

4.  Through defendants' CRM database in LoanPost, we dispatched a global email with the notice to consumers to the universe of customers designated by the office manager as currently active.

5.  We suspended modification processing, except as to files with immediate foreclosures sale dates.  We have spoken to more than 40 consumers, explaining the situation and referring them to the Receiver's website to review the pleadings.  For borrowers with foreclosure sale dates between January 11, 2018 and February 11, 2018, we will provide lenders notice of the FTC action and the TRO and request they extend the sale date by at least 60 days.  To date, we have communicated directly with the six consumers and their respective lenders who had foreclosure sales scheduled from January 11, 2018 through January 26, 2018 and alerted them to the situation.  We will contact the remaining 15 sale date consumers and their respective lenders soon.

6.  Defendants have yet to provide login credentials to their websites.  Once we do secure those credentials, we will place the notice to consumers on each website.

7.  We activated a Consumer Defense receivership page on the Receiver's website as a vehicle for consumer information.

**E.**     **Obstruction and Contempt by Defendants Jonathan and Sandra Hanley**

Implementation of the TRO has been <u>substantially</u> hindered and obstructed by Defendants Jonathan Hanley and Sandra Hanley.  At the appropriate time, we may present the full details of this misconduct in an Application for an Order to Show Cause Why Defendants Should Not Be Held in Contempt.  For purposes of this report, we submit here a summary:

1.     Instructions to Employees to Go Home and Not Speak with the Receiver

While my counsel was addressing a group of employees shortly after we secured the premises, Mr. Hanley interrupted and loudly announced that the employees were not required to speak to the Receiver and instructed them all to leave.  He relented and returned to his office only after a direct confrontation with the Receiver.

2.     Refusal to Provide Administrative Passwords to Email Accounts and
         Unauthorized Access to Those Accounts

Mr. Hanley repeatedly refused to provide the Receiver with the administrative passwords necessary to secure and access the Google "G Suites" accounts which hosted Defendants' Gmail accounts and Google Drive documents.

Beginning on the morning of January 11, 2018, the Receiver made multiple requests to Mr. Hanley to provide these user names and passwords as required by the TRO, but he refused. Mr. Hanley did not provide any login credentials to the Google G Suite accounts until January 15, after we spoke to his counsel, but several of those were not functional.

With such intransigence, both Hanleys retained the capacity to access these accounts in violation of the asset freeze and the TRO.  Of course, the risk of this access is that items can be changed, forwarded, or deleted.  We have confirmed at least three specific instances of unauthorized access:

- On January 14, 2018, the Receiver's staff was able, by virtue of locating some passwords onsite and much trial and error, to log onto the JHanley@Americanhomeloans.com email account.  But, shortly thereafter, the account was accessed, presumably by Mr. Hanley, and the password was changed, locking us out.
- On January 15, 2018, the Receiver's staff accessed, again by way of trial and error, the email account customerservice@ampropertyinc.com and learned that on January 13-14, 2018, Mrs. Hanley had accessed the account.  She emailed instructions to rental agencies Vacation Rentals by Owner ("VRBO") and Airbnb to change the contact information and payment arrangements on the Park City

condominium owned by Receivership Entity AM Property Management, LLC. (*See* Exhibit 2.)  We scrambled to serve notice of the TRO on the rental agencies and payment processor and were able to freeze approximately $6,000 which would otherwise have been transferred to the Hanleys.

- On January 17, 2018, we accessed another account – sandraofficemanager@defaultsupport.com – and learned that on January 15, 2018, Mrs. Hanley accessed the account and sent copies of promissory notes and mortgages due to Receivership Entity AHL to her personal email address.  (*See* Exhibit 3.)  Mrs. Hanley also forwarded other emails to her private email account and deleted others.  We changed the password and now have full access, but cannot determine what Mrs. Hanley may have permanently deleted or changed.

To date, the Hanleys have failed to provide us login credentials for all their email administrative accounts.  While Mr. Hanley purported to provide credentials for four accounts, he only provided the correct administrator username and password for the modificationreviewboard.com account.  Two usernames and passwords that Mr. Hanley provided were accurate, but were not the administrative accounts.  Currently, we have control of the administrative account for three email domains (i.e., consumerdefense.com, defaultsupport.com, and modificationreviewboard.com), only one of which Mr. Hanley provided to us.  We have made multiple requests to Mr. Hanley to provide the administrator usernames and passwords for the remaining three email domains (i.e., americanhomeloans.com, ampropertyinc.com, and preferredlawteam.com).

3.      Refusal to Provide Passwords for Access to Websites

Despite multiple requests, the Hanleys have similarly failed to provide any login credentials to Receivership Entities' websites.  On January 16, 2018, the Hanleys' counsel provided an email address for the website administrator and informed us that the website administrator was instructed to cooperate with the Receiver.  The website administrator has yet to respond to our email requests.  Additionally, even though we requested the login credentials from Mr. Hanley himself, he has yet to provide this information.

We note that some of the Receivership Entities' websites have been modified to display the message "site unavailable", but it is not known whether this change was initiated by Mr. Hanley's website administrator or by GoDaddy after receiving a copy of the TRO.

4.       Interference with Receivership Assets – Park City Condominium

As detailed in Section II.E.2 above, Mrs. Hanley's effort to redirect rental payments relating to the Park City condo to an account she personally controlled is an overt interference with the Receiver's possession and control of Receivership Entity assets.  We have also seen email traffic suggesting that Mr. Hanley may now be seeking to sell the property or obtain loans secured by the property.  (*See* Exhibit 4.)

5.       Interference with Receivership Assets – AHL Mortgages

As detailed in II.E.2 above, Mrs. Hanley's effort to forward copies of promissory notes and mortgages due to AHL is another overt interference with the Receiver's possession and control of Receivership Entity assets.

6.       Refusal to Deliver, and Attempts to Hide and Sell, Vehicles owned by
         Receivership Entities

Beginning on the morning of January 11, 2018, the Receiver advised Mr. Hanley that four vehicles titled in the name of Receivership Entities were to be delivered to the Receiver and would be safely stored until the Preliminary Injunction hearing.  One of those vehicles – the 2008 Mercedes S550 (owned by Brown Legal, Inc.) parked in front of the building at our arrival – was delivered without incident on January 11, 2018 when Mr. Hanley turned over the keys to the Receiver.  As to the other three vehicles, Mr. Hanley's obstruction and treachery were remarkable:

- 2007 Chevy Suburban.  On January 11, 2018, Mr. Hanley requested continued access to the 2007 Chevy Suburban (owned by Brown Legal, Inc.).  The Receiver confirmed that the vehicle must be stored pending the next hearing, but Mr. Hanley could drive it home (as he had no other means to get home) with the express agreement he return it to the offices the next day.  Mr. Hanley did return to the office the next day to retrieve his mobile phone.  When the Receiver asked

8

about the Suburban, Mr. Hanley quickly left the building, claiming he had walked to the office from his home.  This was a direct violation of the agreement to return the Suburban and also implausible as Mrs. Hanley had required more than 20 minutes to drive from their home to the office the day before.  Two members of the Receiver's team followed Mr. Hanley on foot, where they later saw and took photos of him driving the Suburban out of a parking lot behind, and some distance from, the offices.  We did not get control of the vehicle until January 17, 2018.

- 2014 Porsche 911 Carrera 4S.  The most valuable of the Receivership Entities' vehicles is a 2014 Porsche 911 owned by AM Property Management, LLC ("AM Property").  Mr. Hanley turned the recovery of this vehicle into a whack-a-mole adventure.  On January 11, 2018, he claimed not to control the Porsche, hinting he was not a principal of AM Property and the service of the complaint and TRO on him was ineffective as to AM Property.  Through counsel, Mr. Hanley later claimed we should contact another law firm which represented the interests of AM Property and the vehicle; but still later he claimed he personally owned the Porsche which was incorrectly titled in the AM Property name.  After six days of conflicting and evolving stories and Mr. Hanley's failure to provide supporting documents to his claims, we were concerned.  On the morning of January 17, 2018, the Porsche was observed at a Salt Lake City Porsche dealer.  Fearing that Mr. Hanley might sell the car – in obvious violation of the TRO – we contacted the dealer who confirmed that Mr. Hanley wished to sell the car to the dealer and the car was being evaluated at that moment.  We provided the TRO to the dealer, explained the provisions regarding the dealer's obligations as the holder of an estate asset and demanded that the car be turned over.  We were able to take possession of the car and have it towed to a secure storage location before Mr. Hanley returned to the dealer.  Of course, all of this clandestine activity could have been avoided had Mr. Hanley simply abided by the clear terms of the TRO.

///

9

- 2015 Forest River RV.  We learned the location of this RV (owned by AM Property) only after serving the TRO on a storage facility (StoragePlus) which had recently received payments from a Receivership Entity.  Storage Plus agreed to prevent the Hanleys from accessing the RV until further notice.  We ultimately received the keys from Mr. Hanley on January 17, 2018.

7.      <u>Refusal to Identify Location and Provide Access to Storage Unit(s)</u>.

The FTC's moving papers identified business payments to a storage facility in Salt Lake City, Utah.  On January 11, 2018, Mr. Hanley confirmed to the Receiver that the business did indeed maintain four separate storage units, mostly for personal property and furniture, but refused to give the location, necessary access information, or keys.  Not until January 16, 2018, did we receive any cooperation when Hanleys' counsel advised that we would be permitted to inspect these units on January 18, 2018.

These acts of overt obstruction and interference violate multiple provisions of the TRO, including specific requirements to cooperate with the Receiver, provide passwords and other access information (Section XVII), not to interfere with the Receiver (Section VIII), and to cooperate with and assist the Receiver in maintaining and taking possession of Receivership Entities' assets (Section XV).

**III.**

**ASSETS AND LIABILITIES OF RECEIVERSHIP ENTITIES**

Attached as Exhibit 5 is a Preliminary Schedule of Known Assets of Receivership Entities ("Preliminary Schedule").

**A.      <u>Bank Accounts</u>**

Immediately after receiving the TRO, the FTC and the Receiver served the asset freeze on all banks and financial institutions where Defendants were known to maintain accounts. Section I of the Preliminary Schedule summarizes the accounts we are now aware of, including those that are frozen.  Other than the money in these accounts, there do not appear to be any other liquid assets.

///

**B.   Vehicles**

Receivership Entities are the titled owners of three automobiles and a recreational vehicle as detailed in Section II of the Preliminary Schedule.  Despite Mr. Hanley's obstruction, described above at Section II.E, we did ultimately secure possession of the three automobiles and have placed them in temporary storage in Salt Lake City.  We also ultimately secured the keys to the RV which remains stored at its original storage location.

**C.   Real Property**

AM Property Management, LLC, which Mr. Hanley sometimes abbreviated to AM Property, LLC, is the owner of a high-end condominium property in Park City, Utah, purchased in September 2014 for $1.3 million.  The property is subject to a $700,000 mortgage, requiring monthly payments of nearly $7,000.  The property is rented through various websites, such as VRBO, HomeAway, Airbnb, and is currently advertised for rent at $1,200 per day.  *See* https://www.airbnb.com/rooms/4400043; https://www.vrbo.com/627802.  We have provided the TRO to the rental websites.

Defendant Zinly, LLC is the titled owner of the office building at 41 West 9000 South, Sandy, Utah.  It was purchased in October 2016 for $700,000 and is subject to a $510,000 mortgage.  We also found evidence of a 36-month lease between AM Property Management, LLC and Zinly, LLC at $1,500 per month which appears to have been prepared in September, 2017 but signed as of May, 2017.

As to each real property identified above, we will record *Lis Pendens* to protect the Receiver's interests.  As to the Park City property, we confirmed the HOA maintains insurance for the property.  As to the Sandy Office, we found no evidence of insurance and, therefore, have purchased coverage.

**D.   AHL Fundings**

AHL played the role of substitute lender for a limited number of homeowners which resulted in a small portfolio of mortgage loans identified in AHL's records as "AHL Fundings."

1.    Mortgage Loans.  For some homeowners who were unable to secure a
   modification, usually lower-end distressed homes, AHL negotiated and funded a

11

1   "short payoff" with the lender and simultaneously entered into a First Trust Deed

2   mortgage with the homeowner by which AHL became the secured lender.  As

3   such, AHL is the owner of a small portfolio of 25 mortgage loans (current

4   aggregate principal of $1.2 million) with projected monthly cash flow of $8,000.

5   We have not yet reviewed all details of each mortgage, including the operative

6   interest rate and whether the principal amounts of these loans match the amounts

7   advanced by AHL to the prior lender to fund the short payoff.

8   2.   Short Sale Purchases.  In two instances, one in Iowa and one in Mississippi, AHL

9   actually purchased the homeowner's home as a short sale and then entered into

10   loan arrangements with the homeowners – those loans are included in the 25

11   mortgages identified above.

12   Individual details on these AHL Fundings assets are scheduled out in the Receiver's

13   Preliminary Financial Report.  *See* Section IV.E.

14   **IV.**

15   **SUMMARY OF BUSINESS OPERATIONS**

16   The Defendants' business operating upon our arrival was indisputably an advance fee loan

17   modification operation.  Despite many names, locations, and structure changes, all thinly-veiled

18   efforts to avoid the MARS Rule, the current business is consistent with prior iterations of the

19   same core business back to 2011 – a high-pressure, cash-up-front telephone sales business,

20   deceptively selling loan modification services to distressed homeowners.

21   **A.   <u>Structure – the Bifurcation Fiction</u>**

22   The most current structure appears designed to skirt the MARS Rule by promoting a pure

23   fiction – i.e., AHL, which does collect advance fees, is not a loan modification service provider,

24   but a mortgage auditor; Consumer Link, a supposed non-profit entity located in Reno operating

25   separate and apart from AHL, is a loan modification service provider, but collects no fees at all.

26   The reality is that AHL and Consumer Link are not independent or bona fide operating

27   companies, they are just integrated pieces of a business selling loan modification services.  In

28   short, AHL and Consumer Link have common ownership, management, employees, and location.

Further evidence of their interdependence, and Defendants' amateurish efforts to conceal it, abound:

- Internal directories posted in the office identify a family executive team with John Hanley as the "GM" of AHL and Sandra Hanley as the "GM" of Consumer Link, but place AHL in Sandy, Utah (41 W 9000 S) and Consumer Link in Reno, Nevada (200 S. Virginia 8th Floor).  (*See* Exhibit 6.)  The Hanleys, however, both reside in the Salt Lake City, employees operate from the Sandy Office, although consumers are told Consumer Link is in Reno and mail to Consumer Link goes to Reno.

- The AHL directory identifies the sales "Advisers," all with email addresses at the americanhomeloans.com domain while the Consumer Link directory identifies a staff of nine with email addresses at defaultsupport.com.  (*See id*.)  Jonathan and Sandra Hanley are the designated administrators of both domains.

- The AHL sales agents and the Consumer Link staff are situated less than 20 feet from each other in the Sandy Office owned by Receivership Entity Zinly, LLC and leased to AM Property.  (*See* Schematic, Exhibit 1.)

- The AHL sales agents, Consumer Link processing staff, and the Hanleys all received 2017 W-2 and 1099 tax forms indicating that were paid by Consumer Defense, LLC, although the actual funds were disbursed from a Chase Bank account in the name of AHL.

The current bifurcation fiction has its roots in prior iterations of Hanley businesses with each structure change necessitated by consumer complaints and legal risks:

- From 2011 through August, 2016, it was Modification Review Board, LLC labeled as sales and Preferred Law, PLLC labeled as processing with the added element of Defendant Benjamin Horton as the front man attorney.  But, this structure imploded when Mr. Horton was suspended from the Utah Bar on

///

///

13

September 15, 2016 and consumer complaints escalated.[3]  On August 18, 2016, Mr. Hanley instructed his web designer to "build a whole new site for consumerdefense.com.  Any reference to lawyer or Law firm should be changed as follows: Lawyer = Professional, Law firm= Consumer Defense."  (*See* Exhibit 9.)

- From August, 2016 through May, 2017, Defendants dropped the pretense of attorney-involvement and pivoted to the bifurcation fiction of American Home Loan Counselors as sales and Consumer Defense, LLC as a separate processor.  But, this iteration became untenable when consumer complaints to the BBB became insurmountable.  On February 15, 2017, Mr. Hanley reported to the team that "the issues with the BBB appear to be impossible to resolve" and instructed office manager Bobbi Collins to "update the sales agreement with the new American Home Loans logo and swap out 'consumer defense' with 'American hOme laons' [sic] wherever it appears."  (*See* Exhibit 10.)

- Sales agents were anxiously awaiting a change because the negative PR was a problem.  In April, 2017, Sales Agent Rod Kartchner sent two emails to Jonathan Hanley, first pleading to expedite the removal of the Preferred Law and Consumer Defense names from the website because they were "the kiss of death for our line of work." The second noted that "people back out and cancel on us even after they become clients because there are still too many references [to Consumer Defense and Preferred Law] in the material to the negative PR" and "homeowners do a lot of digging…so we are looking for ways to lessen the fall-out and to increase the closing ratio…."  (*See* Exhibit 11.)

- The current structure of AHL as sales and Consumer Link as processing was the pivot designed to avoid the BBB problem.  It was launched in or around May, 2017 when Defendants took occupancy of the 41 West 9000 South building after its purchase by Zinly, LLC.

---

[3]  Mr. Horton continued to play a role in the business throughout 2017.  Among other things, he interacted with the Las Vegas and Reno virtual office landlords (Exhibit 7), and even sought out radio spots for the businesses (Exhibit 8).

The basic structure which included multiple offices, some operational, some limited to mail service, had but one purpose – to provide consumers the false impression of separate operations.  Emails and other correspondence from Consumer Link showed an address in Reno, Nevada and correspondence from Consumer Defense an address in Las Vegas.  (*See* Exhibit 12.)

In our interview with Senior Adviser Wendi Kartchner aka Sue Chowhan, one of the two longest-serving members of the sales team, she offered a summary of her sales presentation which incorporated the implausible fiction of a sales/processing separation as follows: AHL is not a loan modification business, but a company that educates consumers about their options and performs audits of their mortgages (at a cost of $3,900) in order to determine if they "qualify" for a loan modification; those who do "qualify" are referred to a "non-profit" (i.e., Consumer Link) or other provider that process loan modifications at no cost.  She extolled the standard contract between AHL and the consumer (Exhibit 13) as the ultimate confirmation of this sales/processing bifurcation.

While the standard form written agreement was apparently drafted to confirm the distance between AHL and Consumer Link, it actually confirms their interdependence:

- The initial package to consumers includes a Borrower(s) Authorization form on Consumer Link stationery (with the Reno address).  (*See id*.)

- The initial welcome letter, labeled "Service Guarantee Agreement," from AHL specifically identifies Consumer Link and "GUARANTEES" that a modification will be secured, subject to limited conditions.  (*See id*.)

- The scope of services description expressly extends to "continually cooperate with all services performed on Client's matter, including providing mutual online access to Client's file and process supervision."  (*See id*.)

- Client agrees that AHL may engage the service of and provide confidential information to Consumer Link.  (*See id*.)

- The Terms and Conditions include a 10% Principal Reduction Fee to be paid to Consumer Link.  (*See id*.)

///

- Client is required to notify AHL and Consumer Link of any communication with their lender and agrees to provide accurate information to AHL and Consumer Link.  (*See id*.)

- The withdrawal provision provides that "American Home Loans reserves the right to IMMEDIATELY withdraw from assisting Client (which shall include Consumer Link for purposes of this paragraph)."  (*See id*.)

- The "Client agrees to indemnify and hold American Home Loans (including Consumer Link and any other relevant entity or person) harmless."  (*See id*.)

- The contract does include several hollow disclaimers which promote form over substance (that the fees paid by consumers do not relate to "loan modification" and that AHL is totally separate from Consumer Link"), but these disclaimers are expressly contradicted by the Terms and Conditions themselves and by the operational reality.  (*See id*.)

**B.     Marketing**

We found minimal evidence of marketing materials onsite.  While some employees had some recollection of prior use of TV, radio,[4] and direct marketing, current marketing appeared limited to Internet-based vehicles to drive distressed homeowners to Defendants' website, toll-free telephone numbers and/or email.  Leads were purchased from lead generation vendors or initiated by Google AdWords or consumers conducting Google searches for loan modification providers.  The Hanleys spent between $20,000-$30,000 per month with one lead generator.  Each lead appears to have cost roughly $25-$30 to acquire.

**C.     Sales**

The Sales "Department" is not so much a department as a loose alliance of three "Senior Advisers" operating under the name AHL.  They respond to incoming consumer phone calls and email leads as distributed by Mr. Hanley and the office manager.  They described their system as "freelance" with minimal written scripts or other directives and apparently modest management

---

[4] As of October of 2017, Benjamin Horton was scouting radio commercials.  (*See* Exhibit 8.)

supervision.  They followed no set hours and each apparently deployed their own chosen sales tactics.

      1.   <u>Advance Fee</u>

The standard fee was $3,900 with three basic payment options (three payments of $1,300; four payments of $975; or six 6 payments of $650), although Senior Advisers had some limited discretion to vary this price.

This $3,900 fee was an advance fee at every conceivable level:

- At a minimum, no work would commence until receipt of the first payment.  Late payment outside the "Payment Form" signed at the outset would result in a Hold on the account until the payment was received.  Our review of LoanPost indicates that approximately 33 accounts are currently in Hold status.

- Regardless of the payment schedule, files were not to be submitted to lenders at all until a designated minimum amount was received from the consumer.  This minimum was $1,500 through January, 2017, increasing to $2,500 in February, 2017.  (*See* Exhibit 14.)  For example, on February 10, 2017, office manager Bobbi Collins confirmed that on a client with a sale date on March 14, 2017 who had only paid $975 to date, "Sandra is wanting a minimum $2500 in order to submit him to the lender sale date 3.14.17…" The sales rep was thus instructed to tell the consumer that "$1525 needed to submit his file."  (*See* Exhibit 15.)

- Sandra Hanley was particularly concerned about clients with extended payment schedules.  In evaluating whether to approve a $2,000 reduced fee on a second mortgage modification, to be paid over 4 months, she wrote: "But if the client is going to be wondering what we are doing for 4 months until we collect 2000 minimum, then we are setting ourselves up for a headache."  (*See* Exhibit 16).

- Sales Advisers were encouraged to secure the shortest possible payment schedule.  In reply to a message from Sandra Hanley criticizing a long payment schedule, the adviser Ron Karcher boasted: "Jon has also told me on several occasions that I am better at getting the most money out of clients than any of the other advisers…I

consistently set the very highest payment schedule that I can possible get out of homeowners for my own benefit and for everyone else's benefit" (*See* Exhibit 17.)

The $3,900 fee was not the complete fee, but was deviously increased by terms and conditions buried in the standard contract:

- Buried in Paragraph 2 of the Terms and Conditions of the form agreement is a $297 per month "continuity fee" until "services are complete."  Such continuity charges accounted for $1.49 million in revenues, 10% of total revenue.  *See* Exhibit 13 and Section IV.E.

- The Terms and Conditions also included a "Debt Reduction Contingency Fee" of 10% of any reduction in mortgage principal to be paid to Consumer Link or its assigns.  (*See* Exhibit 13.)

- The Terms and Conditions include a classic adhesion provision by which a client paying by credit card agrees not to chargeback the card "for any reason" and to pay liquidated damages of $250 if they do so.  (*See id.*)

2.   Commissions

Senior Advisers were paid by commission at $400 per completed sale, but received the full amount upon the consumer's first payment only if they had sold the consumer on the fast pay rate of three payments of $1,300.  Otherwise, this commission was paid over two months.  The incentives were clear – make the sale and collect the money as soon as possible.

3.   Deceptive Sales Practices

Our review of materials on site also revealed the use of deceptive sales practices as part of a culture where the incentives were to sell:

- The Service Guarantee Agreement includes an express "GUARANTEE," subject to certain conditions.  (*See* Exhibit 13.)

- In one brief undated document titled "Important notes regarding client calls" found on site (Exhibit 18), Mr. Hanley highlighted key ingredients of the business. First, he confirmed that heavy investment in lead generation compelled sales

18

results.  "It costs me $1,500 in marketing costs to generate each new client file and this is BEFORE I pay any wages, costs, etc."  The goal was not to help homeowners, but to achieve an appropriate return on investment.

- Second, he confirmed that Clients should be told "Your bank will not work with you if you are making payments."  (*See id.*)

- Third, he confirmed that Cease & Desist Letters sent out early in the process "guarantees that ALL communications and correspondence will go through us", thus precluding consumers from direct communication with their lender.  (*See id.*)

- Sales personnel seldom answered incoming calls under the name AHL, but only with generic names such as "Agency" or "Default Support."

- Sales calls were recorded.  We have only had the opportunity to review a small number of calls, but in those, sales personnel claimed a 99% success rate and made numerous misrepresentations and omissions.  Sales personnel also portrayed themselves as unrelated to AHL or Consumer Link and claimed to be independent and uncompensated third parties just trying to be helpful.

4.  Refunds

Refunds were granted to complaining clients only after significant resistance.  The office manager's practice was to "typically wait to do anything on refunds until they [customers] call in two times."  (*See* Exhibit 19.)  Email traffic indicated that only the most intrepid consumers secured refunds, but generally only partial refunds.  (*See* Exhibit 20.)

**D.  Processing**

The Sandy Office did include infrastructure to process mortgage modification applications and it does appear that some homeowner clients secured some form of mortgage relief from their lenders.  The processing staff, loosely operating as Consumer Link in the latest iteration, was composed of the office manager, a billing assistant, case representatives, processors, and negotiators.  We made a temporary arrangement with one of the negotiators to assist in our on-going efforts to minimize prejudice to consumers.

///

19

Based on available data, current processing volume was not high.  A white board on the processing wall at our arrival (Exhibit 21) indicated 210 active accounts, 38 accounts with sale dates ("SD"), and 28 on hold ("Hold") for payment problems.  The board also indicated that another 89 accounts were currently in their 3-month Trial Payment Plan ("TPP") after an initial modification approval by their lender.

With assistance from onsite staff, we reviewed LoanPost data for an approximate snapshot of historical activity.  For calendar year 2017, that data indicated that 812 new accounts were activated in 2017.  177 are categorized as "active."  The others are categorized as closed (497), hold (31), arranged collect (16), hard collect (25), TPP (47), refunds pending (13), and AHL pending funding (2).  Of the 497 closed files, a review of the LoanPost data by the Receiver's staff identified 68 approved loan modifications, and 5 TPPs (which is a conditional approval).  We have not audited or confirmed the accuracy of these numbers.

We have been unable in the time available to confirm a reliable summary of historical loan modification activity for the full period of 2011 to January, 2018.

While the LoanPost data may indicate that some consumers secured modifications, no level of success can obviate the fraudulent and illegal intake process or the fact that the same or similar relief could be obtained by homeowners themselves or with the assistance of a no-fee public service provider.

**E.**   **Operating Results**

We found minimal financial records on site and no evidence that Defendants deployed any sort of accounting system.

We retained James Wood of the firm of Lone Peak Valuation Group ("Wood") in Salt Lake City to reconstruct the financial activity of Defendants.  To date, Wood has reviewed the limited available records and has prepared a Receiver's Preliminary Financial Report, attached as Exhibit 22.

That report is limited to revenues since we do not yet have bank records or other documents regarding expenses.  The primary source of data was Smartsheet, an online

///

spreadsheet program, on which the billing clerk in the processing department, tracked payments coming in from clients.  We have not reconciled these with any bank records.

Total net fee revenues reported in Smartsheet from 2011 to present are $14,293,221.  In Smartsheet, these revenues are broken down by the three chronological phases of the business: Preferred Law[5] (net revenues $12,829,211); Consumer Defense[6] (net revenues $244,273); and American Home Loans[7] (net revenues $1,200,037).  A final category for Armour Debt Collections, which was the name used by internal collections staff, accounted for net revenues of $19,700.

AHL also received $227,098 in revenue from interest payments on its portfolio of 25 mortgages, categorized in Smartsheet as "AHL Funded."  AM Property Management, LLC received revenues from rental payments on the Park City condominium of $42,452 for the period 2014-2017, categorized in Smartsheet as Royal Terrace (the street name of the condominium).

Wood's report also projects the universe of unique customers who made fee payments to Receivership Entities at 4,457, broken done by Preferred Law (3,804), Consumer Defense (141), and American Home Loans (532).  This appears to roughly track the calculations provided us by the office manager that the LoanPost universe of "qualified" customers was 4,392.

The available records indicate that the Individual Defendants were well compensated. Based on W-2 and 1099 forms onsite, Jonathan Hanley was paid W-2 wages of $129,500 in 2016 ($122,000 by Modification Review Board; $7,500 by Consumer Defense LLC) and $151,000 in 2017 (Consumer Defense LLC); Sandra Hanley was paid W-2 wages of $153,000 in 2016 ($144,000 by Modification Review Board; $9,000 by Consumer Defense LLC) and $141,500 in 2017 (Consumer Defense LLC); and Benjamin Horton, through his entity Capitalism LLC, in 2017 received non-employee compensation of $109,200 from Consumer Defense LLC.

---

[5]  The Preferred Law designation represents the period 2011 through August, 2016 when Defendants operated as Modification Review Board/Preferred Law.

[6] The Consumer Defense designation represents the period August, 2016 through May, 2017 when Defendants operated as American Home Loan Consultants/Consumer Defense.

[7] The AHL designation represents the period since May, 2017 when Defendants have operated as AHL/Consumer Link.

# V.

## CAN THIS BUSINESS BE OPERATED

## LAWFULLY AND PROFITABLY?

The TRO tasks the Receiver to determine whether the business of the Receivership Entities can be operated lawfully and profitably.  Our conclusion is a decisive no.  These Defendants embraced an illegal and predatory business model to make money on the backs of distressed homeowners.

### A.   **Legally**

The MARS Rule prohibition of advance fees for loan modification services has now been textbook law for more than six years.  In that time, these Defendants have invoked every artifice possible to disguise and camouflage their overt violation of the Rule.

As fully detailed in the FTC's filings, the MARS Rule is crystal clear – providers of mortgage assistance relief services are prohibited from charging up-front fees.  Such providers cannot collect a fee until the homeowner has signed a written agreement with the lender that includes the relief the company obtained.  When the homeowner is presented with the written agreement, the provider must inform the homeowner that he or she can reject the offer without obligation and, if the homeowner accepts, the total fee is due.  16 C.F.R. § 322.3 and 322.5.  At no level, has the loan modification business of Receivership Entities complied with this Rule.

The misrepresentations and lack of disclosures to consumers identified in the FTC's filings and confirmed by our on-site experience, could, in theory, be corrected by a total overhaul – no sales pitch that misrepresented, over-promised and under-disclosed; no sales personnel incentives tied only to closed sales.  But, such an overhaul, regardless how comprehensive and pure, would not render this advance fee business lawful.

### B.   **Profitably**

If the business could somehow be run lawfully, sustainability and profitability would be doomed:

- The prohibition of advance fees would itself kill the opportunity to build a volume business as there would not be enough operating income to cover expenses.  To

operate on a payment upon completion system would require substantial capital to fund operations.

- If sales personnel were trained to sell without hyperbole, hype, or misinformation, that alone would reduce sales and increase expenses for hiring, training, and supervision.

Dated:  January 24, 2018                    By: ___/s/ Thomas W. McNamara_____
                                                Thomas W. McNamara,
                                                Court-Appointed Temporary Receiver

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of January, 2018, pursuant to Fed. R. Civ. P. 5(b), I served via CM/ECF or delivered by email and mailing in the U.S. Mail a true and correct copy of the foregoing **PRELIMINARY REPORT OF TEMPORARY RECEIVER**, postage prepaid and addressed to the following:

**VIA CM/ECF**
Adam M Wesolowski
Gregory A. Ashe
Federal Trade Commission
600 Pennsylvania Ave NW
Mailstop CC-10232
Washington, DC 20580
Tel.:    202-326-3068 (Wesolowski)
          202-326-3309 (Ashe)
Fax:    202-326-2558
Email: awesolowski@ftc.gov
          gashe@ftc.gov
*Attorneys for the Federal Trade Commission*

**VIA CM/ECF**
Blaine T. Welsh
U.S. Attorney's Office
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, NV 89101
Tel.:    702-388-6336
Email: Blaine.Welsh@usdoj.gov
*Attorneys for the Federal Trade Commission*

**VIA U.S. MAIL
& EMAIL**
Benjamin R Horton
793 West Centino Drive, #C208
South Jordan, UT 84095
Email: benhortonesq@yahoo.com


  /s/ Edward Chang
Edward Chang
*Attorneys for the Court-appointed Temporary*
*Receiver, Thomas W. McNamara*

i