ALDEN F. ABBOTT
General Counsel
GREGORY A. ASHE
JASON SCHALL
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Telephone: 202-326-3719 (Ashe)
Telephone: 202-326-2251 (Schall)
Facsimile: 202-326-3768
Email: gashe@ftc.gov, jschall@ftc.gov

NICHOLAS A. TRUTANICH
United States Attorney
BLAINE T. WELSH
Assistant United States Attorney
Nevada Bar No. 4790
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787

Attorneys for Plaintiff

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION,** | **Case No. 2:18-cv-00030-JCM-BNW** |
| Plaintiff, | |
| v. | **FTC'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF** |
| **CONSUMER DEFENSE, LLC, *et al*.,** | |
| Defendants. | |

1

**TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................... 1

II.   STATEMENT OF MATERIAL FACTS ...................................................... 2

      A.  The Parties ...................................................................................... 2

          1.  Federal Trade Commission ...................................................... 2

          2.  Defendants ................................................................................ 2

      B.  Defendants' Unlawful Business Practices ..................................... 8

          1.  Defendants Use False, Deceptive, or Misleading Representations to Market Mortgage Assistance Relief Services .......................................................... 9

              a.  Defendants Misrepresent that They Generally Will Obtain Mortgage Modifications that Will Make Consumers' Payments Substantially More Affordable .................................................... 9

              b.  Defendants Make False Claims of Government Affiliation and Endorsement and Special Relationships with Lenders ............................ 14

              c.  Defendants Make False Claims that Consumers Are Not Obligated to Pay Their Mortgages and Should Not Contact or Communicate with Their Lenders or Servicers .................................................. 16

          2.  Defendants Fail to Make Required Disclosures .................... 18

          3.  Defendants Illegally Collect Advance Fees for Their Services ........................... 19

      C.  Defendants' Practices Have Squeezed Millions of Dollars from Consumers ........... 22

      D.  Facts Relating to Defendants' Affirmative Defenses ................... 22

III.  THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST DEFENDANTS ............................................................. 23

      A.  Summary Judgment Standard ....................................................... 23

      B.  This Court Has Jurisdiction and Venue Is Proper ....................... 23

      C.  Defendants Have Violated Section 5 of the FTC Act .................. 25

          1.  Defendants Failed to Obtain Promised Mortgage Relief (Count I) ..................... 28

i

2. Defendants Falsely Claimed Affiliation with the Government and Lenders, and Misrepresented Consumers' Obligations to Pay Their Mortgages (Count II) ...... 30

D. Defendants Have Violated Several Provisions of Regulation O ................................. 31

1. Defendants Took Prohibited Advance Fees (Count III) ............................... 32

2. Defendants Made Prohibited Representations (Count IV) ................................... 33

3. Defendants Made Material Misrepresentations (Count V) ................................... 34

4. Defendants Failed to Make Required Disclosures (Count VI) ............................ 34

E. The Corporate Defendants Are Jointly and Severally Liable as a Common Enterprise ........................................................................................................... 36

F. Individual Defendants Jonathan Hanley and Sandra Hanley Are Liable for injunctive and Monetary Relief ................................................................................................. 37

IV.   THE SCOPE OF THE PROPOSED ORDER IS APPROPRIATE IN LIGHT OF DEFENDANTS' CONDUCT ................................................................................ 39

A. The Proposed Injunctive Provisions Are Appropriate ................................................. 40

1. Conduct Relief ............................................................................................... 40

2. Monitoring Provisions .................................................................................... 42

B. The Proposed Equitable Monetary Relief Is Appropriate ........................................... 43

1. The Amount of Equitable Monetary Relief Is Appropriate ................................. 43

2. Defendants' Statute of Limitations Defense Is Without Merit ............................ 45

V.   THERE IS NO GENUINE DISPUTE OF MATERIAL FACTS AS TO ANY OF DEFENDANTS' REMAINING AFFIRMATIVE DEFENSES ...................................... 46

A. Because Third Parties Did Not Cause Defendants to Violate the Law, Defendants' Fifth Affirmative Defense Can Be Rejected ............................................................... 47

B. Entry of the Proposed Order Is in the Public Interest ................................................. 48

C. Defendants' Remaining Affirmative Defenses Are Not Affirmative Defenses and Can Be Rejected .............................................................................................................. 49

VI.   CONCLUSION ........................................................................................................ 50

# TABLE OF AUTHORITIES

## CASES

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970)................................................................2

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................23

*Barnes v. AT&T Pension Benefit Plan*,
  718 F. Supp. 2d 1167 (N.D. Cal. 2010) ...................................49

*Cmty. Blood Bank of the Kan. City Area v. FTC*,
  405 F.2d 1011 (8th Cir. 1969)..................................................24

*Curtis Lumber Co. v. La. Pac. Corp.*,
  618 F.3d 762 (8th Cir. 2010)...................................................27

*Exposition Press, Inc. v. FTC*,
  295 F.2d 869 (2d Cir. 1961)....................................................28

*Ford Motor Co. v. FTC*,
  120 F.2d 175 (6th Cir.), *cert. denied*, 314 U.S. 668 (1941).............24

*FTC v. Affordable Media, LLC*,
  179 F.3d 1228 (9th Cir. 1999)..................................................38

*FTC v. AmeriDebt, Inc.*,
  343 F. Supp. 2d 451 (D. Md. 2004) .........................................25

*FTC v. AMG Servs.*,
  29 F. Supp. 3d 1338 (D. Nev. 2014) ........................................26

*FTC v. AMG Servs.*,
  2017 U.S. Dist. LEXIS 66689
  (D. Nev. May 1, 2017) .............................23, 26, 27, 36, 37, 38, 39, 43, 44, 45

*FTC v. Amy Travel Serv., Inc.*,
  875 F.2d 564 (7th Cir. 1989)...........................................29, 37, 38

*FTC v. Am. Standard Credit Sys.*,
  874 F. SUpp. 1080 (C.D. Cal. 1994).........................................39

*FTC v. A to Z Mktg., Inc.*,
  2014 U.S. Dist. LEXIS 197440 (C.D. Cal. Sept. 17, 2014)..............32

*FTC v. A to Z Mktg., Inc.*,
    2014 U.S. Dist. LEXIS 191693 (C.D. Cal. Sept. 2, 2014) .................................................. 41

*FTC v. City W. Advantage, Inc.*,
    2008 WL 2844696 (D. Nev. July 22, 2008) .................................................................... 28

*FTC v. Colgate-Palmolive Co.*,
    380 U.S. 374 (1965) ........................................................................................................ 41

*FTC v. Commerce Planet, Inc.*
    815 F.3d 593 (9th Cir. 2016) ................................................................................. 43, 44

*FTC v. Connelly*,
    2006 U.S. Dist. LEXIS 98263 (C.D. Cal. Dec. 20, 2006) ............................................ 29

*FTC v. Cyberspace.com, LLC*,
    453 F.3d 1196 (9th Cir. 2006) .................................................. 25, 26, 27, 30, 31

*FTC v. Dalbey*,
    2012 U.S. Dist. LEXIS 67393 (D. Colo. May 15, 2012) ............................................. 46

*FTC v. Data Med. Capital, Inc.*,
    2010 U.S. Dist. LEXIS 3344 (C.D. Cal. Jan. 15, 2010) ............................................... 26

*FTC v. Dig. Altitude, LLC*,
    2019 U.S. Dist. LEXIS 37010 (C.D. Cal. Mar. 6, 2019) ............................................. 42

*FTC v. Dinamica Financiera, LLC*,
    2010 U.S. Dist. LEXIS 88000 (C.D. Cal. Aug. 19, 2010) ..................................... 41, 43

*FTC v. Direct Mktg. Concepts, Inc.*,
    624 F.3d 1 (1st Cir. 2010) ............................................................................................. 27

*FTC v. Direct Mktg. Concepts, Inc.*,
    648 F. Supp. 2d 202 (D. Mass. 2009) ......................................................................... 42

*FTC v. EDebitPay, LLC*,
    2011 U.S. Dist. LEXIS 15750 (C.D. Cal. Feb. 3, 2011) .............................................. 44

*FTC v. Ewing*,
    2017 U.S. Dist. LEXIS 176209 (D. Nev. Oct. 24, 2017) ............................................. 44

*FTC v. Figgie Int'l, Inc.*,
    994 F.2d 595 (9th Cir. 1993) .................................................................... 26, 43, 44

*FTC v. Five-Star Auto Club*,
    97 F. Supp. 2d 502 (S.D.N.Y. 2000)........................................................26, 29

*FTC v. Gill*,
    265 F.3d 944 (9th Cir. 2001)..................................................................40, 41

*FTC v. Grant Connect, LLC*,
    763 F.3d 1094 (9th Cir. 2014)..................................................36, 37, 38, 42

*FTC v. Grant Connect, LLC*,
    827 F. Supp. 2d 1199 (D. Nev. 2011) .....................................26, 27, 28, 36

*FTC v. H.N. Singer, Inc.*,
    668 F.2d 1107 (9th Cir. 1982)...........................................................................39

*FTC v. Ideal Fin. Solutions, Inc.*,
    2016 U.S. Dist. LEXIS 23102 (D. Nev. Feb. 23, 2016) ............................41, 42

*FTC v. Inc21.com*,
    475 F. App'x 106 (9th Cir. 2012) ....................................................................43

*FTC v. Inc21.com*,
    745 F. Supp. 2d 975 (N.D. Cal. 2010), *aff'd*, 475 F. App'x 106 (9th Cir. 2012) ........44, 46

*FTC v. Instant Response Sys., LLC*,
    2014 U.S. Dist. LEXIS 17148 (E.D.N.Y. Feb. 11, 2014) ................................46

*FTC v. Ivy Capital, Inc.*,
    2013 U.S. Dist. LEXIS 90566 (D. Nev. Jun. 26, 2013)....................................42

*FTC v. Ivy Capital, Inc.*,
    2013 U.S. Dist. LEXIS 42369 (D. Nev. Mar. 26, 2013).....................26, 36, 37, 38, 41, 43

*FTC v. Ivy Capital, Inc.*,
    2011 U.S. Dist. LEXIS 65835 (D. Nev. Jun. 20, 2011)....................................45

*FTC v. J.K. Publ'ns, Inc.*,
    99 F. Supp. 2d 1176 (C.D. Cal. 2000) ...........................................................36

*FTC v. John Beck Amazing Profits, LLC*,
    888 F. Supp. 2d 1006 (C.D. Cal. 2012) ...........................................................42

*FTC v. John Beck Amazing Profits, LLC*,
    865 F. Supp. 2d 1052 (C.D. Cal. 2012) ...........................................................36

*FTC v. Johnson*,
    2013 U.S. Dist. LEXIS 80341 (D. Nev. Jun. 6, 2013)....................................50

*FTC v. Kitco of Nev., Inc.*,
    612 F. Supp. 1282 (D. Minn. 1985) ............................................................26

*FTC v. Kutzner*,
    2017 U.S. Dist. LEXIS 174298 (C.D. Cal. Sep. 21, 2017) ..............................41

*FTC v. Lake*,
    2016 U.S. Dist. LEXIS 187702 (C.D. Cal. May 31, 2016) ..............................41

*FTC v. Lake*,
    181 F. Supp. 3d 692 (C.D. Cal. 2016) ..........................................................41

*FTC v. Lakhany*,
    2013 U.S. Dist. LEXIS 194718 (C.D. Cal. Feb. 28, 2013) ..............................41

*FTC v. MacGregor*,
    360 F. App'x 891 (9th Cir. 2009) ................................................................38

*FTC v. Mortgage Relief Advocates LLC*,
    2015 U.S. Dist. LEXIS 186809 (C.D. Cal. Jul. 1, 2015) ................................30

*FTC v. Moses*,
    913 F.3d 297 (2d Cir. 2019) ........................................................................38

*FTC v. NCH, Inc.*,
    1995 U.S. Dist. LEXIS 21096 (D. Nev. Sep. 5, 1995), *aff'd* 106 F.3d 407
    (9th Cir. 1997) ......................................................................................38, 41

*FTC v. Neovi, Inc.*,
    604 F.3d 1150 (9th Cir. 2010) ......................................................................44

*FTC v. Neovi, Inc.*,
    598 F. Supp. 2d 1104 (S.D. Cal. 2008) ........................................................38

*FTC v. Network Servs. Depot, Inc.*,
    617 F.3d 1127 (9th Cir. 2010) ................................................................36, 38

*FTC v. N. Am. Mktg. & Assocs.*,
    2012 U.S. Dist. LEXIS 150102 (D. Ariz. Oct. 17, 2012) ................................49

*FTC v. OMICS Grp. Inc.*,
    374 F. Supp. 3d 994 (D. Nev. 2019) ...............23, 26, 27, 28, 30, 36, 37, 38, 39, 42, 43, 44

*FTC v. Pantron I. Corp.*,
    33 F.3d 1088 (9th Cir. 1994)..........................................................26, 39, 43

*FTC v. Publishers Bus. Servs.*,
   540 F. App'x 555 (9th Cir. 2013) ....................................................................37, 43, 44

*FTC v. Publ'g Clearing House, Inc.*,
   104 F.3d 1168 (9th Cir. 1997).........................................................................27, 37, 38

*FTC v. Publ'g Clearing House, Inc.*,
   1995 U.S. Dist. LEXIS 19659 (D. Nev. May 12, 1995), *aff'd* 104 F.3d 1168
   (9th Cir. 1997).........................................................................................................41

*FTC v. SlimAmerica, Inc.*,
   77 F. Supp. 2d 1263 (S.D. Fla. 1999) ......................................................................43

*FTC v. Stefanchik*,
   559 F.3d 924 (9th Cir. 2009).......................................................................23, 25, 43

*FTC v. Stefanchik*,
   2007 U.S. Dist. LEXIS 25173 (W.D. Wash. Apr. 3, 2007)......................................26

*FTC v. Stefanchik*,
   2004 U.S. Dist. LEXIS 30710 (W.D. Wash. Nov. 12, 2004) ...................................47

*FTC v. Think Achievement Corp.*,
   144 F. Supp. 2d 993 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002)................36, 38

*FTC v. Think Achievement Corp.*,
   144 F. Supp. 2d 1013 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002)....................42

*FTC v. Think All Publishing, LLC*,
   564 F. Supp. 2d 663 (E.D. Tex. 2008) ......................................................................49

*FTC v. US Sales Corp.*,
   785 F. Supp. 737, 753-54 (N.D. Ill. 1992) ...............................................................43

*FTC v. Vemma Nutrition Co.*,
   2016 U.S. Dist. LEXIS 85280 (D. Ariz. Jun. 30, 2016) ...........................................47

*FTC v. Wash. Data Res.*,
   856 F. Supp. 2d 1247 (M.D. Fla. 2012) ....................................................................30

*FTC v. Wellness Support Network, Inc.*,
   2014 U.S. Dist. LEXIS 21449 (N.D. Cal. Feb. 19, 2014).........................................42

*FTC v. Wells*,
   385 F. App'x 712 (9th Cir. 2010) ..............................................................................43

*FTC v. World Travel Vacation Brokers*,
    861 F.2d 1020 (7th Cir. 1988)............................................................27

*Heckler v. Chaney*,
    470 U.S. 821 (1985)...........................................................................48

*Kokesh v. SEC*,
    137 S. Ct. 1635 (2017)......................................................................46

*Kraft, Inc. v. FTC*,
    970 F.2d 311 (7th Cir. 1992)............................................................28

*Lemery v. Duroso*,
    2009 U.S. Dist. LEXIS 50771 (E.D. Mo. June 16, 2009)...................49

*Litton Indus., Inc. v. FTC*,
    676 F.2d 364 (9th Cir. 1982)............................................................42

*Ohio Christian Coll.*,
    80 F.T.C. 815 (1972).........................................................................24

*Removatron Int'l Corp. v. FTC*,
    884 F.2d 1489 (1st Cir. 1989)......................................................27, 28

*Resort Car Rental Sys., Inc. v. FTC*,
    518 F.2d 962 (9th Cir. 1975)........................................................27, 28

*Sears, Roebuck and Co. v. FTC*,
    676 F.2d 385 (9th Cir. 1982)............................................................40

*SEC v. Am. Bd. of Trade*,
    751 F.2d 529 (2d Cir. 1984).............................................................40

*SEC v. Mgmt. Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975).............................................................40

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980)............................................................40

*SEC v. Princeton Econ. Int'l Ltd.*,
    2001 U.S. Dist. LEXIS 948 (S.D.N.Y. Feb. 7, 2001).......................48

*Temple v. Synthes Corp.*,
    498 U.S. 5 (1990)..............................................................................48

*In re Thompson Med. Co.*,
    104 F.T.C. 648 (1984).......................................................................28

*United States v. Dos Cabezas Corp.*,
 995 F.2d 1486 (9th Cir. 1993)............................................................45

*United States v. Lopez*,
 6 F.3d 1281 (7th Cir. 1993)............................................................48

*United States v. W.T. Grant Co.*,
 345 U.S. 629 (1953)............................................................40, 49

*Vogel v. Huntington Oaks Delaware Partners, LLC*,
 291 F.R.D. 438 (C.D. Cal. 2013)............................................................49

## STATUTES & REGULATIONS

12 U.S.C. § 5538............................................................2

15 U.S.C. §§ 41–58............................................................2

15 U.S.C. § 44............................................................24

15 U.S.C. § 45............................................................1, 2, 23, 25

15 U.S.C. § 45(a)............................................................2

15 U.S.C. § 53(b)............................................................23, 39, 45, 48

15 U.S.C. § 57b(d)............................................................46

28 U.S.C. § 1337(a)............................................................23

28 U.S.C. § 1345............................................................23

12 C.F.R. Part 1015............................................................1, 2

12 C.F.R. Part 1015.2............................................................31, 35

12 C.F.R. Part 1015.3(a)............................................................33

12 C.F.R. Part 1015.3(b)............................................................34

12 C.F.R. Part 1015.4(a)............................................................34

12 C.F.R. Part 1015.4(b)(1), (2), (3)............................................................34, 35

12 C.F.R. Part 1015.4(c)............................................................35

12 C.F.R. Part 1015.5(a) ...................................................................................32

12 C.F.R. Part 1015.7 .......................................................................................32

12 C.F.R. Part 1015.7(a) ...................................................................................32

12 C.F.R. Part 1015.7(a)(2) ...............................................................................33

12 C.F.R. Part 1015.7(a)(3) ...............................................................................33

12 C.F.R. Part 1015.7(b) ...................................................................................33

75 FR 48458 (Aug. 10, 2010) ...........................................................................29

Fed. R. Civ. P. 12(f) .........................................................................................47

Fed. R. Civ. P. 56(a) .........................................................................................23

Utah Code Ann. § 16-6a-110(4) ........................................................................25

Utah Code Ann. § 16-10a-1405 ...........................................................................3

Utah Code Ann. § 48-3a-706 ...............................................................................3

**MISCELLANEOUS**

2 Moore's Federal Practice § 12.37[3] ...............................................................47

## I.   INTRODUCTION

The Federal Trade Commission ("FTC") filed its complaint (ECF No. 1) on January 8, 2018, to halt an unlawful mortgage assistance relief services scam that has bilked consumers out of more than $18 million. Defendants targeted distressed homeowners with false promises that they would obtain mortgage modifications that would make consumers' mortgages more affordable. Defendants also represented that they were affiliated with or endorsed by the government or consumers' lenders. In addition, Defendants instructed consumers to not pay their mortgages and not contact or respond to their lenders, failed to make required disclosures, and collected hefty illegal advance fees from consumers. Despite their lofty promises and the extraction of thousands of dollars from individual consumers, many victimized consumers found themselves worse off, with months of penalties, interest, and missed payments added to their mortgages, and in some cases, have faced foreclosure, bankruptcy, and the loss of their homes. The FTC alleged that these practices violate Section 5 of the FTC Act, 15 U.S.C. § 45, and multiple provisions of the CFPB's Regulation O, 12 C.F.R. Part 1015.

On January 10, 2018, on motion by the FTC, the Court entered an *ex parte* temporary restraining order with asset freeze, appointment of a receiver, and other equitable relief. (ECF No. 12.) On February 20, 2018, after a hearing held on February 15, 2018, the Court entered a preliminary injunction continuing the terms of the temporary restraining order. (ECF No. 55.)

The FTC hereby moves the Court, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, for summary judgment against Defendants Consumer Defense, LLC (Nevada), Consumer Link, Inc., Preferred Law, PLLC, American Home Loan Counselors, Consumer Defense Group, LLC, Consumer Defense, LLC (Utah), Brown Legal, Inc., AM Property

Management, LLC, FMG Partners, LLC, Zinly, LLC, Jonathan Hanley, and Sandra Hanley.[1]  As discussed below, summary judgment is appropriate in this case because the FTC has presented overwhelming and uncontroverted evidence that Defendants violated Section 5 of the FTC Act, 15 U.S.C. § 45, and multiple provisions of Regulation O, 12 C.F.R. Part 1015, in connection with the marketing of mortgage assistance relief services, and because there are no genuine issues of material fact requiring a trial. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A proposed order has been filed with this motion.

## II.   STATEMENT OF MATERIAL FACTS

### A.  The Parties

#### 1.  Federal Trade Commission

| No. | Statement of Material Fact |
|---|---|
| (1) | The FTC is an independent agency of the United States Government created by the FTC Act. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. In addition, pursuant to 12 U.S.C. § 5538, the FTC enforces Regulation O, which requires mortgage assistance relief services providers to make certain disclosures, prohibits certain misrepresentations, and generally prohibits the collection of an advance fee. |

#### 2.  Defendants

| No. | Statement of Material Fact |
|---|---|
| (2) | Defendant Consumer Defense, LLC ("Consumer Defense–Nevada") is a Nevada limited liability company formed on July 18, 2016. (PX20 at 9 ¶ 16, Att. A at 48-49.)[2] Consumer Defense–Nevada is one of the consumer-facing components of the common enterprise, placing its name and logo on Defendants' websites, and marketing Defendants' mortgage assistance relief services online and over the phone. (*See, e.g.*, PX01 at 3 ¶ 9; PX09 at 2 ¶ 5, Att. A at 5-6, 8-13; PX11 at 1-2 ¶¶ 2-5; PX22 Att. C at 77-79; SJX18 at 10-11, 26.[3]) |
| (3) | Defendant Consumer Link, Inc. ("Consumer Link") is a Nevada corporation incorporated |

---

[1] On June 5, 2018, the Court entered a stipulated order for permanent injunction and monetary judgment as to Defendant Benjamin Horton. (ECF No. 111.)

[2] The label "PX" refers to the FTC's exhibits filed in support of its motion for preliminary injunction, and are located at ECF Nos. 7 – 7-10 and 49-2 – 49-13. The exhibits filed with this motion for summary judgment are labeled "SJX."

[3] For the Court's convenience, the FTC has highlighted the relevant passages on the deposition transcript.

purportedly as a non-profit on September 7, 2016. (PX20 at 9 ¶ 17, Att. B at 55.) Consumer Link works in tandem with Consumer Defense–Nevada. (*See, e.g.*, PX13 Att. A at 15-17; SJX18 at 12, 25, 26.) Consumer Link did not provide any of the charitable services listed in its articles of incorporation, such as "the promotion of housing development for the relief of the poor, indigent, underprivileged, and distressed." (*See* PX20 Att. E at 82.) Further, it has not obtained federal non-profit status. (*Id.* at 10-11 ¶ 21; SJX05 at 9 (Admission No. 83).)

| **(4)** | Defendants admit that Consumer Defense, LLC ("Consumer Defense–Utah") is a Utah limited liability corporation formed on February 11, 2016. (SJX01 at 4 ¶ 12; PX20 at 10 ¶ 20, Att. H at 107-108). Like its Nevada counterpart, Consumer Defense–Utah is one of the consumer-facing components of Defendants' operation, sharing addresses and bank accounts with Consumer Defense–Nevada. (PX20 at 5-6 Table 4, 11 ¶ 21, Att. HHH at 1277.) |
|---|---|
| **(5)** | Defendants admit that Preferred Law, PLLC ("Preferred Law") is a Utah professional limited liability company formed on October 26, 2011. (SJX01 at 4 ¶ 8; PX20 Att. K at 132-33.) Defendant Horton filed its statement of dissolution on November 16, 2016, (PX20 Att. K at 138), although Defendants have continued to use the name "Preferred Law" in interactions with some consumers. (*See* PX07 Att. D at 25 (December 2016 email to consumer); PX16 Att. E at 20 (listing consumer payments to Preferred Law after November 16, 2016); PX23 Att. F at 41-42 (emails to consumer after November 16, 2016 stating that payments could be withdrawn in name of Preferred Law)). In any event, dissolution does not alter Preferred Law's amenability to suit or liability. *See* Utah Code Ann. § 48-3a-706. Preferred Law has described itself to consumers as a law firm, (*see* PX02 at 1 ¶ 3; PX18 at 3 ¶ 7; PX22 at 8 ¶ 22, Att. I at 405), and has operated as the initial hub of Defendants' mortgage assistance relief services operation. (SJX18 at 13-14, 23, 24.) Many consumers' service contracts with Defendants are provided in the name of Preferred Law, (*see, e.g.*, PX02 at 2 ¶ 7, Att. A at 9-10; PX04 at 2 ¶ 9, Att. A at 6-15), and consumers report interacting with numerous representatives with preferredlawteam.com email addresses, (*see, e.g.*, PX03 Att. D at 19, Att. E at 21; PX12 Att. A at 7-11). |
| **(6)** | Defendants admit that American Home Loan Counselors is a Utah corporation incorporated as a purported non-profit on September 21, 2012. (SJX01 at 4 ¶ 9; PX20 Att. E at 82-85.) Defendant Jonathan Hanley filed its articles of dissolution on June 26, 2016. (PX20 Att. E at 90.) Dissolution does not alter American Home Loan Counselors' amenability to suit or liability. *See* Utah Code Ann. §§ 16-10a-1405, 16-10a-1407. American Home Loan Counselors has purported to be a non-profit mortgage assistance relief services provider that works with Preferred Law, similar to Consumer Link and Consumer Defense. (*See, e.g.*, PX04 at 2 ¶ 10, Att. B at 17; PX20 Att. Y at 439:23-440:22, Att. Z at 559:25-561:18; SJX18 at 26.) American Home Loan Counselors did not provide any of the charitable services listed in its articles of incorporation, such as "the promotion of housing development for the relief of the poor, indigent, underprivileged, and distressed." (*See* PX20 Att. E at 82.) Further, it has not obtained federal non-profit status. (*Id.* at 10-11 ¶ 21; SJX05 at 9 (Admission No. 84).) |
| **(7)** | Defendants admit that Consumer Defense Group, LLC ("Consumer Defense Group") is a Utah limited liability company formed under the name Modification Review Board, LLC on October 26, 2011. (SJX01 at 4 ¶ 11; PX20 Att. J at 124-25.) It changed its name to Consumer Defense Group, LLC on January 12, 2017. (PX20 Att. J at 130.) Consumer |

|     |     |
|-----|-----|
|     | Defense Group has operated as one of the marketing and consumer intake components of the common enterprise, (*see* PX01 at 2 ¶ 6; PX20 Att. Z at 608:8-21; SJX18 at 15-16, 19, 22-23, 32), and has also provided many of the performance guarantee letters to consumers (*see, e.g.*, PX03 Att. A at 10-11; PX07 Att. A at 6). |
| **(8)** | Defendants admit that American Home Loans, LLC ("American Home Loans") is a Utah limited liability company formed on August 20, 2012. (SJX01 at 4 ¶ 10; PX20 at 10 ¶ 19, Att. F at 92-93.) American Home Loans has operated as a payment collector for the Defendants, as some consumers have reported making some payments to American Home Loans for Defendants' mortgage assistance relief services. (PX06 at 3 ¶ 8, Att. A at 12-13; PX16 at 7 ¶ 20, Att. E at 20; PX19 Att. A at 10; *see* PX20 at 26-27 Table 9, 27-28 Table 10 (merchant accounts and summary of consumer payments).) Defendants' call center representatives have also at times referred to themselves as employees of American Home Loans. (PX19 at 1-2 ¶¶ 3-5, Att. A at 7-8, 10-17; PX22 Att. J at 423:3-9.) |
| **(9)** | Defendants admit that AM Property Management, LLC ("AM Property") is a Utah limited liability company formed on November 1, 2011. (SJX01 at 5 ¶14; PX20 at 9-10 ¶ 18, Att. D at 68-69.) AM Property has collected consumer payments on behalf of the common enterprise. (*See, e.g.*, PX02 at 4 ¶¶ 15-16, Att. G at 44-45, Att. H at 52; PX20 at 26-27 Table 9, 27-28 Table 10 (merchant accounts and summary of consumer payments).) |
| **(10)** | Defendants admit that FMG Partners, LLC ("FMG Partners") is a Utah limited liability company formed on October 31, 2011. (SJX01 at 5 ¶ 15; PX20 Att. I at 113-15.) FMG Partners has collected consumer payments on behalf of the common enterprise. (PX02 at 4 ¶ 15, Att. G at 44-45; PX20 at 26-27 Table 9, 27-28 Table 10 (merchant accounts and summary of consumer payments), 31 ¶ 68, Att. SS at 1185.) It has paid employees of the operation, (PX20 at 39 ¶ 86), and has also transferred money among the Corporate Defendants, (*id.* at 43 ¶ 94, Att. NNN at 1296-1302). |
| **(11)** | Defendants admit that Brown Legal, Inc. ("Brown Legal") is a Utah corporation incorporated on May 4, 2001. (SJX01 at 4 ¶ 13; PX20 Att. G at 103-05.) Many of Defendants' websites have been registered in the name of Brown Legal, (PX20 at 20-21 Table 6, 35 ¶ 77), and it has been a conduit for hundreds of thousands of dollars between other Defendants' bank accounts, (*id.* at 43 ¶ 94). |
| **(12)** | Defendants admit that Zinly, LLC ("Zinly") is a Utah limited liability company formed on July 13, 2016. (SJX01 at 5 ¶16; PX20 Att. L at 140-41.) Zinly owns one of the locations where Defendants' boiler rooms are located, (PX20 at 12 ¶ 24, Att. M at 144-46; SJX18 at 9), and has also signed up for the delivery of mail to the virtual offices for Consumer Defense and Consumer Link, (PX20 at 13-14 ¶¶ 26-28, Att. O at 153, Att. P at 160). |
| **(13)** | Defendant Jonathan P. Hanley is a manager of Preferred Law, American Home Loan Counselors, American Home Loans, Modification Review Board, Consumer Defense, Consumer Link, Brown Legal, AM Property, and Zinly, and is listed on most of the corporate papers for Corporate Defendants. (PX20 at 3-4 Table 1; PX07 Att. A at 6 (listed as general manager of Consumer Defense Group); PX08 Att. B at 22 (same); PX27 Att. B at 17 (phone list identifying Jonathan Hanley as "GM" of Consumer Defense Group), Att. C at 44 (phone list identifying Jonathan Hanley as "GM" of American Home Loans), Att. D at 75 (same); PX28 Att. D at 37 (same), 38-39 (phone list identifying Jonathan Hanley as "GM" of Consumer Defense), Att. H at 101-03 (phone list identifying Jonathan Hanley as "GM" of American Home Loans); SJX05 at 5 (admission no. 5), 6 (admission no. 10); SJX07 at 2 ¶ 3 (former employee understood that Jonathan Hanley "was the boss of the |

| | |
|---|---|
| | entire business"); SJX09 at 3 ¶ 2 (declaration of Jonathan Hanley admitting that he is a "principal" of the corporate defendants); SJX15 Att. C at 16 (in email from Jonathan Hanley to former customers soliciting positive feedback before the preliminary injunction hearing, identifies himself as "manager and owner of the 2 companies that you were working with"); SJX18 at 8 (received compensation); SJX18 at 14 (general manager of Preferred Law), 44-45 (Hanley admitted that employees "would have answered to me"); SJX20 at 4 ¶ 10, 5 ¶¶ 12-13, 7 ¶ 22.) |
| **(14)** | Defendant Jonathan Hanley is a signatory on many of the corporate bank accounts. (PX20 at 26-27 Table 9 (merchant accounts), 38-39 Table 11 (bank accounts), 40-41 Table 12 (bank accounts)) and is the contact for many of Corporate Defendants' service providers, such as web domains. (*Id.* at 20-21 ¶ 44, Table 6; SJX08 at 21-27; SJX20 at 5-6 ¶ 15, 12-14 ¶ 44, 46, Att. D at 55-59, Att. J at 88, Att. K at 91, Att. L at 94, Att. M at 97.) |
| **(15)** | Defendant's Internet websites abogadodemodificacion.com, homeloanmodificationlawyer.com, americanhomeloans.com, consumerdefense.com, harshipletters.com, hardshipletter.org, preferredlawteam.com, attorneyloanmodifications.com, and homerelief.com are registered to Jonathan Hanley and are paid for with his personal credit card. (PX20 at 20-21 ¶ 44, Table 6; SJX05 at 17-20 (Admissions No. 155-163); SJX18 at 19.) |
| **(16)** | Defendant Jonathan Hanley has responded to consumer complaints to the Better Business Bureau ("BBB") on behalf of Consumer Defense, Preferred Law, and Modification Review Board. (PX25 at 1-2 ¶ 4.) |
| **(17)** | Defendant Jonathan Hanley is the contact and paid for several of Defendants' mail drops and arranged for mail forwarding for Consumer Defense–Nevada and Consumer Link. (PX20 at 13-14 ¶¶ 26-28; SJX20 Att. C at 40-48.) |
| **(18)** | Defendant Jonathan Hanley appears on numerous consumer contracts as Defendants' representative who is authorized to negotiate with consumers' lenders or servicers for mortgage loan modifications. (*See, e.g.*, PX02 Att. A at 9; PX03 Att. A at 13; PX04 Att. B at 17; PX07 Att. A at 5; PX08 Att. A at 18; PX09 Att. A at 7; PX11 Att. B at 15; PX13 Att. A at 17; PX14 Att. B at 15; PX15 Att. B at 10; PX19 Att. A at 9; PX23 Att. A at 14; SJX14 Att. A at 9.) |
| **(19)** | Defendants admit that Jonathan Hanley was involved in the creation of Defendants' websites and marketing and sales materials. (SJX03 at 5 (response to Interrogatory No. 3); SJX18 at 31, 35, 36, 44, 48-49; SJX20 at 5 ¶ 14.) |
| **(20)** | Defendants admit that Jonathan Hanley was involved in Defendants' operations. (SJX03 at 6-7 (response to Interrogatory No. 5 ("duties included generating new business and supervising day to day operations, supervising employees, and hiring and firing employees")); *see also* SJX08 at 29-30, 32, 34-35 (operational emails to and from Jonathan Hanley); SJX09 at 3 ¶¶ 2-3 (declaration of Jonathan Hanley admitting that he "personally participated" in creation of business records, had full access to customer records, selected Defendants choice of customer relations management software and regularly used it, and trained employees); SJX18 at 13, 14, 15 (involved in reviewing consumers' documents), 16 ("I would review probably almost every [application]"), 21, 39-40, 50, 52-53 (approved changes in fee schedules); SJX20 at 4 ¶¶ 9-10, 5 ¶ 12Att. X ("I will review. Has she indicated when she feels she would be able to make the payment.").) In addition, he had knowledge that Defendants' representatives were misrepresenting their services. (SJX20 at 6 ¶ 17, 8 ¶¶ 26-27.) |

| (21) | Defendant Sandra X. Hanley is a manager or director of Preferred Law, American Home Loan Counselors, Modification Review Board, Consumer Defense–Nevada, Consumer Link, AM Property, and Zinly.  (PX20 at 4 Table 2; PX27 Att. B at 16 (phone list identifying Sandra Hanley as "GM" of Preferred Law), Att. C at 45, 68 (phone list identifying Sandra Hanley as "GM" of Consumer Link), Att. D at 76 (same); PX28 Att. D at 40-48 (same), Att. G at 90-96 (same), 97-99 (phone list identifying Sandra Hanley as "GM" of Preferred Law); ECF No. 26-1 at 40, 42, 44, 46 (phone list identifying Sandra Hanley as "GM" of Consumer Link); SJX08 at 10-13, 15-16 (same), 17-19 (phone list identifying Sandra Hanley as "GM" of Preferred Law); SJX07 at 2 ¶ 3 (former employee understood that Sandra Hanley "was also the boss"); SJX20 at 4 ¶ 10, 5-6 ¶ 15 (Sandra Hanley (role akin to office manager, involved in managing day-to-day affairs of the business and helped with accounting, payroll, and vendor relations).) |
|---|---|
| (22) | Defendant Sandra Hanley is a signatory on numerous corporate bank accounts.  (PX20 at 38-39 Table 11, 40-41 Table 12; SJX20 at 5-6 ¶ 15, 12-14 ¶ 44, 46, Att. H at 73, 79, Att. I at 85, Att. K at 91, Att. L at 94, Att. M at 97, Att. N at 100, Att. O at 103, Att. P at 106.) |
| (23) | Defendant Sandra Hanley is in charge of employee payroll.  (PX20 at 23 ¶¶ 50-51, Att. DD at 790:24-791:2; SJX03 at 8 (response to Interrogatory No. 6—"handled some aspects of payroll"); SJX07 at 2 ¶ 3 (according to former employee, she was in charge of paychecks); SJX13 at 2 ¶ 5 (same); SJX18 at 46, 47; SJX20 at 5-6 ¶ 15, 7 ¶ 22.) |
| (24) | Defendants admit that Sandra Hanley has handled personnel matters for Defendants.  (SJX03 at 7-8 (response to Interrogatory No. 6—"some involvement in the hiring or employees"); SJX07 at 2 ¶ 2 (former employee interviewed and hired by Sandra Hanley); SJX13 at 2 ¶ 5 (reviewed resumes); SJX20 at 3 ¶¶ 4, 5 (former employee hired and promoted by Sandra Hanley), 6 ¶ 19 (same), 7 ¶ 22.) |
| (25) | Defendant Sandra Hanley has responded to chargebacks on many of Defendants' merchant accounts.  (PX20 at 30-31 ¶ 66, Att. RR at 1170-1174.) |
| (26) | Defendant Sandra Hanley appears on numerous consumer contracts as Defendants' representative who is authorized to negotiate with consumers' lenders or servicers for mortgage loan modifications.  (*See, e.g.,* PX02 Att. A at 9; PX08 Att. A at 18; PX09 Att. A at 7; PX11 Att. B at 15; PX13 Att. A at 17; PX14 Att. B at 15; PX15 Att. B at 10;PX19 Att. A at 9; SJX14 Att. A at 9.) |
| (27) | Defendant Sandra Hanley is the sender or recipient of numerous operational-related emails, which show, among other things, her involvement in Defendants' refund process and decision-making, personnel matters, decision-making regarding charging customers prohibited fees before they agree to mortgage modification agreements, and instructions to halt work on consumer accounts if those consumers were delinquent in payment.  (*See, e.g.,* PX27 Att. B at 18; PX28 Att. E at 76, Att. I at 154, Att. N at 213, Att. O at 215, Att. P at 218, 223, Att. Q at 226, Att. R at 232, Att. S at 235-36, Att. T at 239 ("I think we should get as close to two full payments as possible, how much can they do? We are not going to be super flexible because once we get them approved they wont [sic] want to pay us anything"),  Att. U at 243-46, Att. W at 272; ECF No. 26-1 at 19-21, 87; ECF No. 26-2 at 23-24, 26, 28-30, 32-35, 42, 48, 55-59; SJX08 at 32; SJX20 Att. W at 158 ("making sure you are aware due to Sandra's new billing guidelines we need an additional 1626 from this guy in order to push him through"), Att. X at 167 ("There is nothing wrong with waiting for payments to be made and then moving forward on modification process"), Att. Y at 170 ("When her [the consumer's] next payment clears we can begin working on her file. |

And if the following payment declines, then we stop working on file and or close, but let her know in writing so she is aware"), Att. Z at 173 ("Client fell behind on some of the payments to us, and therefore we can not submit him just yet"), Att. AA at 183 ("If client has paid more than 2500 of their service fee, you don't even have to ask. Go ahead and submit packet to lender. Anything under 2500 please let me know"), Att. BB at 185 ("However their [the consumers'] payment plan is directly related to how quickly we can move through the various phases of the process"), Att. CC at 187 ("But remember we can not submit file to Lender until we have received a considerable portion of our fees . . . We are wanting to have about 2500 paid because odds are client will be approved within a month of being submitted and then will not be able to afford mortgage and our fees"); *see also* SJX20 Att. C at 49-52 (Defendants' commercial mail box paid for with Sandra Hanley credit card).)

| (28) | Payroll records indicate that Corporate Defendants have shared numerous employees, who have also referred to themselves as employees of different Corporate Defendants during the same transaction with the same consumer.  (*See, e.g.*, PX03 at 2 ¶ 8; PX20 at 24-25 ¶ 54, Table 7; PX22 at 4 ¶ 13; SJX18 at 17-18, 19, 27.) |
|------|---|
| (29) | Bank records demonstrated routine commingling of funds, with regular transfers between the various Corporate Defendants.  (PX20 at 43 ¶¶ 93-94, Table 14.) |
| (30) | Corporate Defendants have used identical or nearly identical contracts.  (*Compare* PX02 Att. D at 30-37 (Preferred Law contract) *with* PX14 Att. B at 12-14 (Consumer Defense contract) *and* PX19 Att. A at 12-17 (American Home Loans contract); *compare* PX04 Att. B at 17 (American Home Loan Counselors Borrower's Authorization) *with* PX13 Att. A at 17 (Consumer Link Borrower's Authorization).) |
| (31) | Defendants have blurred corporate distinctions when interacting with consumers. Consumers often call one company, such as Preferred Law or Consumer Defense; receive contracts and forms from others, such as Modification Review Board, American Home Loan Counselors, or Consumer Link; and make payments to yet others, such as AM Property or FMG Partners. (*See, e.g.*, PX01 at 1-3 ¶¶ 3, 6, 9, Att. A at 9-11, B at 13 (consumer signed up with Preferred Law but then began interacting with employees with a "consumerdefense.com" email address); PX02 at 4-5 ¶¶ 15-16, Att. G at 44-45, Att. H at 47-54; PX05 at 1 ¶ 3, Att. A at 9-11 (consumer signed up with Preferred Law and had to request a refund from Consumer Defense); PX06 at 3 ¶ 8, Att. A at 12-13; SJX07 at 2 ¶ 2 (former employee stated he worked for Consumer Link but documents he sent to clients had name Consumer Defense); SJX08 at 29 (email from Jonathan Hanley stating "can we update the sales agreement with the new American Home Loans logo and swap out 'consumer defense' with 'American hOme laons [sic]' wherever it appears"); SJX14 Att. A at 9-10 ("Borrower Authorization" form from Consumer Link but "Payment Form" from American Home Loans); SJX18 at 19, 20, 22-23, 24, 25, 26, 28, 38, 39-40.) |
| (32) | Defendants have operated out of two locations located at 41 West 9000 South, Sandy, Utah (a property owned by Zinly) and 8180 South 700 East, Suite 110, Sandy, Utah.  (*See* SJX01 at 4-5 ¶¶ 9, 11, 14; SJX05 at 7-8 (admissions nos. 68, 69, 71, 73, 74); PX20 at 5 Table 4, Att. M at 144-46, Att. DD at 793:10-14, 800:6-12; PX22 Att. C at 78 (Consumer Defense website listing 8180 South 700 East as address); SJX18 at 65-66; SJX20 Att. D at 55, Att. E at 61, Att. F at 65, Att. G at 69, Att. H at 73, Att. J at 88, Att. M at 97.) |
| (33) | Defendants have often represented to consumers that they are located in Nevada, using Nevada phone numbers and mail drops located at 500 N. Rainbow Blvd., Suite 300, Las |

|   | Vegas, Nevada and 200 S. Virginia, 8th Floor, Reno, Nevada in their communications and contracts. (*See, e.g.*, PX13 Att. A at 9-17; PX16 Att. A at 11; PX19 at 4 ¶ 12, Att. A at 9; PX20 at 6-7 Table 4; PX22 Att. H at 403; SJX05 at 23-25 (Admission Nos. 187, 188, 191, 192); SJX08 at 21.) |
|---|---|
| **(34)** | Defendants have also listed as addresses—on corporate papers, bank statements, and consumer correspondence and contracts—2825 E. Cottonwood Pkwy., Suite 500, Salt Lake City, Utah (a virtual office), P.O. Box 949, Sandy, Utah, and 9980 South 300 West, Suite 200, Sandy, Utah. (*See, e.g.*, SJX01 at 4 ¶¶ 8, 10; PX04 Att. A at 6-12 (listing address of Preferred Law as 2825 E. Cottonwood Pkwy.); PX06 Att. F at 27-28 (address to send documents to Defendants is P.O. Box 949); PX19 Att. A at 10-17 (listing address of American Home Loans as 2825 E. Cottonwood Pkwy.); PX20 at 6-7 Table 4; SJX20 at 12 ¶ 43, Att. C at 40-52.) |
| **(35)** | The FTC's action is not Defendants' first tangle with law enforcement for their deceptive activities. Preferred Law is subject to a July 2016 Order to Cease and Desist issued by the Connecticut Department of Banking. (PX20 Att. Z at 659-77.) Preferred Law, Modification Review Board, and American Home Loan Counselors are subject to a November 2015 Final Order to Cease and Desist issued by the Oregon Department of Consumer and Business Services. (*Id.* Att. AA at 699-706.) |
| **(36)** | Defendants Jonathan Hanley and Sandra Hanley have violated the asset freeze provisions of the Preliminary Injunction. Sections V.A.1 and XVIII.C of the Preliminary Injunction prohibit the Hanleys from transferring receivership funds (ECF No. 55 at 14, 29), but the Hanleys attempted to kite two checks on receivership accounts (SJX20 at 14-15 ¶ 49, Att. Q at 115-23), and have retained receivership funds for personal use. (*Id.* at 14, 15 ¶¶ 48, 50, Att. Q at 109-14, Att. R at 125-27.) Section V.A.1 of the Preliminary Injunction prohibits Defendants from "encumbering, pledging, loaning, selling" any assets, (ECF No. 55 at 14), but the Hanleys have used jewelry as collateral for several loans with pawnshops (SJX20 at 15-16 ¶ 52, 16-17 ¶¶ 54-55, Att. R at 125, Att. S at 130-35, Att. U at 144-50, Att. V at 152-56), and have sold at least one Internet domain name. (*Id.* at 15 ¶ 51, Att. R at 128.) Section V.B of the Preliminary Injunction requires the Hanleys to identify any loans they obtain greater than $500 (ECF No. 55 at 15-16), but the Hanleys have obtained several loans without so notifying the FTC. (SJX20 at 16-17 ¶¶ 53-55, Att. T at 137-42, Att. U at 144-50, Att. V at 152-56.) |

**B. Defendants' Unlawful Business Practices**

| No. | Statement of Material Fact |
|---|---|
| **(37)** | Defendants admit that they are in the business of providing mortgage assistance relief services to consumers. (SJX01 at 4 ¶¶ 8-12, 6 ¶¶ 22-23.) |
| **(38)** | Since late 2011, Defendants have marketed mortgage assistance relief services online and through telemarketing. (*See generally* SJX01 at 6 ¶ 28; PX01, PX02, PX03, PX04, PX05, PX06, PX07, PX08, PX09, PX10, PX11, PX12, PX13, PX14, PX15, PX16, PX17, PX18, PX19, PX22 at 7-19 ¶¶ 20-67; PX23; PX26 at 5-12 ¶¶ 21-32; PX30; SJX14 at 2 ¶ 3; SJX16 at 2 ¶ 2.) |
| **(39)** | Defendants have maintained at least nine Internet websites on which they market their mortgage assistance relief services, eight English language sites and one Spanish language site. (PX22 at 2-3 ¶ 5, Table 1, Att. A at 21-37, Att. B at 39-75, Att. C at 77-372, Att. D at |

| | |
|---|---|
| | 374-84, Att. E at 386-91, Att. F at 393-97, Att. G at 399, Att. H at 401-03, Att. I at 405; SJX05 at 17-20 (Admissions Nos. 155-163); SJX18 at 29-30.) Defendants' websites are similar in form and content.  (*See* PX22 at 2-3 ¶¶ 5-6, Table 1.) |
| (40) | Defendants have done business with consumers located throughout the United States. (*See, e.g.,* PX01 (Georgia); PX02 (New York); PX03 (New Jersey); PX04 (Ohio); PX05 (Tennessee); PX07 (North Carolina); PX09 (California); PX11 (Connecticut); PX13 (Minnesota); PX15 (Texas); PX16 (South Carolina); PX18 (Maryland); PX19 (Illinois); PX22 at 14-16 ¶¶ 45-52 (Oregon), 16-19 ¶¶ 53-67 (Alabama); PX29 at 7 ¶¶36-43 (Indiana); SJX15 (Massachusetts).) |

1. **Defendants Use False, Deceptive, or Misleading Representations to Market Mortgage Assistance Relief Services**

   a. **Defendants Misrepresent that They Generally Will Obtain Mortgage Modifications that Will Make Consumers' Payments Substantially More Affordable**

| No. | Statement of Material Fact |
|---|---|
| (41) | Many consumers first learned about Defendants' purported mortgage assistance relief services by visiting one of Defendants' websites. (PX05 at 1 ¶ 2; PX06 at 1 ¶ 2; PX07 at 1 ¶ 3; PX09 at 1 ¶ 2; PX11 at 1 ¶ 2; PX12 at 1 ¶ 2; PX13 at 1 ¶ 5; PX14 at 2 ¶ 12; PX15 at 1 ¶ 3; PX22 at 11-12 ¶ 35, 15 ¶ 47, 16 ¶ 54; PX26 at 5 ¶ 22; PX30 at 1 ¶ 2; SJX14 at 2 ¶ 3; SJX15 at 2 ¶ 3; SJX18 at 33-34.) Others received unsolicited mail, email, or telephone calls from Defendants.  (PX02 at 1 ¶ 3; PX03 at 1 ¶ 3; PX04 at 1 ¶ 3; PX18 at 2 ¶ 6; SJX16 at 2 ¶ 2.) And some recall hearing about Defendants through television or radio advertisements.  (PX08 at 1 ¶ 2; PX16 at 1 ¶ 3; PX22 at 8 ¶ 22.) |
| (42) | Defendants' websites have represented that Defendants would obtain mortgage modifications for consumers that would make consumers' monthly payments substantially more affordable or help them avoid foreclosure, including : <br>• We can help you <u>keep</u> your home! (PX22 Att. B at 39, 41, 43, 45, 49, 51, 53, 55, 58, 60, 62, 64, 71, 74) <br>• **Fill the form** below to handle your home loan modification application, it might be your only chance to get what you deserve! *We can help you <u>keep</u> your home!* (*Id.* Att. C at 77, 80, 84, 89, 94, 98, 101, 105, 109, 112, 116, 122, 125, 128, 132, 136, 138, 141.) <br>• The only consistently good way to deal with a bad home loan situation is by consulting a lawyer to handle the home loan modification application. Getting good legal representation is the best method for ensuring one's interests are protected in often tense negotiations.  This is not something to do alone. (*Id.* at 117.) <br>• A Loan Modification Can Lower Your Mortgage Payments and Stop Foreclosure! (*Id.* Att. H at 401.) |
| (43) | Defendants' websites also have contained numerous purported consumer testimonials touting Defendants' success in obtaining mortgage modifications. (*Id.* Att. C at 228-335.) For example: <br>• Guillermo received a Modification.  Payment went from $2153.00 to $1269.26, a savings of $883.74 a month.  (*Id.* at 229.) |

- James went from his Original Payment of $3,768.87.  Now look what he's paying $2,241.82.  (*Id.* at 232.)
- Dwight was approved for a HAMP modification, new payment is $1537.88, his payment was previously $2358.00 then reduced to $1537.88.  That is a savings of $820.12.  (*Id.* at 317.)
- **Borrower was 7 months behind.  MONTHLY PAYMENT CUT OVER 60%! Borrower now saving over $24,000.00 a year!**
  Lender: IndyMac
  Old Payment:  $3,496.21
  Old Rate:  8.00%
  New Payment:  $1,474.26
  New Rate:  2.50%  (*Id.* Att. H at 403.)

(44) In phone calls and emails with consumers, Defendants have made similar pitches , and even stronger claims of success.  In many instances, Defendants guarantee that they will obtain loan modifications for consumers that will result in payment reductions of hundreds of dollars a month and will cut interest rates in half, and tout perfect or near perfect (98%) track records of success in obtaining modifications.  (PX01 at 1 ¶ 3; PX02 at 1-2 ¶ 3; PX03 at 1 ¶¶ 3-4; PX04 at 1-2 ¶¶ 4-5, 7; PX05 at 1 ¶ 3; PX06 at 1 ¶ 3; PX07 at 1 ¶¶ 2, 4-5; PX08 at 1 ¶ 3; PX09 at 1-2 ¶¶ 3-5; PX11 at 1-2 ¶¶ 3-4, 8, Att. A at 6 (email to consumer stating Defendants "***consistently*** receive approvals with the best terms and conditions because of their small case load and strong negotiating position) (emphasis in original); PX12 at 1-2 ¶¶ 3, 6; PX13 at 1-3 ¶¶ 7, 11, Att. A at 15, Att. B at 19; PX14 at 2-3 ¶¶ 12, 13, Att. A at 8; PX15 at 1-2 ¶¶ 4-5; PX16 at 1-2 ¶¶ 3-4; PX17 at 1 ¶ 4; PX18 at 2 ¶ 4; PX19 at 1-2 ¶ 3; PX20 Att. T at 215, Att. Y at 426 ("But this is our specialty.  I mean, we've completed over about 5,200 successfully), 427 ("Most likely, you know, you'll get a better, lower interest rate and lower payment"), 445 ("Q: So you get a 100 percent guarantee?  A:  Yeah, it's something I would do if I was hurting, you know, and losing my home"), 455-56 ("We don't even try unless we can win"), 459; PX22 at 8, 12, 15, 17 ¶¶ 23, 36, 48, 57, Att. J at 424-25 ("So we do guarantee our work 100 percent," and "worst case scenario, yeah, if we're not able to do it, then we do refund any funds that we've charged you"); PX23 at 1-2 ¶¶ 3, 5; PX24 Att. A at 8 ("We've done well over 6,000."), 18-19 (after only asking minimal questions, representative states "But looking at your wage reductions, you definitely—first of all, you've had a hardship that definitely qualifies you.  And, second of all, you qualify for a much lower payment.  Okay?"), 23-24 ("We will get you a much lower rate. . . But in any case, it's going to be $400 or $500 less than you're making—or paying. . . We can get rates down to 4 percent, you know"), 25 ("And we will—we will guarantee a modification); PX27 Att. C at 40, 41 (("the good news is that there are 2 different programs that you're qualified for."), Att. D at 77, 81-83 (call script stating "What you need is a federal hardship modification (FHM).  Thankfully, you qualify for it," that a "FHM" reduces the mortgage interest rate to 2-4% with a lower monthly payment, and that Defendant "Amer Home Loans" provides a "written guarantee" and has done "over 6,000 cases, [with a] 98% success rate"); PX28 Att. I at 165-69 (email to consumer stating "Bottom line – we can and WE WILL get you a better modification than you could possible [sic] get anywhere else!"), Att. I at 170 (email to consumer stating that American Home Loans will get a modification with a fixed low interest rate and payment that is the lowest possible as opposed to a free service that would only be able to

10

obtain a "mid range interest rate that is variable"), Att. Z at 332:24-25, 333:19-25, 334:2-9 (testimonials on website are "absolutely proof that [Defendants'] strategy works"), Att. DD at 399:12-21 ("the best people in the United States at handling cases like yours is [sic] American Home Loans. They're the only ones—to offer a written guarantee and they're the only ones that have a 99 percent success rate."), 403:1-7, Att. EE at 416:1-2 ("I say the chances of you getting a good modification are about 99.5 percent."), 418:5-8 (reduce interest rate from 3.75 to 2 percent), 424:10-15 (reassuring consumer that Defendants are not a scam and that American Home Loans has "done almost 7,000 cases like yours"), 426:5-23 (Defendants offer a written guarantee and have a 99 percent success rate and only take on cases they can win), 427:2-7, 439:23-25 (Defendants "cannot maintain a 99 percent success rate by taking on cases that are questionable that they may or may not win."), Att. GG at 518:5-7 ("we don't bring anybody on that we can't guarantee"), 521:9-13, 530:15-17, Att. HH at 564:1-2, 569:11-13, Att. II at 602:1-2, 606:22-15 ("American Home Loans has a 100 percent success rate"), 614:14-15, 615:23-24); PX29 at 7 ¶¶ 39, 42, 9 Table 1; PX30 at 1 ¶ 3, at 3 ¶ 14; SJX07 at 3 ¶ 6 (former employee recalled hearing sales representatives overpromise what Defendants could do for consumers); SJX14 at 2 ¶ 5; SJX15 at 2 ¶ 4; SJX16 at 2 ¶ 3 (consumer told he was guaranteed to get a loan modification that would lower his payments by $500 per month); SJX18 at 54-55; SJX20 at 6 ¶ 17 (former employee would hear sales associates promise they could lower mortgage payments and stated Jonathan Hanley was aware of that), 8 ¶¶ 26-27 (same).) Defendants recorded many of their sales calls. (See, e.g., PX28 at 9-10 ¶¶ 21-22, Att. Z at 322-40, Att. DD at 369-406, Att. EE at 407-42, Att. FF at 443-502, Att. GG at 503-41, Att. HH at 542-80, Att. II at 581-658, Att. JJ at 659-64.)

**(45)**  In many cases, Defendants have actually provided this guarantee in writing:

> Based on the past performance of American Home Loan Counselors with the assistance of Preferred Law's federal legal services, and our knowledge of your factual situation, MRB [Modification Review Board] hereby GUARANTEES that a modification or home foreclosure alternative pursuant to the HAFA program will be secured for you conditioned upon the following terms . . .

(PX03 at 2 ¶ 7, Att. A at 10-11; PX07 at 1 ¶ 5, Att. A at 6; PX08 at 2-3 ¶ 7, Att. B at 22 (similar guarantee form); PX09 at 2 ¶ 5, Att. A at 5 to 6 (similar guarantee form and consumer instructed in email to cross out "N/A" on another contract form that stated "no guarantee"); PX13 Att. A at 15 (similar guarantee form); PX16 at 4 ¶ 8, Att. A at 11 (similar guarantee form); PX19 Att. A at 11 (similar guarantee form); PX22 Att. N at 449 to 450, Att. T at 496 to 497; PX23 Att. A at 28; SJX14 Att. A at 11.)  The "conditions" have consisted of items easily satisfied by Defendants' customers such as timely returning documents and paying fees to Defendants and ensuring that any information provided to Defendants is and remains accurate and complete.  (PX03 Att. A at 10-11; PX07 Att. A at 6-7; PX08 Att. B at 22; PX09 Att. A at 6; PX13 Att. A at 15; PX16 Att. A at 11; PX19 Att. A at 11; PX23 Att. A at 28; SJX14 Att. A at 11.)  The list of conditions also states: that consumers "allow American Home Loan Counselors to process the modification and [consumers] promptly cooperate with Preferred Law and American Home Loan Counselors at all times"; that consumers immediately forward any communications from

1

2

lenders to Preferred Law; that consumers will have "no significant changes to [their] current circumstances"; that consumers "recognize that this guarantee is from MRB"; that disputes will be resolved by binding arbitration in Salt Lake City, Utah; and that the guarantee agreement constitutes the "entire agreement" between the parties. (*See, e.g.*, PX03 Att. A at 10-11.)

**(46)** Despite their repeated promises and guarantees, Defendants often failed to obtain loan modifications for consumers.  (PX02 at 6 ¶ 23; PX03 at 4-5 ¶¶ 14, 19; PX04 at 4 ¶ 20; PX05 at 2-3 ¶¶ 9, 12; PX06 at 8-9 ¶¶ 22, 27; PX07 at 3 ¶ 14; PX08 at 4-5 ¶¶ 11, 15; PX09 at 3 ¶¶ 7, 10; PX11 at 3-4 ¶ 15; PX13 at 3 ¶ 14; PX14 at 4-5 ¶¶ 19, 22; PX15 at 3-4 ¶¶ 12, 16; PX16 at 8 ¶ 23; PX17 at 4 ¶ 16; PX18 at 5 ¶¶ 14, 16; PX19 at 4 ¶ 14; PX20 at 19 ¶ 41; PX22 at 6 Table 2; PX27 Att. E at 95-99, 101-103; PX28 Att. F at 64-65, 72-73, Att. F at 82-87 (failure to get loan modification despite promise and refusal to grant a full refund); PX30 at 2-3 ¶¶ 13-14, Att. A at 5-6 (same).)  In many cases, after months of paying Defendants, consumers have learned that they have been denied for modifications, (PX06 at 5-6, 9 ¶¶ 16, 18, 27; PX09 at 3 ¶ 7; PX11 at 3-4 ¶ 15; PX13 at 3 ¶ 14; PX14 at 4 ¶ 19), that the lenders have not received complete modification packages from Defendants, (PX04 at 3 ¶ 14; PX05 at 2 ¶¶ 7-8; PX06 at 6 ¶ 16; PX07 at 2 ¶¶ 10-11; PX20 at 19 ¶ 41), or that the lenders have not been contacted at all by Defendants, (PX01 at 4 ¶ 12; PX02 at 5 ¶ 19; PX08 at 4 ¶¶ 11-12; PX15 at 3 ¶ 12 (lender said it did not receive any documents from Defendants); PX16 at 6 ¶ 17; PX17 at 2-3 ¶¶ 8, 12; PX18 at 4-5 ¶¶ 11, 16; SJX14 at 4 ¶ 11; SJX15 at 3-4 ¶¶ 11-12; SJX16 at 3 ¶ 9. ).  In the rare case where Defendants have obtained a modification offer, it has often contained worse terms than consumers' original loans, such as a higher monthly payment.  (PX12 at 2-3 ¶ 9; PX23 at 6, 8 ¶¶ 18, 23 (Defendants entered consumer into modification with higher monthly payment without her consent).)  In numerous instances, victimized consumers have fallen further behind on their loans, fallen into foreclosure or bankruptcy, or have actually lost their homes.  (PX01 at 5¶ 16 (foreclosure); PX02 at 6 ¶ 23 (three years behind on mortgage payments); PX03 at 5 ¶ 19 (bankruptcy and facing foreclosure); PX06 at 9 ¶ 27 (further in debt); PX07 at 3 ¶ 14 (facing foreclosure); PX08 at 5 ¶ 15 (two years behind on mortgage payments); PX09 at 3 ¶¶ 9-10 (months behind on mortgage, foreclosure initiated for a period, consumer filed for bankruptcy, and monthly mortgage payments increased); PX11 at 4-5 ¶¶ 15, 17 (behind on mortgage, monthly mortgage payments increased); PX12 at 4 ¶¶ 14-15 (foreclosure); PX13 at 6 ¶ 27 (short sale); PX16 at 8-9 ¶¶ 22-23 (foreclosure); PX17 at 4-5 ¶¶ 16-17 (bankruptcy and damaged credit); PX18 at 4-5 ¶¶ 12-14 (foreclosure initiated); PX22 at 6-7 Table 2; SJX16 at 2-3 ¶ 7 (consumer's home in foreclosure because he was so far behind on payments after following Defendants' instructions to stop paying); SJX17 at 2 ¶ 6 (consumer's house placed on pre-foreclosure list).)  Despite their guarantees of success, in many instances, Defendants have failed to provide full refunds for consumers who request them.  (PX01 at 4 ¶ 13; PX02 at 6 ¶ 21; PX03 at 4-5 ¶¶ 15-18, Att. E at 21; PX04 at 4 ¶ 19; PX05 at 2-3 ¶ 10; PX06 at 9 ¶¶ 23-24; PX07 at 3 ¶ 12; PX08 at 4-5 ¶ 14, Att. E at 29-38; PX09 at 3 ¶ 8; PX12 at 4 ¶ 12; PX13 at 6 ¶¶ 26-27, Att. J at 46-48 (Defendant Jonathan Hanley blaming consumer for failure to get a modification and refusing to provide refund unless consumer agrees to sign a release), Att. L at 52 (Defendant Jonathan Hanley refusing to provide refund because of consumer's threats to file complaints); PX14 at 5 ¶ 25; PX15 at 3-5 ¶¶ 15-19, Att. F at 29; PX16 at 7 ¶ 18; PX17 at 3-4 ¶¶ 11, 13; PX18 at 5 ¶ 14; PX19 at 3-4 ¶¶ 11, 14, Att. B at 20-21; SJX17 at 2 ¶ 7.)

| (47) | Defendants' own data from their customer relationship management software, The Loan Post, does not support their claim of a 98-100% success rate in obtaining loan modifications that either lowered consumers' interest rates or monthly payments. (*See, e.g.*, PX28 Att. I at 108). In a random sample of Defendants' Loan Post database, Defendants obtained any type of loan modification, whether or not it resulted in lower interest rates or monthly payments as promised, for only approximately 39.2% of their clients. (SJX19 at 4 ¶¶ 12-13.)[4] But this figure only represents the percentage of consumers who obtained some form of loan modification and does not address whether the modification made consumers' monthly payment substantially more affordable. In the FTC's random sample, only approximately 27.6% of Defendants' clients experienced either any decrease in monthly payment (whether substantial or not) or any decrease in interest rate. (*Id.* at 6-7 ¶ 22.)[5] |
|---|---|
| (48) | These figures are consistent with the evidence presented before the preliminary injunction hearing. (PX28 at 7-9 ¶¶ 14-18, Table 1 (indicating that, at best, Defendants only obtained loan modifications for slightly more than 30% of consumers);ECF No. 26 at 22 (Receiver's analysis of The Loan Post data for 2017); see also SJX20 at 7 ¶ 23 (former employee estimated of the 70% of her clients who did not drop out, she obtained trial payment plans for about 65%, for a total of about 45% overall).) |
| (49) | In their opposition to the preliminary injunction, Defendants claim to have obtained loan modifications for at least 3,294 customers. (ECF No. 44 at 8-9.) Their "Exhibit A" that supports this assertion, however, was not properly filed on the record. (*See* ECF No. 130 at 5 ("If defendants wish the exhibits to be made part of the record defendants shall have until September 4, 2018 to electronically FILE Exhibits A and B through the CM/ECF filing system in compliance with LR IC 2-2").) Even if it was part of the record, Defendants' Exhibit A does not support their claim. First, Exhibit A contains multiple duplicate records. (SJX11 at 3-4 ¶¶ 6-8; SJX12 at 3-4 ¶¶ 5-6.) Removing them, Exhibit A contains records for 2,055 unique names. (SJX11 at 3-4 ¶ 8; SJX19 at 9 ¶ 29.) Second, based on a random sample of Exhibit A, Exhibit A contains documents evidencing that |

---

[4] In the random sample of Defendants' Loan Post database, 81.5% were client accounts (with a 95% confidence interval of 76.1% to 86.9%), corresponding to approximately 6,231 customers (the rest were leads that did not become clients) and 32.0% obtained some form of loan modification (with a 95% confidence interval of 25.5% to 38.5%), corresponding to approximately 2,446 customers, resulting in a "success" rate of only 39.2% (2446 ÷ 6231). (*Id.* at 4 ¶¶ 12-13.)

[5] In the random sample, only 12.5% received some reduction interest rate (with a 95% confidence interval of 7.9% to 17.1%), corresponding to approximately 956 consumers (or 15.3% of Defendants' clients) receiving an interest rate reduction, with an average reduction in interest rate of only 1.7%. (*Id.* at 5-6 ¶¶18-19.) In the random sample, only 20.0% received some reduction in monthly payment (with a 95% confidence interval of 14.4% to 25.6%), corresponding to approximately 1,529 consumers (or 24.5% of Defendants' clients) receiving some reduction in monthly payment, with an average reduction of only $196.60. (*Id.* at 6 ¶¶ 20-21.) In the random sample, only 22.5% received either a reduction in interest rate or monthly payment (with a 95% confidence interval of 16.7% to 28.3%), corresponding to approximately 1,720 consumers (or 27.6% of Defendants' clients) who received either a reduction in interest rate or monthly payment. (*Id.* at 6-7 ¶ 22.)

between 1,378 and 1,634 customers obtained a loan modification (SJX19 at 9 ¶ 30), which suggests only 20.7% to 28.1% of Defendants' consumers received some sort of loan modification, whether or not such a modification resulted in substantially lowering consumers' terms (the documents in Exhibit A do not provide data sufficient to make that determination).

**b. Defendants Make False Claims of Government Affiliation and Endorsement and Special Relationships with Lenders**

| No. | Statement of Material Fact |
|---|---|
| **(50)** | In numerous instances, Defendants have frequently referred to the government's Making Home Affordable ("MHA") program or the Home Affordable Modification Program ("HAMP") during calls with consumers and on their websites or other marketing media. (*See, e.g.*, PX22 Att. A at 58-59, Att. C at 85; PX24 Att. A at 19:16-21; PX28 Att. L at 185 (consumer complaint from Missouri AG stating that Defendants stated they "were with Making Home Affordable" in their radio ad).) |
| **(51)** | Defendants have frequently claimed that they are affiliated with these programs in telemarketing calls. (PX01 at 1, 5 ¶¶ 3, 15; PX14 at 2 ¶ 12; PX16 at 1-2 ¶¶ 3-4; PX27 Att. E at 100 (Defendants' sales representative stated he was from the government "Hardest Hit Program"); PX28 Att. C at 35 (Defendants "have contacts in key government agencies to bring pressure down to bear on the servicer to motivate the lender to offer the desired terms and conditions."), Att. I at 140 (Jonathan Hanley email to employees instructing them to not correct consumers if they think that Defendants are part of government hardest hit funds).) |
| **(52)** | To reinforce that false claim, Defendants send follow-up letters or emails to consumers with a doctored government logo that asserts Defendants are "FRIENDS OF" the MHA program. <br><br> <br><br> (official MHA logo available at www.makinghomeaffordable.gov) <br><br> <br><br> (Defendants' doctored MHA logo) <br><br> (PX09 Att. A at 6; PX13 Att. A at 15-16; PX16 at 4 ¶ 8, Att. A at 11; PX19 at 2 ¶ 5, Att. A at 11; SJX20 at 6 ¶ 16 (Jonathan Hanley insisted on putting logo on website even though he knew company was not affiliated with the Making Home Affordable program); *see also* |

14

|  | PX22 at 11-12 ¶ 35 (consumer initially thought Modification Review Board was affiliated with the government); PX23 at 2 ¶ 6 (Defendants' paperwork referencing government housing counseling specialists led consumer to believe Defendants may have been affiliated with the government); PX26 at 5-6 ¶¶ 22-23 (consumer thought Consumer Defense was affiliated with "Hardest Hit" government program), 8-9, 11 ¶¶ 31d-f, p (same); PX28 Att. F at 73 (email to consumer stating "[o]ur agency received your request for information regarding mortgage relief under the Economic Stability Act").) |
|---|---|
| **(53)** | In fact, while the Department of Housing and Urban Development maintains a list of approved housing counselors, Defendants are not on that list. (PX20 at 11-12 ¶¶ 22-23; SJX05 at 9-10 (Admissions Nos. 85-95); SJX18 at 12.) |
| **(54)** | Similarly, Defendants have misrepresented to many consumers that they have a track record of success with particular lenders or some sort of special "in" that will make it more likely to negotiate a loan modification. (PX08 at 1-2, 10 ¶¶ 3, 10; PX11 at 1 ¶ 3; PX12 at 1 ¶ 4; PX13 at 1-2 ¶ 7; PX14 at 2 ¶ 12; PX16 at 2 ¶ 4; PX17 at 1 ¶ 4; PX19 at 1 ¶ 3; PX20 Att. Y at 440 ("And they also have the key to each bank. So they know who to talk to where you or I wouldn't know that"); PX22 at 7 Table 2, Att. J at 428 ("And then—and then on top of it, we work with Wells Fargo all the time. They are difficult to work with; however, we know how to work with them. And so we're literally talking to, you know, the underwriter. So we talk to somebody completely different than what you would talk to."); PX23 at 1-2 ¶ 3; PX24 Att. A at 21:19-21; PX27 Att. C at 44 (handwriting on phone directory "We work with them directly/We administer several, Federal & in house programs" and "We are a consumer advocacy group that handles programs for them on all different modification programs.").) In response to questions about particular lenders' receptiveness to loan modification requests, Defendants have assured consumers they have special contacts at the lenders. (PX22 Att. C at 106-07.) |
| **(55)** | Defendants have also made such representations on sales calls to consumers: for example, one consumer declarant reported that Defendants' representatives told her that they had special contacts with her lender. (PX13 at 1-2 ¶ 7.) Another consumer declarant was told by Defendants' representatives that Defendants had special knowledge about his lender, Bank of America, and that Defendants were the only loan modification negotiators that were able to have success with Bank of America. (PX08 at 1-2 ¶ 3.) A recorded undercover call with one of Defendants' representatives is illustrative of these claims:<br><br>…we work with Wells Fargo all the time. They are difficult to work with; however, we know how to work with them. And so we're literally talking to, you know, the underwriter. So we talk to somebody completely different than what [sic] you would talk to.<br><br>(PX22 Att. J at 428:6-11; *see also* PX28 Att. Z at 316:12-18, 331:19-21, 332:4-13 ("tremendous success" at getting "arrogant" Wells Fargo to "humble themselves"), Att. FF at 470:20-22 ("has access to the office of the president" at Ocwen), Att. HH at 565:22, 576:4-5, Att. II at 606:23-607:4, 613:8-20 (representative saying Ocwen and Select Portfolio "immediately approve" Defendants' modifications), 620:10-16, 644:23-645:12; SJX14 at 3 ¶ 8 (consumer told that "CEO of Consumer Defense had contacts with CEO at Rushmore [consumer's lender]").) |

| | |
|---|---|
| **(56)** | Despite their claims, Defendants are neither affiliated with nor endorsed by any governmental entity or program, (PX20 at 11-12 ¶¶ 22-23; SJX04 at 6 (response to Interrogatory No. 10); SJX05 at 9-12 (Admissions Nos. 88-106 (Defendants admit they are neither a HUD-approved housing counseling agency nor a DOJ-approved credit counseling agency)), 13-16 (Admissions Nos. 133-143 (Defendants admit no affiliation with the Home Affordable Refinance Program)); SJX18 at 37 (Jonathan Hanley knew he could not represent affiliation with government)), nor do they have any particular special relationship with specific lenders, (PX04 at 3 ¶ 15; PX14 at 4 ¶ 19; *see* PX11 at 3-4 ¶ 15 (Defendants later admitted to consumer that consumer's mortgage lender did not do modifications); PX19 at 4 ¶ 13 (consumer's lender said it normally does not refer consumers to third-party modification companies); SJX20 at 7 ¶ 24 (former employee stated that they did not have any special relationships with lenders, servicers, or government agencies)). In contrast, to the extent they do anything at all and in the best possible light, Defendants simply collect and forward standard modification application documents to consumers' lenders. (*See* PX02 at 4 ¶ 14, Att. F at 41; PX12 at 2, 4 ¶¶ 7, 11, 15.) Indeed, some lenders have explicitly told consumers that they do not work with third party modification negotiators like Defendants. (PX04 at 3 ¶ 15; PX14 at 4 ¶ 19; *see* PX11 at 3-4 ¶ 15 (Defendants later told consumer that Deutsche Bank does not do modifications); PX19 at 4 ¶ 13 (consumer's lender said it normally does not refer consumers to third-party modification companies).) |
| **(57)** | Defendants have made vague and generic references that they have "special contacts" with unidentified employees at JP Morgan Chase Bank, Bank of America, Wells Fargo, and HUD's National Servicing Center. (SJX10 at 2 ¶ 3.) When asked to identify those unidentified contacts, however, Defendants could identify only one individual at HUD and no one from any lender or servicer. (SJX04 at 3-4 (response to Interrogatory No. 8); SJX13 at 3 ¶ 14; SJX18 at 62.) Again, Defendants make vague and generic references to unidentified "[p]revious employees of the corporate defendants obtained employment with loan servicers in their respective loss mitigation/default support/loan modification departments." (SJX10 at 2 ¶ 5; SJX13 at 3 ¶ 16.) But when asked to identify those unidentified former employees, Defendants could only identify one former employee who was later hired by a lender or servicer. (SJX04 at 5 (response to Interrogatory No. 9); SJX13 at 3 ¶ 16 (only remained in contact with one former employee); SJX18 at 63-64, 65; SJX20 at 7-8 ¶ 24 (former employee only aware of two employees who went to work for a mortgage servicer).) |

        **c. Defendants Make False Claims that Consumers Are Not Obligated to Pay Their Mortgages and Should Not Contact or Communicate with Their Lenders or Servicers**

| No. | Statement of Material Fact |
|---|---|
| **(58)** | To reassure struggling homeowners who are wary about paying Defendants' hefty fees in addition to their mortgages, Defendants in many cases have explicitly told consumers that they do not have to pay their mortgages or have instructed consumers not to pay their mortgages. (*See* PX01 at 2 ¶ 4 (consumer told that payments to Defendants would be forwarded to mortgage lender); PX02 at 2 ¶ 6; PX03 at 2 ¶ 6; PX04 at 1 ¶ 5; PX05 at 1 ¶ 3; PX06 at 1 ¶ 4; PX07 at 1 ¶ 4; PX08 at 1 ¶ 3; PX09 at 1 ¶ 4; PX11 at 1-2 ¶¶ 4-5, Att. A |

16

at 6; PX13 at 2 ¶ 7; PX14 at 3 ¶ 13, Att. A at 8; PX15 at 1 ¶ 4; PX16 at 2 ¶ 5; PX17 at 2 ¶ 5; PX18 at 3 ¶ 7; PX20 Att. Y at 426 (representative telling consumer they afford Defendants' fee "because you won't be making your current $1,022 a month"), 443 ("If you decide that you want us to do the modification, then you start paying monthly.  But that's in lieu of your mortgage payment."), 444 ("But if you started paying your mortgage, they wouldn't give you nothing. . .  Don't pay them."); PX22 Att. J at 420 ("Well, you're not paying your payment while you're in the middle of the modification.  That's the thing.  So you can't make payment while you're in the middle of a modification."); PX23 at 2 ¶ 4; PX24 Att. A at 23 ("So a modification, you're not making payments until you're processed"), 27 ("During the modification process—the next five to seven months,  you cannot be making payments to your lender. . . And if you start making payments, it will disqualify you from the program."); PX27 Att. D at 77, Att. D at 83-84; PX28 Att. I at 105-06, 149, 165-66, 170 (stock email sent to consumers), Att. K at 181, Att. DD at 390:2-10 (Defendants' sales rep stating that it would be "stupid" for consumers to try and bring themselves current on their mortgage payments), Att. EE at 422:13-19 (telling consumer she will pay American Home Loans' monthly fee rather than her mortgage), 431:16-22 ("everyone in America that has ever received a federal hardship modification has been in foreclosure for several months before getting the modification finished."), Att. FF at 475:25, 476:6-9, Att. GG at 516:16-18 (telling consumer that making payments would "disqualify" her from receiving a modification), 517:1-2, Att. HH at 564:10-12, Att. II at 634:1; PX29 at 7 ¶ 39, 9 Table 1; PX30 at 1 ¶ 3; SJX14 at 3 ¶ 7; SJX16 at 2-3 ¶¶ 3, 7.) Defendants have often justified this advice by stating that because Defendants will obtain loan modifications that will result in a new loan, consumers should not make regular monthly mortgage payments.  (*See* PX02 at 2 ¶ 6; PX05 at 1 ¶ 3; PX06 at 1 ¶ 4; PX07 at 1 ¶ 4; PX08 at 1 ¶ 3; PX09 at 1-2 ¶ 4.)  In other cases, Defendants have said that lenders will not accept payments while a modification is in process, (PX17 at 2 ¶ 5; PX22 Att. J at 420:15-24), or that consumers  will not be eligible for a loan modification unless they are behind on mortgage payments, (PX20 Att. Y at 444 ("But if you started paying your mortgage, they wouldn't give you nothing. . . Don't pay them."); PX22 Att. J at 426:14-17; PX24 Att. A at 27:10-11).  For example, in a written "Explanation of Why You Should Do the Modification," Defendants claimed "You have to be 61 days behind on your mortgage to be eligible for any modification.  You may continue to pay on your loan after that but it really will make no difference.  Please reconsider your options."  (PX26 Att. A at 16.)

| (59) | In many cases, Defendants have also told consumers that they should not contact or communicate  with their lenders or servicers. (PX02 at 2 ¶ 6; PX03 at 2 ¶ 6; PX06 at 1 ¶ 4; PX08 at 2 ¶ 6; PX09 at 1-2 ¶ 4; PX11 at 1 ¶ 4; PX12 at 1-2 ¶¶ 4, 8; PX14 at 3 ¶ 15; PX16 at 1-2 ¶ 5; PX17 at 2 ¶ 5; PX22 at 12 ¶ 36; PX23 at 2-3 ¶ 73; PX28 Att. DD at 397:17-18, Att. II at 609:18-21 (telling consumer that working directly with her lender "is like Little Red Riding Hood going to the grandmother that's really a wolf"), 632:19-23, 633:20-21; PX29 at 9 Table 1, PX30 at 1 ¶ 3; SJX15 at 3 ¶ 7.) |
| (60) | As a result, many consumers have fallen months  behind on their loans, accrued penalties and interest, and have gone into or are facing foreclosure.  (PX01 at 5 ¶ 16; PX03 at 5 ¶ 19; PX07 at 3 ¶ 14; PX12 at 4 ¶¶ 14-15; PX13 at 6 ¶ 27 (short sale); PX16 at 8-9 ¶¶ 22-23; PX22 at 6-7 Table 2.) |

1

2

3

### 2. Defendants Fail to Make Required Disclosures

| No. | Statement of Material Fact |
|---|---|
| **(61)** | Defendants' websites abogadodemodificacion.com, homeloanmodificationlawyer.com, americanhomeloans.com, consumerdefense.com, harshipletters.com, hardshipletter.org, and preferredlawteam.com do not contain the statements (1) "(Name of company) is not associated with the government, and our service is not approved by the government or your lender" or (2) "Even if you accept this offer and use our service, your lender may not agree to change your loan." (*See* PX22 at 3-4 ¶ 12, Att. A at 21-37, Att. B at 39-75, Att. D at 374-84, Att. E at 386-91, Att. F at 393-97, Att. G at 399, Att. I at 405.) |
| **(62)** | In small print at the bottom of each webpage, Defendants' website attorneyloanmodifications.com contains the statement "Attorney Loan Modifications is not affiliated with the government, and our service is not affiliated by the government or your lender". (PX22 Att. C at 78.) Also at the bottom of each webpage is a small hyperlink titled "Important MARS Disclosure." (*Id.*) Clicking on that hyperlink takes consumers to a webpage that contains the statements (1) "You may stop doing business with Preferred Law, PLLC at any time. You may accept or reject the offer of mortgage assistance that Preferred Law obtains from your lender [or servicer]," (2) Preferred Law is not associated with the government, and our service is not approved by the government or your lender," (3) "Even if you accept this offer and use our service, your lender may not agree to change your loan," and (4) "If you stop paying your mortgage, you could lose your home and damage your credit rating." (*Id.* at 360.) The statements reference Preferred Law, although the disclosure at the bottom of the webpage states "This site and it's [sic] content is the Property of Consumer Defense." (*Id.*) |
| **(63)** | Defendants' website homerelief.com contains the following statements in small print at the bottom of the webpage: (1) "Home Relief is not affiliated with the government, and our service is not affiliated by the government or your lender," (2) "You may stop doing business with Home Relief at any time. You may accept or reject the offer of mortgage assistance that Home Relief obtains from your lender [or servicer]," (3) "Home Relief is not associated with the government, and our service is not approved by the government or your lender," (4) "Even if you accept this offer and use our service, your lender may not agree to change your loan," and (5) "If you stop paying your mortgage, you could lose your home and damage your credit rating." (*Id.* Att. H at 403.) |
| **(64)** | In numerous instances, Defendants fail to provide consumers with one or more of the following statements during telephone calls with consumers: (1) "You may stop doing business with us at any time. You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer]. If you reject the offer, you do not have to pay us. If you accept the offer, you will have to pay us (insert amount or method for calculating the amount) for our services," (2) "(Name of company) is not associated with the government, and our service is not approved by the government or your lender," (3) "Even if you accept this offer and use our service, your lender may not agree to change your loan," or (4) "If you stop paying your mortgage, you could lose your home and damage your credit rating." (PX01 at 4 ¶ 15; PX05 at 1 ¶ 3 (no warning of consequences from failing to pay mortgage); PX06 at 2 ¶ 6; PX16 at 8-9 ¶ 23; PX17 at 4-5 ¶ 16; PX19 at 4-5 ¶ 14; PX20 Att. Y at 417-30 (no disclosure during recorded call), 435-57 (same); PX22 at 9, 17 ¶¶ 24, 57 (no warning of consequences from failing to pay mortgage), Att. J at 407-32 |

18

| | |
|---|---|
| | (no disclosures during undercover call); PX23 at 7-8 ¶ 22; PX24 Att. A at 7-40 (no disclosures during undercover call); PX28 Att. Z at 326-339 (disclosures not made on consumer call), Att. DD at 373-405 (same), Att. EE at 411-441 (same), Att. FF at 444-502 (same), Att. GG at 504-41 (same); Att. HH at 546-79 (same), Att. II 585-621, 626-57 (same); PX30 at 3 ¶ 14; SJX16 at 3 ¶ 9 (consumer told her could not stop paying Defendants).) |
| **(65)** | Buried in some consumer contracts, Defendants include the statement "Preferred Law is not associated with the government and our services have not been approved by borrower's lender." (PX02 Att. D at 31; PX04 Att. A at 7; PX08 Att. A at 9.) Other contracts have the following buried statements: "Consumer Defense is not associated with the government, and Consumer Defense's federal legal services have not been approved by the government or Client's lender," "Client's lender may not agree to change Client's loan," and "if Client stops paying Client's mortgage, Client could lose Client's home and damage Client's credit rating." (PX09 Att. Att. A at 13.) |

### 3. Defendants Illegally Collect Advance Fees for Their Services

| No. | Statement of Material Fact |
|---|---|
| **(66)** | Defendants' typical service contract requires consumers to make six months of payments of $650, for a total of $3,900. (*See* PX02 Att. B at 10 ($3,900 in five months); PX03 Att. A at 12; PX 04 Att. B at 24; PX05 at 1 ¶ 4; PX07 at 1 ¶ 5; PX08 at 2 ¶ 4, Att. A at 19; PX09 Att. A at 8; PX11 Att. B at 13-14 (four months at $974); PX13 at 2 ¶ 9, Att. A at 9 ($3,900 in three months); PX14 at 3 ¶ 14, Att. B at 16; PX15 at 2 ¶ 6 (around $700/month for six months); PX16 at 2 ¶ 5; PX17 at 2 ¶ 5 (total of $3,900); PX18 at 3 ¶ 8; PX19 at 1 ¶ 3, Att. A at 10 (three monthly payments of $1,300); PX22 at 9 ¶ 26, Att. W at 518 ($3,900 in eight months); PX23 at 2 ¶ 6, Att. A at 16; PX24 Att. A at 24 ("And during the modification process, you will make six payments to Consumer Defense to do this for you"); PX27 Att. C at 41, 58 (payment schedule), Att. E at 95-103; PX28 Att. F at 4 (email to consumer stating that file would not be worked on until consumer made payments to Defendants), Att. F at 15; PX29 at 9 Table 1; PX30 at 1 ¶ 3; SJX01 at 6 ¶ 25, 9 ¶ 48, 11 ¶ 70; SJX14 at 2-3 ¶ 6, Att. A at 10; SJX15 at 2 ¶ 5, Att. at 9, Att. B at 14; SJX16 at 2 ¶ 3, Att. A at 5 (despite failing to complete a loan modification, Defendants sued consumer for unpaid fees); SJX18 at 41-42, 43, 51, 57; SJX20 at 3 ¶ 7.) Some consumers have reported signing up to pay much more than $3,900. (PX01 at 2 ¶ 4 ($5,000); PX06 at 1 ¶ 4 ($6,000); PX22 at 13 ¶ 38 (consumer ended up paying close to $5,000).) |
| **(67)** | Defendants have begun charging consumers' credit or debit cards immediately after consumers sign up, and have continued to make monthly charges even though they have not presented consumers with loan modification offers to which consumers subsequently agree. (PX01 at 3, 5 ¶¶ 7, 10, 16; PX02 at 2 ¶ 5; PX03 at 2, 5 ¶¶ 6, 19; PX04 at 1-4 ¶¶ 5, 9, 16, 20; PX05 at 1-3 ¶¶ 4-5, 8, 12; PX06 at 9 ¶ 27; PX07 at 1, 3 ¶¶ 5, 14; PX08 at 4-5 ¶¶ 13, 15; PX09 at 2-3 ¶¶ 6, 7, 10, Att. A at 8; PX11 at 4 ¶ 17, Att. I at 54-59; PX12 at 2, 4 ¶¶ 5, 8, 13, 15; PX13 at 3 ¶¶ 13-14, 17; PX14 at 5 ¶ 25, Att. G at 52 to 53; PX15 at 3 ¶ 13; PX16 at 8 ¶ 23; PX17 at 2 ¶ 7; PX18 at 3, 5 ¶¶ 7-8, 16; PX19 at 1-2 ¶ 3; PX23 at 2 ¶ 4; SJX14 at 3-4 ¶ 9; SJX16 at 2 ¶ 5; SJX18 at 53 (first payment typically within two weeks after signing up); SJX20 at 3-4 ¶ 7.) |

| | |
|---|---|
| **(68)** | Indeed, Defendants admit to having charged and collected advanced fees. (SJX05 at 21-22 (Admission No. 178); SJX09 at 4 ¶ 7 (declaration of Jonathan Hanley admitting that "we appear to have charged advance fees to a number of customers"); SJX18 at 41-42, 43, 53 (first payment typically within two weeks after signing up); SJX20 at 6 ¶ 18 (Horton admitted that vast majority of clients made payments before receiving modification offers).) |
| **(69)** | Moreover, Defendants instructed employees not to start working on consumers' accounts until they had begun payment. (SJX07 at 2 ¶ 5; SJX20 at 4 ¶ 8 (if clients missed payment, there accounts were marked "Hold"), 8 ¶ 25 (former employee stated she was instructed to tell consumers no work would be done on their accounts until they were current on their payments), Att. W at 158 ("making sure you are aware due to Sandra's new billing guidelines we need an additional 1626 from this guy in order to push him through"), Att. X at 167 ( "There is nothing wrong with waiting for payments to be made and then moving forward on modification process"), Att. Y at 170 ( "When her [the consumer's] next payment clears we can begin working on her file. And if the following payment declines, then we stop working on file and or close, but let her know in writing so she is aware"), Att. Z at 173 ( "Client fell behind on some of the payments to us, and therefore we can not submit him just yet"), Att. AA at 183 ( "If client has paid more than 2500 of their service fee, you don't even have to ask. Go ahead and submit packet to lender. Anything under 2500 please let me know"), Att. BB at 185 ("However their [the consumers'] payment plan is directly related to how quickly we can move through the various phases of the process"), Att. CC at 187 ("But remember we can not submit file to Lender until we have received a considerable portion of our fees . . . We are wanting to have about 2500 paid because odds are client will be approved within a month of being submitted and then will not be able to afford mortgage and our fees").) |
| **(70)** | Defendants' own data from their customer relationship management software, The Loan Post, confirms they routinely charged illegal advance fees. In a random sample of Defendants' Loan Post database, 85.3% of Defendants' customers made at least one payment to Defendants before obtaining any loan modification. (SJX19 at 4-5 ¶ 14.)[6] |
| **(71)** | In some cases, Defendants have bizarrely asserted that their fees are not "up-front" because they purportedly start working on consumers' files soon after consumers sign up with Defendants, and that consumers should watch out for "scammers" who do charge up-front fees: |

> You know, another good thing, we don't take any money up-front from you. And I should warn you of that. If anyone does want money up-front from you, I would definitely run away. That's a red flag. There are a lot of scammers out there. So do not take -- let them take money from you up-front. . . . We don't take money up-front. We give you about two weeks and we're already working on your file as soon as we get documents back from you in order to work with your lender.

---

[6] In the random sample of Defendants' Loan Post database, 69.5% made at least one payment to Defendants (with a 95% confidence interval of 63.1% to 75.9%), corresponding to approximately 5,313 customers or 85.3% (5313 ÷ 6231) who made at least one payment. (*Id.* at 4-5 ¶¶ 12, 14.)

(PX22 Att. J at 424:16-21, 23-25-425:1; *see also* PX13 Att. B at 19-20 (email from employee stating "nothing [no payments needed] upfront. Just the payments notated on the scheduled payment form."); PX20 Att. Y at 444:11-16 (sales representative advising to not pay modification companies "money up front because they're frauds," but that Defendants "earn our money monthly"); PX23 Att. A at 10 (email from employee stating that "[t]here are no upfront fees for legal services").)

| (72) | Defendant Horton claimed in a deposition conducted as part of his State of Utah disbarment proceedings that American Home Loan Counselors provided mortgage assistance relief services to consumers, but that, in order to comply with Regulation O, American Home Loan Counselors did not charge fees. (*See* PX20 Att. DD at 848:16-850:4, 864:3-19, 886:13-20.) Instead, he asserted that a different entity, Preferred Law, collected fees for its purported provision of services related to consumers' "federal rights" under various statutes, but admitted that Preferred Law then paid employees of American Home Loan Counselors for their work. (*See id.* at 23-25 ¶¶ 52-54 and Table 7 (payroll paid to Corporate Defendants' employees, including those of American Home Loan Counselors and Consumer Link), Att. Y at 439:30-31 to 444:3 (Defendants' representative stating that there is a fee for the modification services provided by American Home Loan Counselors, a non-profit), Att. DD at 790:10-18, 850:5-13, 889:1-23.) |
|---|---|
| (73) | Despite Defendants' disingenuous mischaracterizations of the meaning of "up-front", Defendants have admitted in at least one case on a merchant account application that they charge "upfront application fees." (PX20 at 36 ¶ 78, Att. AAA at 1233.) Also, in many cases, consumers have stated that Defendants explicitly told them that no work would be done until Defendants received payment. (PX01 at 2 ¶ 4; PX02 at 2 ¶ 5; PX04 at 1 ¶ 5; PX17 at 2 ¶ 7; PX19 at 1-2 ¶ 3; PX23 at 2 ¶ 4.) And in numerous cases when consumers have fallen behind on their payments to Defendants, they have been told that Defendants will cease working on their files until they have caught up. (PX02 at 3-4 ¶ 12, Att. E at 39; *see also* PX06 at 4 ¶ 13, Att. C at 17 (consumer file on hold until consumer updated payment information); PX16 Att. B at 13 (describing fee to remove "payment hold" on file if incurred); PX18 at 3 ¶ 7.) |
| (74) | Defendant Horton was licensed to practice law in Texas but his Utah license was revoked in 2016. (PX26 ¶¶ 4-5 at 1-2; SJX18 at 56.) Additionally, as he admitted in his September 2016 agreement with the Utah State Bar to suspend his Utah bar license for three years, Horton did not comply with Utah bar ethics rules. (PX20 Att. FF at 1013-31.) Further, bank records show that funds were not deposited in client trust accounts and that Defendants transferred and spent consumers' money at a rapid pace. (PX20 ¶¶ 90-91 at 41-42; *see also id.* Att. DD at 895:5-896:11.) Additionally, all consumers report Defendants took advance fees and, when refunds were sought, Defendants often could not substantiate what modification work, if any, was done for them. (*See, e.g.*, PX14 Att. G at 49; PX15 ¶¶ 15-19 at 3-5, Att. F at 29 (referring generically to services rendered "in accordance with the fee agreement on file"); PX20 Att. DD at 833:11-15, 834:12-15.) Defendants admit that other than Mr. Horton, they did not employ any other licensed attorneys. (SJX05 at 22 (Admission No. 179); SJX18 at 56.) |

1
2
3

**C. Defendants' Practices Have Squeezed Millions of Dollars from Consumers**

| No. | Statement of Material Fact |
|---|---|
| (75) | Between January 8, 2013 and January 8, 2018, Defendants had gross revenues of $19,154,115 and $564,090 in chargebacks or returns. (SJX20 at 29 ¶ 60.) Defendants refunded an additional $161,655. (*Id.*) Thus, the net consumer injury caused by their deceptive marketing practices amounts to $18,428,370. (*Id.*) A review of bank records indicates that essentially none of the advance fees were deposited in client trust accounts. (PX20 at 42 ¶ 91; *see also id.* Att. DD at 895:5-896:11.) |

**D. Facts Relating to Defendants' Affirmative Defenses**

| No. | Statement of Material Fact |
|---|---|
| (76) | Defendants claim that the following governmental entities caused, in whole or in part, the consumer injury: U.S Department of Treasury, the CFPB, the FDIC, Freddie Mac, Fannie Mae, HMP Administrator (via Black Knight Financial Technology Solutions), Office of the Inspector General for the Troubled Asset Relief Program, the FTC, the Federal Housing Finance Agency, the Federal Reserve, the Office of the Comptroller of the Currency, the Department of Justice, and the Government National Mortgage Association as an agent of the Department of Housing and Urban Development. (SJX02 at 5-19) Defendants also allege that 28 lenders or servicers also caused, in whole or in part, the consumer injury. (*Id.* at 19-22.) |
| (77) | Defendants provide no evidence that any of the Department of Treasury, the CFPB, the FDIC, Freddie Mac, Fannie Mae, HMP Administrator (via Black Knight Financial Technology Solutions), Office of the Inspector General for the Troubled Asset Relief Program, the FTC, the Federal Housing Finance Agency, the Federal Reserve, the Office of the Comptroller of the Currency, the Department of Justice, and the Government National Mortgage Association as an agent of the Department of Housing and Urban Development, or the 28 lenders or servicers caused or required Defendants to engage in the unlawful conduct alleged in the FTC's complaint. (*Id.* at 5-22; SJX06 at 5 (Admission No. 204, Defendants admit that the Treasury Department did not required them to charge illegal advance fees), 6 (Defendants failed to respond to Admission No. 256 and therefore are deemed to have admitted that the FDIC did not require Defendants to charge illegal advance fees), 7-14 (Admission Nos. 282, 360, 438, 464, 490, 516, and 542, Defendants admit that they are not regulated by Freddie Mac, the Office of the Inspector General for the Troubled Asset Relief Program, the Federal Reserve Board, the Office of the Comptroller of the Currency, DOJ, the Government National Mortgage Association, or any bank or servicer when asked to admit whether those entities required Defendants to charge illegal advance fees), 13 (Defendants failed to respond to Admission No. 515 and therefore are deemed to have admitted that the Government National Mortgage Association did not cause Defendants to charge illegal advance fees); SJX18 at 58, 59, 60.) |
| (78) | Defendants offered no viable privilege or justification for their unlawful conduct, or explain why entry of a permanent injunction would not be in the public interest. (SJX18 at 61, 62.) |

### III.  THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST DEFENDANTS

#### A. Summary Judgment Standard

Summary judgment is appropriate where, as here, the movant shows "that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the moving party, the FTC bears the initial burden of demonstrating the absence of any genuine issues concerning any material facts.  *See FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994, 1007 (D. Nev. 2019); *FTC v. AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *8-9 (D. Nev. May 1, 2017).  A fact is material if it may affect the outcome of the case, and a dispute is genuine if there is sufficient evidence for the trier of fact to return a verdict for the non-moving party.  *OMICS Grp.*, 374 F. Supp. 3d at 1008 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Once the FTC has met its burden, "the burden shifts to [Defendants] to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue…" *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (quotation omitted); *OMICS Grp.*, 374 F. Supp. 3d at 1008.

Here, there are no material facts in dispute that (1) Defendants violated Section 5 of the FTC Act and multiple provisions of Regulation O, (2) Defendants operated, and are liable, as a common enterprise, and (3) individual Defendants Jonathan Hanley and Sandra Hanley had the necessary level of involvement and knowledge to be individually liable.

#### B. This Court Has Jurisdiction and Venue Is Proper

This Court has jurisdiction over cases brought under the FTC Act. 15 U.S.C. §§ 45, 53(b).  In addition, the Court has subject matter jurisdiction because this is a civil action arising under an Act of Congress regulating commerce, 28 U.S.C. § 1337(a), and an agency of the United States is plaintiff, 28 U.S.C. § 1345.  As discussed above, Defendants solicit consumers nationwide for

23

their mortgage assistance relief services.  (SMF 40.)[7]  Such transactions are "in or affecting

commerce," as required by the FTC Act.  *Ford Motor Co. v. FTC*, 120 F.2d 175, 183 (6th Cir.),

*cert. denied*, 314 U.S. 668 (1941).  And this Court has already found that venue is proper.  (*See*

ECF No. 112.)

    In addition, the Court has jurisdiction over Defendants American Home Loan Counselors and

Consumer Link notwithstanding their purported non-profit status.  Section 4 of the FTC Act

defines "corporations" subject to the FTC's jurisdiction as "any company . . . which is organized

to carry on business for its own profit or that of its members."  15 U.S.C. § 44.  This definition

does not restrict the FTC's regulatory authority over non-profit corporations merely because of

the charter of such corporations, but rather requires an analysis that looks beyond the technical

form of a corporation's organization.  *Cmty. Blood Bank of the Kan. City Area v. FTC*, 405 F.2d

1011, 1017-18 (8th Cir. 1969) ("Congress did not intend to provide a blanket exclusion of all

non-profit corporations, for it was also aware that corporations ostensibly organized not-for-

profit...were merely vehicles through which a pecuniary profit could be realized for themselves

or their members"); *Ohio Christian Coll.*, 80 F.T.C. 815, 849 (1972) (Commission has

jurisdiction over a corporation that exists as a mere shell, cloaking for-profit activities).  In

conducting this analysis, courts have considered whether the corporation at issue is organized as

a non-profit, whether it has been granted tax exempt status by the IRS, whether funds are

distributed or inure to the profit of members or shareholders, or whether profit realized in the

corporation's operations is devoted exclusively to charitable purposes.  *Cmty. Blood Bank*, 405

F.2d at 1019.  Utah law expressly states that acceptance of an organization's designation as a

non-profit is solely "ministerial" and "does not create a presumption that the document is valid

---

[7] The label "SMF" refers to the individually numbered Statements of Material Fact set forth in
Section II above.

or invalid or that information contained in the document is correct or incorrect." Utah Code Ann. § 16-6a-110(4).  Here, neither entity has provided any sort of charitable service that they have promised in their articles of incorporation, such as "the promotion of housing development for the relief of the poor, indigent, underprivileged, and distressed." (SMF 3, 6.)  Further, neither entity has obtained federal non-profit status, (SMF 3, 6), and both have operated as part of the common enterprise to profit from consumer deception, and thus are not exempt from FTC jurisdiction.  (SMF 3, 6.)  *See FTC v. AmeriDebt, Inc.*, 343 F. Supp. 2d 451, 460 (D. Md. 2004) ("Although AmeriDebt is incorporated as a non-stock corporation with tax-exempt status, the Court finds this insufficient to insulate it from the regulatory coverage of the FTC Act.").  Indeed, when challenged by aggrieved consumers and the authorities, Defendants have tried to use the purported non-profit entities as an obfuscation tactic by claiming that the purported non-profits are the companies that are actually providing mortgage assistance relief services, not the formally for-profit entities, and that consumers' payments to Defendants are actually for ancillary services. (SMF 72.)  In short, the entities are sham non-profits designed to help the scam to profit from the deception at issue.

### C.   Defendants Violated Section 5 of the FTC Act

Section 5 of the FTC Act prohibits "unfair or deceptive practices in or affecting commerce."  15 U.S.C. § 45.  An act or practice is deceptive under Section 5 if it involves a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances.  *Stefanchik*, 559 F.3d at 928.  A misrepresentation is material if it involves facts that a reasonable person would consider important in choosing a course of action.  *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).  Express claims are presumed material, so consumers, to be deemed reasonable, are not required to question the veracity of

such claims. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994). In addition, consumer action based on express statements is presumptively reasonable. *FTC v. Ivy Capital, Inc.*, 2013 U.S. Dist. LEXIS 42369, at *23 (D. Nev. Mar. 26, 2013); *FTC v. Data Med. Capital, Inc.*, 2010 U.S. Dist. LEXIS 3344, at *76-77 (C.D. Cal. Jan. 15, 2010); *FTC v. Stefanchik*, 2007 U.S. Dist. LEXIS 25173, at *14 (W.D. Wash. Apr. 3, 2007) ("Reasonable consumers are not required to doubt the veracity of express representations…"), *aff'd* 559 F.3d 924 (9th Cir. 2009).

The FTC need not prove reliance by each consumer misled by Defendants. *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993); *OMICS Grp.*, 374 F. Supp. 3d at 1010. "Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of [Section 13(b)]." *Figgie Int'l*, 994 F.2d at 605 (quoting *FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1293 (D. Minn. 1985)); *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *38.

In considering whether a claim is deceptive, the Court must consider the "net impression" created by the representation, even when the solicitation contains some truthful disclosures. *Cyberspace.com*, 453 F.3d at 1200; *FTC v. AMG Servs.*, 29 F. Supp. 3d 1338, 1365 (D. Nev. 2014) ("Deception may be found based on the 'net impression' created by a representation. This means that the court employs its 'common sense,' and that a section 5 violation is not determined by fine print, technicalities, and legalese"); *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) ("[T]he Court must consider the misrepresentations at issue, by viewing them as a whole without emphasizing isolated words or phrases apart from their context." (brackets and internal quotation marks omitted)). "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." *Cyberspace.com*, 453 F.3d at 1200; *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1214 (D.

Nev. 2011).  And because the FTC Act is a consumer protection statute, any disputed

representation should be construed in favor of the consumer.  *Resort Car Rental Sys. v. FTC*, 518

F.2d 962, 964 (9th Cir.1975)

      The FTC need not prove that Defendants' misrepresentations were made with an intent to

defraud or deceive or in bad faith.  *See, e.g.*, *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489,

1495 (1st Cir. 1989); *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir.

1988); *OMICS Grp.*, 374 F. Supp. 3d at 1010; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at

*17.  Indeed, good faith is not a defense to liability for violating Section 5 of the FTC Act, as

asserted by Defendants in their sixth affirmative defense; thus, the Court should reject this

defense.[8]  *See, e.g.*, *Curtis Lumber Co. v. La. Pac. Corp.*, 618 F.3d 762, 779 (8th Cir. 2010)

(noting consensus that "a defendant's good faith is immaterial to whether a 'deceptive act' has

occurred under § 5 of the Federal Trade Commission Act because that statute does not require an

intent to deceive"); *Cyberspace.com*, 453 F.3d at 1202; *AMG Servs.*, 2017 U.S. Dist. LEXIS

66689, at *17; .  Neither is intent to deceive necessary to demonstrate a violation of Section 5 of

the FTC Act.  *See, e.g., FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997);

*AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *18.

      A representation is also deceptive if the maker of the representation lacks a reasonable

basis for the claim.  *See FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010);

*OMICS Grp.*, 374 F. Supp. 3d at 1010.  Where the maker lacks adequate substantiation evidence,

they necessarily lack any reasonable basis for their claims.  *Direct Mktg. Concepts*, 624 F.3d at

8; *Removatron Int'l*, 884 F.2d at 1498; *OMICS Grp.*, 374 F. Supp. 3d at 1010.

---

[8] Where appropriate, the FTC will address Defendants' affirmative defenses in context.  The
remaining defenses are discussed in Section V below.

Any disclaimers must be prominent and unambiguous to change the apparent meaning and leave an accurate impression. *Kraft, Inc. v. FTC*, 970 F.2d 311, 325 (7th Cir. 1992); *Removatron Int'l*, 884 F.2d at 1497; *OMICS Grp.*, 374 F. Supp. 3d at 1010. A qualification must be likely to come to the attention of the person who sees the basic claim, and a qualification in small print or its equivalent is unlikely to be effective. *See Grant Connect*, 827 F. Supp. 2d at 1214. Statements used to qualify otherwise deceptive statements must be sufficiently clear and conspicuous. *See, e.g.*, *In re Thompson Med. Co.*, 104 F.T.C. 648, 789 n.9 (1984).

Finally, it is well established that "[t]he Federal Trade Act is violated if [a seller] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract." *Resort Car Rental Sys.*, 518 F.2d at 964 (citing *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961); *OMICS Grp.*, 374 F. Supp. 3d at 1010; *FTC v. City W. Advantage, Inc.*, 2008 U.S. Dist. LEXIS 71608, at *7 (D. Nev. Jul. 22, 2008).

Here, Defendants make three core misrepresentations in order to market their purported mortgage assistance relief services. In particular, Defendants misrepresent that: (1) they will obtain loan modifications for consumers that will make consumers' payments substantially more affordable; (2) they are affiliated with or endorsed by the government and have special relationships with consumers' lenders; and (3) consumers are not obligated to pay their mortgages.

### 1. Defendants Failed to Obtain the Promised Mortgage Relief (Count I)

As discussed above, there is no genuine dispute that, in connection with providing mortgage assistance relief services, Defendants represent that they will generally obtain mortgage modifications for consumers that will make consumers' payments substantially more affordable—indeed, they have promised that they achieve such outcomes for 98-100% of their

consumers.  (SMF 41-45.)  And the evidence also shows there is no genuine dispute that in

numerous instances these representations were either false or misleading or were not

substantiated at the time they were made.  (SMF 46-49.)  Defendants' own records show that

they obtained any loan modification, whether or not it resulted in promised lower payments  or

interest rates, for only approximately 39.2% of their consumers.  Only approximately 27.6% saw

any decrease in monthly  payment (putting aside whether such decrease was substantial, as

promised) or any decrease in interest rate.[9]  (SMF 47-48.)  This is not the "adequate

substantiation" necessary to establish a "reasonable basis" for Defendants' claims.  *OMICS Grp.*,

374 F. Supp. 3d at 1010.  Moreover, Defendants have represented that all or virtually all

consumers would obtain mortgage modifications.  (SMF 42-45.)  Courts have held that an

unqualified performance claim implies that consumers generally will receive the claimed

performance and that the benefit is a significant one.  *Five-Star Auto Club*, 97 F. Supp. 2d at 528

("[A]t the very least, it would have been reasonable for consumers to have assumed that the

promised rewards were achieved by the typical Five Star participant.").  And "[t]he existence of

some satisfied customers does not constitute a defense under the FTC [Act]."  *FTC v. Amy*

*Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989).  Here, Defendants go even further than

claiming general success—they claim to have a 98-100% success rate.  In addition to lacking a

_____

[9] In their opposition to the preliminary injunction, Defendants inappropriately tried to limit the
denominator of their purported success rate to "customers for whom [Defendants] completed the
process." (ECF No. 44 at 39-40.) To the extent they try to do so now, the Court should reject
this gerrymandering of the set of consumers in the attempt to inflate artificially success rates.
*See FTC v. Connelly*, 2006 U.S. Dist. LEXIS 98263, at *34-36 (C.D. Cal. Dec. 20, 2006)
(holding that for analogous credit card debt relief operation, denominator is all consumers and
not just those that complete the program); *see also* 75 FR 48458, 48501 (Aug. 10, 2010) (in
discussing savings claims for unsecured debt relief services, which is analogous to success rates
for mortgage assistance relief services, the Statement of Basis and Purposes for amendments
to the FTC's Telemarketing Sales Rule states "in making savings claims, a provider must take into
account the experience of all of its customers, including those who dropped out or otherwise
failed to complete the program").

reasonable basis, Defendants' claims are false. *See FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1273 (M.D. Fla. 2012) (holding that defendants in mortgage modification case violated Section 5 of the FTC Act where their "'success rate' ranged from 29% to 48% and approached nowhere near 100%"); *FTC v. Mortg. Relief Advocates LLC*, 2015 U.S. Dist. LEXIS 186809, at *9 (C.D. Cal. Jul. 1, 2015 (holding that Defendants deceptively claimed that they typically succeed in making consumers' mortgage payments more affordable when success rate was 25%).

Further, because these claims are express they are presumed material. *OMICS Grp.*, 374 F. Supp. 3d at 1010. Even without that presumption, claims regarding a company's success rate in obtaining mortgage modifications are material because they "involve information that is important to consumers," *Cyberspace*, 453 F.3d at 1201, especially when consumers are deciding whether to enlist and pay for the company's services to obtain a modification. And for similar reasons, consumers' reliance on Defendants' express claims were reasonable. Accordingly, there is no genuine dispute that Defendants' claims that they would obtain mortgage modifications that would make consumers' payment substantially more affordable claims are deceptive and violate Section 5 of the FTC Act as alleged in Count I of the Complaint.

### 2. Defendants Falsely Claimed Affiliation with the Government and Lenders, and Misrepresented Consumers' Obligations to Pay Their Mortgages (Count II)

As discussed above, there is no genuine dispute that Defendants routinely represent that they are affiliated with or endorsed by the government and have special relationships with consumers' lenders and that consumers are not obligated to pay their mortgages. (SMF 50-52, 54, 55, 58, 59.) And the evidence shows there is no genuine dispute that these representations are clearly false. (SMF 53, 56, 57, 60.) Like their false promises to obtain loan modifications for consumers, these representations are material both because they are express and because a company's purported connection to the government or specific lenders "involves information

that is important to consumers" when deciding whether to purchase that company's services. *Cyberspace*, 453 F.3d at 1201. Similarly, a claim that a consumer does not need to continue paying their mortgage during the modification process would also be important information for consumers to consider when deciding whether to use their limited funds to pay their mortgage or Defendants' illegal fees. Further, consumers are presumed to have relied reasonably upon Defendants' express claims regarding their mortgage modification services. Accordingly, there is no genuine dispute that Defendants' claims that they are affiliated with or endorsed by the government or consumers' lenders and that consumers are not obligated to pay their mortgages are deceptive and violate Section 5 of the FTC Act as alleged in Count II of the Complaint.

## D. Defendants Violated Several Provisions of Regulation O

Because mortgage relief scams can have devastating consequences for homeowners, Regulation O establishes a series of requirements and prohibitions to prevent unfair or deceptive acts or practices. Regulation O applies to anyone who "provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service." 12 C.F.R. § 1015.2. "Mortgage assistance relief service" includes a host of services, such as "[n]egotiating, obtaining, or arranging a modification of any term of a dwelling loan, including a reduction in the amount of interest, principal balance, monthly payments, or fees," and "[s]topping, preventing, or postponing any mortgage or deed of trust foreclosure sale . . . ." *Id.*

Defendants admit that they are in the business of providing mortgage assistance relief services to consumers. (SMF 37, 38.) Yet, Defendants violated virtually every provision of Regulation O to which they were subject. As set forth below, they misrepresented: the likelihood that they would obtain relief for consumers; the amount of time it would take to obtain relief; their affiliation with government programs and consumers' lenders; and that consumers

were not obligated to pay their mortgages during the modification process. They collected prohibited advance fees. And they failed to make mandated disclosures in communications with consumers.

### 1. Defendants Took Prohibited Advance Fees (Count III)

Regulation O prohibits mortgage assistance relief services providers from requesting or receiving "payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's loan holder or servicer that incorporates the offer that the provider obtained from the loan holder or servicer." 12 C.F.R. § 1015.5(a). As discussed above, there is no genuine dispute that, in connection with providing mortgage assistance relief services, Defendants routinely charged prohibited advance fees. (SMF 66-73.)

Although Regulation O includes an exemption for attorneys under certain, narrow circumstances, 12 C.F.R. § 1015.7, the exemption does not apply to any Defendant in this action. The corporate defendants and individual defendants Jonathan Hanley and Sandra Hanley, who are not attorneys, cannot avail themselves of the exemption because, under the plain language of the Rule, only individual attorneys can be exempted. 12 C.F.R. § 1015.7(a) ("An attorney is exempt from this part . . . if the attorney . . ."); *see also FTC v. A to Z Mktg., Inc.*, 2014 U.S. Dist. LEXIS 197440, at *22-23 (C.D. Cal. Sept. 17, 2014)) (finding law firm defendants and non-attorney defendant associated with the mortgage assistance law firms are liable for violations under the MARS Rule). Neither can the Hanleys rely on former defendant Horton to qualify for the exemption. Although Horton was licensed to practice law in Texas (his Utah license was currently revoked), (SMF 74), Defendants have signed up consumers around the country (SMF 40), and the exemption applies only if the attorney, *inter alia*, "is licensed to practice law in the state in which the consumer for whom the attorney is providing mortgage assistance relief

services resides or in which the consumer's dwelling is located." 12 C.F.R. § 1015.7(a)(2).

Additionally, as he admitted in his September 2016 agreement with the Utah State Bar to

suspend his Utah bar license for three years, Horton did not comply with Utah bar ethics rules, a

requirement for an attorney to be exempt from the MARS Rule. (SMF 74); *see* 12 C.F.R. §

1015.7(a)(3) (attorney must "compl[y] with state laws and regulations that cover the same type

of conduct the rule requires"). Further, even if Horton met the attorney exemption, and even if

the Defendants could claim an exemption based on Horton's status, Defendants would still be

barred from collecting advance fees unless they: (1) deposited fees in client trust accounts and

(2) maintained those accounts in accordance with state regulations. 12 C.F.R. § 1015.7(b).

Here, bank records show that funds were not deposited in client trust accounts and that

Defendants transferred and spent consumers' money at a rapid pace. (SMF 74.) Additionally,

all consumers report Defendants took advance fees and, when refunds were sought, Defendants

often could not substantiate what modification work, if any, was done for them. (SMF 74.)

Accordingly, there is no genuine dispute that Defendants charged prohibited advance fees in

violation of Section 1015.5(a) of Regulation O as alleged in Count III of the Complaint.

### 2. Defendants Made Prohibited Representations (Count IV)

Section 1015.3(a) of Regulation O prohibits mortgage assistance relief services providers

from making any representation that "a consumer cannot or should not contact or communicate

with his or her lender or servicer." 12 C.F.R. § 1015.3(a). As discussed above, there is no

genuine dispute that Defendants routinely told consumers not to contact or communicate with

their lenders or servicers. (SMF 59.) Accordingly, there is no genuine dispute that Defendants

made prohibited representations in violation of Section 1015.3(a) of Regulation O as alleged in

Count IV of the Complaint.

### 3. Defendants Made Material Misrepresentations (Count V)

Section 1015.3(b) of Regulation O prohibits mortgage assistance relief services providers from misrepresenting any material aspect of any mortgage assistance relief service, including but not limited to (a) the likelihood of obtaining or arranging any represented service or result, (b) that the provider is affiliated or otherwise associated with the government or the lender, or (c) the consumer's obligation to make scheduled mortgage payments. 12 C.F.R. § 1015.3(b). As discussed above, there is no genuine dispute that, in connection with providing mortgage assistance relief services activities, Defendants represented that they had a 98 to 100% success rate in obtaining loan modifications, that they were affiliated with the government or consumers' lenders, and that consumers are not obligated to pay their mortgages. (SMF 41-45, 50-52, 54, 55, 58, 60.) And the evidence shows there is no genuine dispute that in numerous instances these representations were false. (SMF 46-49, 53, 56, 57.) Accordingly, there is no genuine dispute that Defendants made material misrepresentations in violation of Section 1015.3(b) of Regulation O as alleged in Count V of the Complaint.

### 4. Defendants Failed to Make Required Disclosures (Count VI)

Section 1015.4(a) of Regulation O requires mortgage assistance relief services providers to make, clearly and prominently, certain verbatim disclosure statements designed to advise consumers of risks in all general commercial and consumer-specific commercial communications. 12 C.F.R. § 1015.4.[10]

---

[10] In particular, the following statements must be clearly and prominently displayed in every general commercial communication: (1) "(Name of company) is not associated with the government, and our service is not approved by the government or your lender" and (2) "Even if you accept this offer and use our service, your lender may not agree to change your loan." 12 C.F.R. § 1015.4(a). Meanwhile, Section 1015.4(b) of Regulation O prohibits mortgage assistance relief services providers from failing to place the following statements clearly and prominently in every consumer-specific commercial communication: (1) "You may stop doing

34

As discussed above, there is no genuine dispute that, in numerous instances, Defendants have failed to place clearly and prominently the required disclosures in their general commercial communications. (SMF 61-65.) For many of their websites, Defendants simply fail to include the disclosures at all. (SMF 61.) For others, the disclosure appears at the very bottom of the webpage or appears only via an unobvious hyperlink (SMF 62, 63), neither of which satisfies Regulation O's requirement that disclosures be "unavoidable." And the evidence also shows there is no genuine dispute that, in connection with providing mortgage assistance relief services, in numerous instances, Defendants have failed to place clearly and prominently the required disclosures in their consumer-specific commercial communications, such as personal emails and telemarketing sales calls. (SMF 64, 65.) Accordingly, there is no genuine dispute that

---

business with us at any time. You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer]. If you reject the offer, you do not have to pay us. If you accept the offer, you will have to pay us (insert amount or method for calculating the amount) for our services;" (2) "(Name of company) is not associated with the government, and our service is not approved by the government or your lender," and (3) "Even if you accept this offer and use our service, your lender may not agree to change your loan." 12 C.F.R. § 1015.4(b)(1), (2), (3). And Section 1015.4(c) of Regulation O prohibits mortgage assistance relief services providers, whenever the provider "has represented that the consumer should temporarily or permanently discontinue payments, in whole or in part, on a dwelling loan," from failing to place the following statement clearly and prominently in every consumer-specific commercial communication: "If you stop paying your mortgage, you could lose your home and damage your credit rating." 12 C.F.R. § 1015.4(c).

    Regulation O defines "commercial communication" to include any written or oral statement "that is designed to effect a sale or create interest in purchasing" a mortgage assistance relief service. 12 C.F.R. § 1015.2. The definition includes "Web pages." *Id.* A "general commercial communication" is a communication not directed at a specific consumer, while a "consumer-specific commercial communication" is. *Id.* In the context of textual communications, Regulation O defines "clear and prominent" to mean that the required disclosures "shall be easily readable; in a high degree of contrast from the immediate background on which it appears. . . in a format so that the disclosure is distinct from other text . . . in a distinct style, such as bold . . . at a minimum, the larger of 12-point type or one-half the size of the largest letter or numeral in the name of the advertised Web site." *Id.* Further, for Internet websites, the required disclosures must also "[b]e unavoidable, i.e., visible to consumers without requiring them to scroll down a Web page." *Id.*

Defendants failed to make required disclosures in violation of Sections 1015.4(a), (b), and (c) of Regulation O as alleged in Count VI of the Complaint.

**E.  The Corporate Defendants Are Jointly and Severally Liable as a Common Enterprise**

Where corporate entities operate together and act as a common enterprise, each may be held liable for the deceptive acts and practices of the others.[11] *Network Servs. Depot*, 617 F.3d at 1143; *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014); *OMICS Grp.*, 374 F. Supp. 3d at 1012-13; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *26; *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002). When determining whether a common enterprise exists, courts consider "common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants." *Grant Connect,* 827 F. Supp. 2d at 1216; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *26; *J.K. Publ'ns.*, 99 F. Supp. 2d at 1202. Where the same individuals transact business through a "maze of interrelated companies," the whole enterprise may be held liable as a joint enterprise. *John Beck Amazing Profits,* 865 F. Supp. 2d at 1082 (quoting *Think Achievement*, 144 F. Supp. 2d at 1011).

---

[11] Courts routinely grant summary judgment on the issue of common enterprise. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010); *OMICS Grp.*, 374 F. Supp. 3d at 1012-13; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *26-28; *Ivy Capital*, 2013 U.S. Dist. LEXIS 42369, at *41.

Here, Defendants operate as a common enterprise to market mortgage assistance relief services. As discussed above, the uncontroverted evidence demonstrates the entities' intertwinement. (SMF 28-34.) Among other things, the various business entities share common ownership and management, office space, employees, and services. (SMF 28, 30-34.) And there is routine commingling of funds among the various Corporate Defendants. (SMF 29.) The common enterprise is used to perpetuate the deceptive practices, and unjust loss or injury would result from treating the corporate Defendants separately, because each company is a beneficiary of, and participant, in the shared business scheme.

## F. Individual Defendants Jonathan Hanley and Sandra Hanley Are Liable for Injunctive and Monetary Relief

Once corporate liability for an FTC Act violation is established, individuals may be held liable for injunctive relief based on those violations if they participated directly in the violations or had authority to control the entities.[12] *Grant Connect*, 763 F.3d at 1101-02; *Publ'g Clearing House*, 104 F.3d at 1170–71; *FTC v. Publishers Bus. Servs.*, 540 F. App'x 555, 558 (9th Cir. 2013) (district court abused its discretion in failing to find liability and restitution as to individual who "had *some degree* of either control or direct participation in the misrepresentations") (emphasis added); *OMICS Grp.*, 374 F. Supp. 3d at 1013. "Authority to control may be evidenced by 'active involvement in business affairs and making of corporate policy, including assuming the duties of a corporate officer.'" *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *18 (citing *Amy Travel*, 875 F.2d at 573). An individual's position as a corporate officer or authority to sign documents on behalf of the corporate defendant is sufficient to show requisite control. *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *18. "When an individual defendant acts as a

---

[12] It is appropriate to enter summary judgment on the issue of individual liability. *Grant Connect*, 763 F.3d at 1102-04; *OMICS Grp.*, 374 F. Supp. 3d at 1013; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *17-18; *Ivy Capital*, 2013 U.S. Dist. LEXIS 42369, at *41-50.

corporate officer of a small, closely held company, courts presume that officer had control over its operations." *Publ'g Clearing House*, 104 F.3d at 1170-71); *see also Ivy Capital*, 2013 U.S. Dist. LEXIS 42369, at *42.

Monetary injunctive relief against individuals is also appropriate if the individual acted with knowledge of the unlawful conduct. *Grant Connect*, 763 F.3d at 1101 (quoting *Publ'g Clearing House*, 104 F.3d at 1171); *Network Servs. Depot*, 617 F.3d at 1138 (same); *OMICS Grp.*, 374 F. Supp. 3d at 1013. The knowledge requirement is satisfied by actual knowledge, reckless indifference, or an awareness of a high probability of fraud with an intentional avoidance of the truth. *Grant Connect*, 763 F.3d at 1101-02; *Network Servs. Depot*, 617 F.3d at 1138-39. Intent is not a necessary element for individual liability. *Grant Connect*, 763 F.3d at 1102; *Network Servs. Depot*, 617 F.3d at 1139; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *17 ("Proof that the defendant intended to deceive consumers or acted in bad faith is unnecessary to establish a § 5(a) violation").

"The extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *OMICS Grp.*, 374 F. Supp. 3d at 1013 (citing *FTC v. Affordable Media*, 179 F.3d 1228, 1235 (9th Cir. 1999)). Participation in corporate affairs is probative of knowledge. *FTC v. Moses*, 913 F.3d 297, 309 (2d Cir. 2019); *Amy Travel*, 875 F.2d at 574. Culpable knowledge is present for individual defendants active in handling consumer complaints and related litigation. *FTC v. MacGregor*, 360 F. App'x 891, 894-95 (9th Cir. 2009 (individual liability where defendant knew of numerous customer complaints and state attorney general proceedings); *FTC v. NCH, Inc.*, 1995 U.S. Dist. LEXIS 21096, at *7 (D. Nev. Sep. 5, 1995), *aff'd* 106 F.3d 407 (9th Cir. 1997); *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1117 (S.D. Cal. 2008); *Think Achievement*, 144 F. Supp. 2d at 1011.

As discussed above, the undisputed evidence shows that individual Defendants Jonathan Hanley and Sandra Hanley had authority to control, and direct knowledge of, Defendants' wrongful acts. (SMF 13-27.) Both have positions of authority over the Corporate Defendants, including acting as corporate officers, possessing signatory authority over financial accounts, drafting marketing materials, making operational decisions, and acquiring services such as web domains and merchant accounts for the companies. (SMF 13-27.) Their companies have faced legal action several times by aggrieved consumers and state authorities. (SMF 35.) And they were aware of Defendants' unlawful practices. (SMF 19, 20, 25, 27, 44, 52.) Accordingly, both may be enjoined from violating the FTC Act and held liable for consumer redress or other monetary relief in connection with Defendants' activities.

## IV. THE SCOPE OF THE PROPOSED ORDER IS APPROPRIATE IN LIGHT OF DEFENDANTS' CONDUCT

Section 13(b) of the FTC Act expressly authorizes courts to grant a permanent injunction against violations of any provisions of law enforced by the FTC. 15 U.S.C. § 53(b); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982); *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *31. "This provision gives the federal courts broad authority to fashion appropriate remedies for violations of the Act," *Pantron I Corp.*, 33 F3d. at 1102, including "any ancillary relief necessary to accomplish complete justice." *H.N. Singer*, 668 F.2d at 1113; *OMICS Grp.*, 374 F. Supp. 3d at 1013. This authority extends to ordering monetary relief, including restitution, rescission of contracts, and disgorgement. *See Pantron I Corp.*, 33 F.3d at 1102; *FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080, 1087 (C.D. Cal. 1994). The scope of the proposed injunctive provisions and monetary relief provided in the proposed final order is appropriate in light of Defendants' past conduct and the likelihood of recurrence absent such relief.

### A. The Proposed Injunctive Provisions Are Appropriate

#### 1. Conduct Relief

A permanent injunction is justified when there is a "cognizable danger of recurrent violation, or some reasonable likelihood of future violations." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). To determine whether violations are likely to recur, courts look to two factors: (1) the deliberateness and seriousness of the present violation, and (2) the violator's past record with respect to unfair advertising practices. *Sears, Roebuck and Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982). Prior illegal conduct is highly suggestive of the likelihood of future violations. *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *see also SEC v. Am. Bd. of Trade*, 751 F.2d 529, 537-38 (2d Cir. 1984); *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975).

Section I of the proposed final order bans Defendants from marketing or selling any secured or unsecured debt relief product or service. The crux of Defendants' unlawful conduct was the deceptive marketing of such mortgage assistance relief services (a type of debt relief service). As discussed, they failed to obtain the promised mortgage relief for consumers, they instructed consumers not to pay their lenders and left most consumers worse off, they charged illegal advance fees, and they generally failed to comply with Regulation O, which covers such activities. Absent injunctive relief, Defendants could begin their fraud anew, as they have in the past after running afoul of law enforcement. (SMF 35.) And Defendants have been unwilling to comply with this Court's preliminary orders. (SMF 36.) Accordingly, banning Defendants from engaging in debt relief activities is appropriate.

Numerous courts in the Ninth Circuit have imposed bans enjoining future participation in a particular line of business, including the debt relief industry. *See, e.g.*, *FTC v. Gill*, 265 F.3d

944, 957-58 (9th Cir. 2001) (upholding ban on engaging in the credit repair business); *FTC v. Kutzner*, 2017 U.S. Dist. LEXIS 174298, at *11 (C.D. Cal. Sep. 21, 2017) (ban on secured and usecured debt relief services); *FTC v. Lake*, 2016 U.S. Dist. LEXIS 187702, at *8 (C.D. Cal. May 31, 2016) (same); *FTC v. Lake*, 181 F. Supp. 3d 692, 704 (C.D. Cal. 2016) (same); *FTC v. Ideal Fin. Solutions, Inc.*, 2016 U.S. Dist. LEXIS 23102, at *14-17 (D. Nev. Feb. 23, 2016) (ban on collection of consumer information and marketing or providing credit related products or services); *FTC v. A to Z Mktg.*, 2014 U.S. Dist. LEXIS 191693, at *11 (C.D. Cal. Sep. 2, 2014) (ban on secured and unsecured debt relief services); *Ivy Capital,* 2013 U.S. Dist. LEXIS 42369, at *46 (ban on business coaching); *FTC v. Lakhany*, 2013 U.S. Dist. LEXIS 194718 , at *13-14 (C.D. Cal. Feb. 28, 2013) (ban on mortgage assistance relief services); *FTC v. Dinamica Financiera*, 2010 U.S. Dist. LEXIS 88000, at *59 (C.D. Cal. Aug. 19, 2010) (ban on loan modification and foreclosure relief services); *NCH, Inc.*, 1995 U.S. Dist. LEXIS 21096, at *8-9 (ban on telephone premium promotions); *FTC v. Publ'g Clearing House, Inc.*, 1995 U.S. Dist. LEXIS 19659, at *10-11 (D. Nev. May 12, 1995), *aff'd* 104 F.3d 1168 (9th Cir. 1997) (ban on telephone premium promotions).  A permanent ban, therefore, is necessary and appropriate here to protect consumers from future harm.

Sections II and III of the proposed order would prohibit Defendants from making various misrepresentations regarding financial-related products and services or any other product or service.  And Section IV would require Defendants to have substantiation for any claims regarding the benefits, performance, or efficacy of any product or service. These injunctive provisions bear a reasonable relation to Defendants' unlawful practices, and are framed to prevent Defendants from engaging in the same or similar illegal practices in the future.  *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) ("The Commission is not limited to

prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the [FTC] Act, respondents must expect some reasonable fencing in."); *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982) (reasonable fencing-in provisions serve to "close all roads to the prohibited goal, so that [the FTC's] order may not be by-passed with impunity");  *Grant Connect*, 763 F.3d at 1105; *FTC v. Dig. Altitude, LLC*, 2019 U.S. Dist. LEXIS 37010, at *32 (C.D. Cal. Mar. 6, 2019).

### 2.   Monitoring Provisions

The proposed order also contains various provisions courts have imposed in other FTC actions to ensure the orders' enforceability:  a provision requiring destruction of consumer information (Section VII); an order distribution requirement (Section VIII); a compliance reporting provision (Section IX); a provision requiring maintenance of records (Section X); and a provision permitting the FTC to monitor Defendants' compliance with the order (Section XI).

It is well-settled that these types of monitoring provisions are proper to ensure compliance with the permanent injunctive provisions discussed above. *See, e.g., OMICS Grp.*, 374 F. Supp. 3d at 1014 ("monitoring provisions are necessary to ensure compliance"), at 1022-24 (ordering containing similar monitoring provisions); *Ideal Fin. Solutions*, 2016 U.S. Dist. LEXIS 23102, at *19; *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1016 (C.D. Cal. 2012); *FTC v. Ivy Capital, Inc.*, 2013 U.S. Dist. LEXIS 90566, at *10 (Jun. 26, 2013); *FTC v. Wellness Support Network, Inc.*, 2014 U.S. Dist. LEXIS 21449, at *71 (N.D. Cal. Feb. 19, 2014); *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202 , 213 (D. Mass. 2009) ("Courts have also included monitoring provisions in final orders in FTC cases to ensure compliance with permanent injunctions"); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 103, 1026-27 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002) ("Courts may order record-

keeping and monitoring to ensure compliance with a permanent injunction"); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1276 (S.D. Fla. 1999); *FTC v. US Sales Corp.*, 785 F. Supp. 737, 753-54 (N.D. Ill. 1992); *see also Dinamica Financiera*, 2010 U.S. Dist. LEXIS 88000, at *65-73.

### B.   The Proposed Equitable Monetary Relief Is Appropriate

#### 1.   The Amount of Equitable Monetary Relief Is Appropriate

The Court, in its final order, may include equitable monetary relief against corporate entities and individuals.[13] *Stefanchik*, 559 F.3d at 931-32 (district court is empowered to order restitution against corporate defendants and individual defendants); *Pantron I Corp.*, 33 F.3d at 1102-04 (same); *OMICS Grp.*, 374 F. Supp. 3d at 1014; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *33-34.   Under Ninth Circuit precedent, courts in FTC matters where consumers make payment directly to defendants calculate redress based on the amount consumers paid for the product or service minus refunds and chargebacks.   *See FTC v. Commerce Planet, Inc.,* 815 F.3d 593, 603 (9th Cir. 2016); *Stefanchik*, 559 F.3d at 931 ("because the FTC Act is designed to protect consumers from economic injuries, courts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits"); *see also Publishers Bus. Servs.,* 540 F. App'x at 556; *FTC v. Wells*, 385 F. App'x 712, 713 (9th Cir. 2010); *OMICS Grp.*, 374 F. Supp. 3d at 1014-15; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *34.   Thus, a monetary award in the amount of consumers' losses may exceed defendants' gain.   *See Figgie Int'l*, 994 F.2d at 606; *Inc21.com*, 745 F. Supp. 2d at 1011.

---

[13] It is appropriate and common for courts to grant monetary redress awards at the summary judgment stage.   *FTC v. Inc21.com Corp.*, 475 F. App'x 106, 108-09 (9th Cir. 2012); *OMICS Grp.*, 374 F. Supp. 3d at 1014-16; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *34; *Ivy Capital*, 2013 U.S. Dist. LEXIS 42369, at *47-50.

The FTC must show a "reasonable approximation" of consumers' losses, and the burden shifts to Defendants to demonstrate the inaccuracy of the FTC's figures. *Commerce Planet*, 815 F.3d at 603-04; *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal. 2010), *aff'd*, 475 F. App'x 106 (9th Cir. 2012) (FTC advanced a "reasonable approximation of consumer losses" that defendants failed to rebut*); FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 n.8 (9th Cir. 2010); *OMICS Grp.*, 374 F. Supp. 3d at 1015; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *35; *FTC v. EDebitPay, LLC*, 2011 U.S. Dist. LEXIS 15750, at *41 (C.D. Cal. Feb. 3, 2011).

Defendants assert in their eighth affirmative defense that any monetary award must be offset by any supposed benefits consumers received.[14] (ECF No. 115 at 12.)  Courts are clear, however, that redress is not reduced by any value received by consumers.  *Publishers Bus. Servs., Inc.,* 540 F. App'x at 557-58 ("The fraud in the selling, not in the value of the thing sold, is what entitles consumers . . . to full refunds.") (citing *Figgie Int'l*, 994 F.2d at 606); *FTC v. Ewing*, 2017 U.S. Dist. LEXIS 176209, at *35 (D. Nev. Oct. 24, 2017) ("a product's value should not reduce or preclude equitable monetary relief").[15]  Accordingly, the Court may reject Defendants' eighth affirmative defense.

Here, the undisputed evidence shows that from January 8, 2013 through January 8, 2018, Defendants had gross revenues of $19,154,115 and paid out $564,090 in chargebacks or returns. (SMF 75.)  Information obtained from the Receiver shows that Defendants paid out an additional $161,655 in refunds.  (SMF 75.)  Thus, the net consumer injury caused by their deceptive marketing practices amounts to $18,428,370.  (SMF 75.)  Because this amount equals the

---

[14] The Court has already struck that portion of their eighth defense that any monetary award should be offset by costs of goods or services, business expenses, and taxes.  (ECF No. 182 at 8.)
[15] The FTC's redress calculation incorporates the refunds and chargebacks that Defendants' documents show they have paid out, rendering moot that portion of Defendants' eighth affirmative defense.

consumer injury caused by Defendants' violations of Section 5 of the FTC and numerous

provisions of Regulation O, it is "reasonably or proportionally related to the alleged actionable

conduct" alleged in this case, and the Court may reject Defendants seventh affirmative defense

that asserts the contrary. (ECF No. 115 at 12.)  Accordingly, it is appropriate for the Court to

enter judgment against each Defendant, jointly and severally, in that amount.

### 2.   Defendants' Statute Of Limitations Defense Is Without Merit

Defendants assert as the eleventh affirmative defense that the FTC's claims are barred by

the statute of limitations, although they fail to state the statute of limitations on which they rely.

(ECF No. 115 at 13.)  This defense fails as a matter of law.

The FTC brought this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b),

and Section 13(b) has no statute of limitations.  *See AMG Servs.*, 2017 U.S. Dist. LEXIS 66689,

at \*15; *FTC v. Ivy Capital, Inc.,* 2011 U.S. Dist. LEXIS 65835, at \*8 (D. Nev. Jun. 20, 2011)

(striking statute of limitations affirmative defense and finding that "Section 13(b) of the Federal

Trade Commission Act specifies no statute of limitations period.").  In fact, the express language

of Section 13(b) provides that the FTC may bring suit "whenever" it has reason to believe a

violation has occurred. 15 U.S.C. § 53(b); *see also Ivy Capital, Inc.,* 2011 U.S. Dist. LEXIS

65835, at \*8.  The Ninth Circuit has held that there is no statute of limitations defense against the

United States government unless the statute in question contains an express limitations period.

*United States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1489 (9th Cir. 1993) ("In the absence of a

federal statute expressly imposing or adopting one, the United States is not bound by any

limitations period.").  Section 13(b) does not have any express limitation periods for government

enforcement actions, so the limitations defenses may be summarily rejected.

45

To the extent that Defendants are attempting to recast this Section 13(b) action as an action under Section 19(d) of the FTC Act, 15 U.S.C. § 57b(d), and apply the three year statute of limitations of the latter, this also fails.  Courts have "universally rejected" such attempts to recast Section 13(b) claims as Section 19(d) claims.  *See FTC v. Instant Response Sys., LLC*, 2014 U.S. Dist. LEXIS 17148, at *7-8 (E.D.N.Y. Feb. 11, 2014) (citing *Ivy Capital* and striking statute of limitations defenses); *FTC v. Dalbey*, 2012 U.S. Dist. LEXIS 67393, at *7 (D. Colo. May 15, 2012) ("arguments that section 19(d)'s period of limitations limits claims for consumer redress brought under section 13(b) have been consistently rejected"); *Inc21.com*, 745 F. Supp. 2d at 1012 ("Since the claims asserted by the FTC against defendants in the instant case were expressly brought under Section 13(b) of the Act (and *not* Section 19), the three-year limitations period does not apply to these claims.") (emphasis in original).

Defendants may also be relying upon the Supreme Court's recent decision in *Kokesh v. SEC*, 137 S. Ct. 1635, 1639 (2017), that held that SEC claims for disgorgement are forfeitures and therefore subject to the five-year statute of limitations under 28 U.S.C. § 2462.  Here, the Court does not need to decide whether *Kokesh* also applies to redress actions under the FTC Act, as the FTC has voluntarily limited its monetary redress calculation to five years from the date it commenced this action.  Accordingly, the Court may reject Defendants' eleventh affirmative defense and enter the proposed equitable monetary relief.

## V.   THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AS TO ANY OF DEFENDANTS' REMAINING AFFIRMATIVE DEFENSES

In their Answer, Defendants advanced fourteen affirmative defenses (ECF No. 115 at 11-13), and the Court has already struck their ninth, tenth, and twelfth defenses.  (ECF No. 182.)  There is no genuine dispute of material fact on the remaining affirmative defenses, which can be

rejected on purely legal determinations.  The FTC has already addressed above Defendants'

sixth, seventh, eighth, and eleventh affirmative defenses.

### A. Because Third Parties Did Not Cause Defendants to Violate the Law, Defendants' Fifth Affirmative Defense Can Be Rejected

Defendants' fifth affirmative defense asserts that any consumer injury was caused "in

whole or in part, by the conduct of third parties." (ECF No. 115 at 12.)  This "affirmative

defense" simply points the finger of liability elsewhere and attempts to shift the blame from

Defendants to third parties.  This is not an affirmative defense at all, but a negative defense or

denial.  A negative defense directly denies the allegations in the complaint.   Under Fed. R. Civ.

P. 12(f), such a defense is redundant and should be stricken because it merely reasserts one of the

defendant's specific denials to the allegations in the Complaint.  *See* 2 Moore's Federal Practice

§ 12.37[3].  This "affirmative defense" does not nullify the undisputed facts, as set forth above,

that Defendants violated Section 5 of the FTC Act and multiple provisions of Regulation O.  *See*

*FTC v. Vemma Nutrition Co.*, 2016 U.S. Dist. LEXIS 85280, at *7 (D. Ariz. Jun. 30, 2016)

(striking defense of injury caused by third parties); *FTC v. Stefanchik*, 2004 U.S. Dist. LEXIS

30710, at *5-6 (W.D. Wash. Nov. 12, 2004) (same).

When asked to identify these third parties, Defendants listed the U.S Department of

Treasury, the CFPB, the FDIC, Freddie Mac, Fannie Mae, HMP Administrator (via Black Knight

Financial Technology Solutions), Office of the Inspector General for the Troubled Asset Relief

Program, the FTC, the Federal Housing Finance Agency, the Federal Reserve, the Office of the

Comptroller of the Currency, DOJ, Ginnie Mae, and 28 lenders and servicers. (SMF 76.) Other

than a rambling 20-page diatribe about the mortgage modification industry in general and the

failure of government regulators to oversee the housing crisis, Defendants failed to indicate how

any of the named third parties caused or required Defendants to (1) misrepresent their services,

47

(2) falsely claim government or lender affiliation or relationship, (3) represent to consumers that they should not pay their mortgages or communicate with their lenders, (4) fail to make the disclosures required by Regulation O, or (5) take illegal advance fees for their services. (SMF 77.) Defendants also attempt to lay blame on their own customers, claiming a litany of perceived failures on consumers' parts. Again, nowhere do they explain how their clients caused Defendants to violate Section 5 of the FTC or Regulation O.

And even if any of these entities was, somehow, responsible in part for consumer injury, that fact does not absolve Defendants. Determinations by regulatory agencies about which parties to name in an enforcement action are presumed immune from judicial review. *SEC v. Princeton Econ. Int'l Ltd.*, 2001 U.S. Dist. LEXIS 948, at \*2-4 (S.D.N.Y. Feb. 7, 2001); *see also Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (holding that "when an agency refuses to act it generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect"). In addition, "[i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990); *United States v. Lopez*, 6 F.3d 1281, 1288 (7th Cir. 1993) (government does not need to charge or even identify coconspirators to convict a defendant of conspiracy). Accordingly, the Court may reject Defendants' fifth affirmative defense.

### B. Entry of the Proposed Order Is in the Public Interest

Defendants' second affirmative defense claims that the FTC's requested relief "would not be in the public interest." (ECF No. 115 at 11.) The FTC brings this action pursuant to the second proviso of Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), which expressly states that "in proper cases the Commission may seek, and after proper proof, the court may issue, a

permanent injunction." Further, when there is a "cognizable danger of recurrent violation, or some reasonable likelihood of future violations," a permanent injunction is justified and in the public interest. *See W.T. Grant*, 345 U.S. at 633. Accordingly, the Court may reject Defendants' second affirmative defense.

### C. Defendants' Remaining Affirmative Defenses Are Not Affirmative Defenses and Can Be Rejected

An affirmative defense absolves a defendant of liability "even where the plaintiff has stated a prima facie case for recovery." *Vogel v. Huntington Oaks Delaware Partners, LLC*, 291 F.R.D. 438, 442 (C.D. Cal. 2013). An attack on a plaintiff's case-in-chief, however, is not an affirmative defense. *Id.* Instead, a defense which tends to disprove one or all of the elements of a complaint is a negative defense. *See FTC v. Think All Publishing, LLC*, 564 F. Supp. 2d 663, 665 (E.D. Tex. 2008). Negative defenses are merely restatements of denials of allegations made elsewhere in the defendants' answers. *Id.* The defense of failure to state a claim is also a negative defense, not an affirmative defense. *See, e.g., FTC v. N. Am. Mktg. & Assocs.*, 2012 U.S. Dist. LEXIS 150102, at *6 (D. Ariz. Oct. 17, 2012) (striking defense of failure to state a claim); *Barnes v. AT&T Pension Benefit Plan*, 718 F. Supp. 2d 1167, 1174 (N.D. Cal. 2010) ("Failure to state a claim is not a proper affirmative defense but, rather, asserts a defect in Barnes' prima facie case"); *Lemery v. Duroso*, 2009 U.S. Dist. LEXIS 50771, at *8 (E.D. Mo. June 16, 2009) ("failure to state a claim is not a proper affirmative defense").

Here, Defendants' first, third, fourth, and thirteenth affirmative defenses ("failure to state a claim," "Defendants did not engage in practices that violate Section 5 of the FTC Act," "Defendants did not engage in practices that violate Regulation O," and Defendants' actions were "privileged and/or justified") are nothing more than "restatements of denials" and should be rejected on that basis alone. Further, the FTC has set forth above undisputed facts that

Defendants, in fact, deceived consumers, failed to make required disclosures, and charged prohibited advanced fees, and, accordingly, violated Section 5 of the FTC Act and multiple provisions of Regulation O.  Therefore, the Court may reject these affirmative defenses.[16]

## VI.    CONCLUSION

For all the foregoing reasons, the FTC respectfully requests that this Court grant its motion for summary judgment and enter the proposed final order.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  July 15, 2019

*/s/ Gregory A. Ashe*
GREGORY A. ASHE
JASON SCHALL
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Telephone: 202-326-3719 (Ashe)
Telephone: 202-326-2251 (Schall)
Facsimile: 202-326-3768
Email: gashe@ftc.gov, jschall@ftc.gov

NICHOLAS A. TRUTANICH
United States Attorney
BLAINE T. WELSH
Assistant United States Attorney
Nevada Bar No. 4790
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787

*Attorneys for Plaintiff*
FEDERAL TRADE COMMISSION

---

[16] Defendants' fourteenth and final affirmative defense is a reservation of additional defenses. (ECF No. 115 at 13.)  Courts are clear, however, that a "reservation of defenses" is not an affirmative defense, and routinely strike such defenses.  *See, e.g., FTC v. Johnson*, 2013 U.S. Dist. LEXIS 80341, at *41 (D. Nev. Jun. 6, 2013).  Accordingly, the Court may reject this defense as well.

1
2
3

**CERTIFICATE OF SERVICE**

4

5    The undersigned hereby certifies that on July 15, 2019, true and correct copies of (1) **FTC'S**
**MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**
6    **THEREOF**, (2) **EXHIBITS IN SUPPORT OF FTC'S MOTION FOR SUMMARY**
**JUDGMENT**, and (3) **[proposed] ORDER FOR PERMANENT INJUNCTION AND**
7    **MONETARY JUDGMENT** were filed electronically with the United States District Court for
the District of Nevada using the CM/ECF system, which sent notification to all parties of interest
8    participating in the CM/ECF system.

9
                                    */s/Gregory A. Ashe*
10                                    Attorney for Plaintiff Federal Trade Commission

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

51