Jonathan Hanley
3241 East Granite Point Circle
Sandy Utah 84092
801-913-5504 |
Jonathanhanley22@gmail.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CONSUMER DEFENSE, LLC, *et. al.*,<br><br>Defendants. | **CASE NO. 2:18-CV-00030-JCM-BNW**<br><br>**DEFENDANTS MOTION FOR HEARING PURSUANT TO DAUBERT/KUMHO TIRE TO EXCLUDE ALL OPINION TESTIMONY OF FTC EXPERT WILLIAM VIOLETTE AND STRIKE COORESPONDING DECLARATIONS**<br><br>**ORAL ARGUMENT REQUESTED** |

1

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION……………………………………………………...…………..1

II. BACKGROUND AND DEFENDANT'S 56(d) REQUEST……..……….…..……..2

    A. Saunders Flawed Methods Cause Violette's Analysis to miss the mark by 20% and 23% Respectively……………………………….…..………………..…....3

        i. Random LoanPost Sample – Violette is Wrong by 20%.......................3

        ii. Defendants Flash Drive - Violette is Wrong by 23%............................4

III. LEGAL STANDARD……………………………………………………..……….4

IV. DECLARATIONS FILED OVER 2 MONTHS AFTER THE EXPERT OPINION CUTOFF SHOULD BE STRICKEN……………………………………………….7

V. RELIABILITY…………………………………………...………...………..8

    A. Violette admits he did not review any documents and was not involved in their coding………………………………...………..9

    B. Violette doesn't understand coding and is not an expert in mortgage terminology………………………….…………9

    C. Saunders Performed Virtually all of Violette's Tasks……………...……...10

VI. LEGAL ARGUMENT AS TO RELIABILITY……………………….………….12

    A. Violette's lack of qualification renders his opinion irrelevant…………...…16

VII. CONCLUSION………………………………………………………………...16

## I.  INTRODUCTION

Comes now Jonathan Hanley, respectfully requesting a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), to determine whether plaintiffs proposed expert testimony is both relevant and reliable.  The plaintiffs seek to admit the expert testimony and declarations of William Violette and all supporting declarations of Emilie Saunders (Ex.'s 1-5).  The Defendant's position is that Violette's expert opinion substantially fails to meet all 3 criteria outlined in Federal Rules of Evidence Rule 702 which are as follows:  (1) is the testimony is based upon *sufficient facts or data*, (2) the testimony is the product of *reliable principles and methods*, and (3) the witness has *applied the principles and methods reliably* to the facts of the case.  As further discussed below, this Court will be shown that these are the opinions of a straw expert whose report lacks any controlling standards that, alone, may provide a basis for excluding this expert testimony. *SQM North America Corp., v. City of Pomona* 750 F.3d at 1045 (quoting and citing *U.S. v. Chischilly*, 30 F.3d 1144 (9th Cir. 1994)).  In addition to lacking controlling standards the report is marred with defects and unreliable methods that include:

1)  *Not one* declaration is produced identifying the methods used in preparing any of the data used in the report.  All we have is an expert 'opinion' that contains unsubstantiated data, derived from unknown methods from unknown sources.

2)  Violette offers opinions without reviewing any client records, files, documents, receipts and without ever examining a single loan modification agreement.

3)  Violette's report had a total reliance on the methodologies and analyses of an FTC paralegal who was without any *instruction, direction or supervision* from Violette.[1]

---

[1] Violette confirms that Emilie Saunders, whose methodologies are known only to her, is the one who reviewed all client files and documents, prepared and coded documents, performed financial analysis and examined client billing etc... None of her methods are addressed in her declaration.

2

4) Saunders' unsupervised conclusions are the result of her unknown methodology and are drawn entirely from the results of her analyses that Violette admits not reviewing.

5) Saunders unsupervised methodologies are flawed, causing a 20% error rate – far exceeding the 5% margin of error that Violette considers statistically sound in his report.

6) Saunders analysis and conclusions are cloaked by Violette report as being those of an expert when they are not.

## II.    BACKGROUND AND DEFENDANTS 56(d) REQUEST

In responding to plaintiffs' motion for summary judgment Hanley, with the corporate defendants joining in, requested relief pursuant to Rule 56(d). The defects of the FTC's expert opinion are a large part of that argument. Without belaboring the facts there are few key points that should be reiterated. Defendants produced detailed declarations from Bobbi Collins and Jonathan Hanley who examine, in detail, the errors of Saunders analysis. (Ex. 6 & Ex. 7)

*Saunders Flawed Methods Cause Violette's Analysis*
*to miss the mark by 20% and 23% Respectively*

1. <u>Random LoanPost Sample – Violette is Wrong by 20%</u>

Attachment B of Violette's report is a random sample of the LoanPost database and its methodology is easily challenged. Saunders methods define certain individuals as clients even though they:

  a)   Never sent in a single document.

  b)   Cancelled within days.

  c)   The file was closed by defendants for failure to return requested documents.

Saunders approach in determining who to classify as a 'client' was entirely at her discretion and not Violette's. This is *extremely* important because although Saunders would

have this Court believe she approached this task from a neutral perspective in a "light most favorable to the defendants." She clearly did not. She had one objective – skew the defendants success rate by counting as many LoanPost files as 'clients' as she could no matter what the records reflected. Per Saunders standards the random sample of 200 files indicates that 163 could be clients.

The Collins declaration (ECF 303-5 & 303-6) provides an in-depth analysis of individuals erroneously identified as 'clients' who should not have been. (*Id*. ¶ 9-73.) In Collins' declaration she states "These errors cause a correct and proper analysis to be far outside the 5% margin of error the FTC's Expert Report deemed to be statistically acceptable. This 95% 'confidence interval' is referenced several times in Violette's Report. Upon review it is indicated that both attachment B and C are in error by well over 20% each." (*Id*. ¶ 8.) Collins indicates approximately 50% of the 163 'clients' are incorrectly dispositioned. This is crucial. This is proof positive the defendant's success rate was 90% even while still applying a lax standard in defining who is a 'client'.

   2. <u>Defendants Flash Drive - Violettes is Wrong by 23%</u>

Attachment C to Violette's report represents 200 files from the flash drive defendants produced to this Court for the PI hearing in February 2018 identified as Exhibit A. Violette's analysis (technically Saunders) indicates 145 files out of 198 had documents evidencing the consumer had obtained a loan modification. However, Saunders never reviewed these clients against LoanPost – so her conclusion was that the remaining 53 received nothing. A direct result of her flawed methods causes Violette's conclusions to be well outside his 5% margin of error. At least 45 of the 53 individuals identified as a 'NO' are incorrectly dispositioned which results

4

in a 96% incidence rate whereas the FTC expert claimed the incidence rate was 73.2%. Just as the Collins declaration attacks with specificity the random LoanPost sample the Hanley declaration, attacks with specificity the flash drive sample and is attached to the Request for 56(d) Relief as ECF's 303-2 and 303-3.

### III.   LEGAL STANDARD

The Supreme Court has interpreted Rule 702 as requiring that the district court act as a "gatekeeper," ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589., *see* also *Kumho Tire Co.*, 526 U.S. at 141; and *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997). Under Federal Rule of Evidence 104(a), the proponent of the testimony bears the burden of establishing to the trial judge that "the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 Advisory Committee's Note (2000 amends.) (*Citing Bourjaily v. United States*, 483 U.S. 171 (1987)). The decision whether to admit or exclude expert testimony is within the broad discretion of the district court. *General Electric Co. v. Joiner*, 522 U.S. at 136-37; *United States v. Hall*, 165 F.3d 1095, 1001. (7th Cir. 1999).

It would not be an abuse of discretion for this Court to exercise its gatekeeping powers in this instance. The Court in *Daubert* declared that the "focus, of course, must be solely on principles and methodology, not on the conclusions they generate." 509 U.S. at 595. Yet as the Court later recognized, "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).   While *Daubert* refers to scientific testimony, *Kumho Tire* held that "[t]he *Daubert* standard applies to all expert testimony, whether it relates to areas of traditional scientific competence or whether it is founded

5

on engineering principles or other technical or specialized expertise." *Smith v. Ford Motor Co.*, 215 F.3d 715, 719 (7th Cir. 2000); *see Kumho Tire*, 526 U.S. at 146. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert," *Zenith Electronics Corp. v. WH-TV Broadcasting Corp*, 395 F.3d 416 420 (7th Cir. 2005) quoting *General Electric Co.*, 522 U.S. at 146.  In *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796 (7th Cir. 2013) the 7th Circuit noted that reliability is determined by the "validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Id*. at 806 (quoting *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999)).

   A 9th Circuit opinion in *SQM North America, Corp. v.  City of Pomona*, 750 F.3d 1036 (9th Cir. 2014) discussed when trial courts may exclude expert testimony as unreliable and reasoned they may do so when it is based on a "faulty methodology or theory." *Id*. 1048. Opinions based on "unsubstantiated and undocumented information is the antithesis of…scientifically reliable expert opinion." *SQM North America*, 750 F.3d at 1044 (quoting *Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir. 1998)).  In assigning trial courts a "gatekeeping" role the Supreme Court has instructed trial courts to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and… whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. Federal Rule of Evidence 702 was amended in 2000 and has essentially codified the *Daubert* standard. The amended rule requires that all adversarial expert testimony be subjected to a reliability test, and its factors mirror those set forth in *Daubert*, including (1) whether the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) whether the testimony is based on

sufficient facts or data; (3) whether it is the product of reliable principles and methods; and (4) whether the expert reliably applied the principles and methods to the facts of the case. The *SQM North America* case provides a recent example of the Ninth Circuit's application of its "methodology-only" standard in reversing the district court's decision to exclude expert testimony. *SQM North America*, 750 F.3d at 1045.

## IV. DECLARATIONS FILED OVER 2 MONTHS AFTER THE EXPERT OPINION CUTOFF SHOULD BE STRICKEN

Violettes report was tendered to Hanley on May 3rd 2019. It contains a brief declaration from Emilie Saunders that only partially addresses her approach to defendant's flash drive – attached as Exhibit A to their opposition to the PI. It addresses nothing *else*. What's confusing is that her declaration specifically states, as it pertains to Exhibit C of Violettes report "*The documents were not reviewed to determine whether they evidenced a successful loan modification*". (Ex. 1 Att. A ¶ 5.) However, Attachment C to Violette's report is the analysis of approximately 200 files from that flash drive wherein *determinations are made as to whether or not certain client received loan modifications and, if so, what was the type*. Then who performed this analysis? Saunders states in her declaration she didn't review the documents to determine whether they evidenced a successful loan modification and Violette makes no mention of it either. On top of that all of the analyses and methodologies used in preparing the data in Attachment B of Violette's report are also left unexplained. Saunders doesn't address Attachment B anywhere in her declaration and neither does Violette. We are left with an expert opinion that contains unsubstantiated data, derived from unknown methods from unknow sources. It seems plaintiff attempts to supplement the Expert opinion on July 15th 2019 by

7

slipping in additional declarations from Saunders. However, these are produced 2 and a half months after the report was due. The FTC is attempting to supplement their expert report months after the close of fact and expert discovery – yet plaintiff has resisted an extension of discovery at the turn of every corner. They simply can't have it both ways – ECF No.'s 255-12, 255-13, 255-20, 255-21 & 255-22 must be stricken.

This motion does not lack in evidencing the flawed methods of this expert report which should give this Court ample reason to grant the requested relief. The reports and all corresponding declaration must be stricken.

## V. RELIABILITY

Discovery in this case is massive. Violette's expert report was tendered to Hanley on May 3rd 2019 (Ex. 1). His methodology *might* appear to be scientific and technical in nature – but they are not. It will be shown that Viollette accepted Saunders data, analysis and conclusions at face value and then regurgitated them under the guise of his expert report bearing his seal of approval. Violette never mentions, in his report or during deposition, of reviewed any records, documents, information, data or analysis other than what was provided to him by Saunders. In fact, Violette admits that he did not review any client records, files, documents, receipts or that he even examined a single loan modification agreement.

Saunders was *never* under Violette's instruction, direction or supervision in employing the methodologies upon which Violette relied in forming his conclusions. Her methodologies were *never* discussed, mentioned or referenced in Violette's May 3rd 2019 report. Nothing in the record indicates that Violette *ever* reviewed *any* of Saunders conclusions for soundness. Violette *never* reviewed Saunders financial analyses (Perhaps the only material he may have

8

been qualified to opine, were it not for the fact that he has never worked in banking or any tangentially related field).

      Saunders provided Violette with unsubstantiated facts and spreadsheet data; which Violette relied upon and then incorporates into his report. (Ex. 1 at 10:8-19.) Saunders, in compiling this data, performed *all* of the following functions and her methodologies are never discussed in Violettes May 3rd 2019 report:

1) *She* represents having reviewed client files that can contain over one hundred discrete highly technical notes further accompanied by hundreds of pages of documents.

2) *She* represents having interpreted complex loan and mortgage documents as well as other records produced by lenders. Some documents are the production of records from Qualified Written Requests issued to lenders by the defendants on behalf of clients.

3) *She* represents having compared various documents in client files to obtain data used in her 'before and after' spreadsheet calculations. The client documents from which Saunders extracts this data are unknown.

4) *She*, not Violette, forms conclusions as to client payment and interest rate changes using unknown data from unknown client documents.

5) *She* made determined the criteria used in defining who was a 'client' for the purposes of calculating defendant's success rate.

6) *She* created the demonstrably error ridden spreadsheet using *her methods* to determine which clients received a loan modification and which ones did not (Ex.1 Att. C). Her unsound methods resulted in an error rate that exceeded 20%. Violette states a 5% margin of error is statistically sound. (Ex. 1 at 10:2-4)

9

*Violette admits he did not review any documents
and was not involved in how they were coded*

Violette concedes the data he received had already been researched, compiled, and coded by Saunders using her methods and without his instruction, supervision or direction. In confirming that his analysis was limited solely to documents compiled by Saunders Violette states: "I did not review the documents specifically. I only reviewed Ms. Saunders's coding of the document." When asked if he gave Saunders instructions on document coding Violette confirms "I did not." When asked if he knows whether Saunders has any training in economics or data analysis he replies "I do not" Violette answers in the affirmative when asked if his opinions are drawn *solely* from documents pulled and coded by Saunders. Violette confirms he performed no outside investigation beyond what was provided by Saunders. (Ex. 8 Violette Depo. 25:20 – 26:25).

*Violette states coding wasn't part of his analysis, he doesn't
understand it and is not an expert in mortgage terminology*

Violette confirmed it was Saunders who "coded what was in the actual files" (*Id*. 20:3) that he "doesn't know what a forbearance is, wasn't requested to analyze that data and isn't an expert in mortgage terminology" (*Id*. 35:5-8). Violette, when asked what the term 'permanent' meant on a spreadsheet discussing a client of the defendants that stated: "Loan Modification? Yes. Type, Permanent." Again states "I also don't know what that coding is referring to. That wasn't part of my analysis" (*Id*. 35:9-16).

*Saunders performed every task that Violette
should have in forming his expert conclusions*

Violette states that Saunders "pulled the files…provided me with data that included whether the accounting was a customer…the customer obtained loan modifications, and

10

whether…customer made at least one payment to defendants" (*Id*. 25:20-25).  In creating a spreadsheet Violette states "…she went -- for each of those names -- and pulled the files…and then created this spreadsheet in Attachment B" (*Id*. 30:18-21).  Attachment B has 14 analytical columns pertaining to the 200 customers resulting in approximately 280 unique data fields.  The methodology Saunders uses to determine the figures she inputs in this spreadsheet is an absolute mystery.  Violette doesn't address it in his report and Saunders doesn't address it in her declaration (Ex. 1 Att. A).  Violette only confirms that he relied *entirely* on Saunders methodology and work product in preparing his report. (*Id*. 10:8-19).

"This is the data that Emilie created by pulling the files for those 200 names" "Emilie…presented me with those two spreadsheets" "Ms. Saunders…compiled this particular document; correct?  "That's right" "I did not use that percent change. That was provided to me by Emilie" "I took…200 observations from the list that Emilie initially provided me…I provided those…back to Emilie and…Emilie provided me with…the analysis of the 200 customer names" (Ex. 8 Violette Depo. 31:1-2, *Id*. 32:16-17, *Id*. 34:9-11, *Id*. 43:4-5, *Id*. 47:9-24 & *Id*. 43:4-5).

Government conduct in a recent disputes reveal a startling lack of candor toward the Courts. *see Shaffer Equip. Co*., 11 F.3d at 457-59. The Fourth Circuit in *Shaffer*, facing a situation in which government lawyers concealed certain misrepresentations made by a government witness, recognized that "[t]he system can provide no harbor for clever devices to divert the search [for truth], mislead opposing counsel or the court, or cover up that which is necessary for justice in the end." *Id*. at 457-58. In this matter, the FTC lawyers have done just that.  In failing to have their expert adequately investigate client files notes and documents they have presented a report to this Court a report, purported to be that of an expert, that is nothing far

11

from it.  They are using this report as a 'clever device' in leading this Court to believe it contains sound conclusions, born of sound data that was gathered using sound methodologies.

Such a display of bad faith in an effort to gain an advantage over Defendants is not only sanctionable, but is also a violation of the FTC lawyers' duty of candor and good faith as officers of the Court. *Id*. at 457. *see* also *Stewart v. U.S. Postal Service*, 649 F. Supp. 1531, 1534 (S.D.N.Y. 1986) (stating that prosecutors, even in a civil case, are held to a higher standard than a private litigant and there "[t]here are other manifestations of the interest in justice rather than in technicalities when the government is a litigant").

Courts have recognized the responsibility of government lawyers to conduct themselves in litigation with the highest integrity and honesty. *see Stewart*, 649 F. Supp. 1534 (noting that different rules apply to government plaintiffs than apply to private parties with counsel and that "when the government is a party to litigation, substance should trump procedure").

### VI.   LEGAL ARGUMENT AS TO RELIABILITY

The law requires the testimony of a proffered expert to meet a certain threshold of reliability.  The testimony of Violette falls short of this threshold.  Violette did no quality control to identify and correct methodological missteps. As a result, Violette's conclusions are riddled with confirmed errors. In other words, beyond being unreliable, Violette's calculations are simply wrong.  The Fourth Circuit has confirmed that expert conclusions based on excluded assumptions are themselves inadmissible. *see*, e.g., *MyGallons LLC v. U.S. Bancorp*, 521 F. App'x 297 (4th Cir. 2013). In *MyGallons*, the plaintiff offered two experts, one of whom extrapolated damages from assumptions established by the other. On appeal, the Fourth Circuit held that the first expert's opinions should have been excluded and that, without the first expert's

12

assumptions, the second "had no basis" for his damages estimate. *Id.* at 307 (holding expert's testimony should be excluded as speculative if it is based on unrealistic assumptions not supported by the record) (*citing Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142–43 (4th Cir. 1994))(additional citation omitted).

Violette's opinions are not proper expert testimony under this standard because he is not an expert in anything. As admitted, Violette has no specialized knowledge necessary in order for him to render an opinion. Because Violette's calculations required no specialized knowledge or expertise and they are not proper expert testimony. see, e.g., *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415–16 (7th Cir. 1992) (Posner, J.) (excluding testimony of expert whose testing consisted "of simplistic extrapolation and childish arithmetic" and cautioning district courts to avoid allowing parties to cloak such testimony "with the appearance of authority by hiring [an expert] to mouth damages theories that make a joke of the concept of expert knowledge"); Cf. *Copeland v. Bieber*, No. 13-cv-246, 2016 WL 7042946, at *3 (E.D. Va. Sept. 8, 2016) (holding that expert's opinion went beyond "simple arithmetic" where it analyzed complicated figures, critiqued opposing expert's analytical model, and relied on specialized training to assist the trier of fact, but excluding testimony on other grounds).

This is exactly the situation we have here. It was Violette who simply plugged numbers into tools, the origins and reliability of which he knows nothing about. Saunders, with the assistance she provided Violette, has exceeded even the most permissive definition ministerial acts. Her opinions exceed simple arithmetic and required the analysis of complex documents. It is she who is attempting to act as the expert. It is her interpretation and analysis of documents that are being presented as those of an expert. It is her unchecked and unknown methodologies that have been used by Violette. In *Joiner*, 522 U.S. 136, decided two years after *Daubert*, the

13

Supreme Court emphasized that "[n]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146; see *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 812–13 (E.D. Va. 2011) (defining *ipse dixit* as "'she herself said it' or 'something asserted but not proved' . . . and 'an unproven assertion resting on the bare authority of some speaker'"), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012) (citations omitted). "[T]he prohibition against allowing *ipse dixit* testimony by experts merely clarifies that the district court's broad discretion includes the discretion to find that there is 'simply too great an analytical gap between the data and the opinion proffered.'" *Id.* (citing *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x. 448, 454 n.4 (4th Cir. 2010) (additional citations and marks omitted); *see also Cooper*, 259 F.3d at 200 (court must ensure that an expert's inferences are "derived using scientific or other valid methods") (citing *Oglesby*, 190 F.3d at 250). As such, pursuant to Rules 702(a), Violette should not be permitted to testify as an expert in the trial of this matter.

Additionally, The Supreme Court has given trial courts broad discretion to strike unreliable and irrelevant expert opinion as they relate to the particular facts of each case. Violettes' opinions do not form the proper basis for a jury to even infer a reasonable, or remotely informed, conclusion as to the work product of the defendants as they relate to this case. As such, his report and opinion testimony should be excluded.

*Violette's lack of qualification
render his opinions irrelevant*

This Court should also consider excluding Violette's report, opinions and testimony as irrelevant. To introduce expert testimony, the proponent must first demonstrate that the proffered expert is "qualified as an expert by knowledge, skill, experience, training, or education

14

to render his or her opinions." Fed. R. Evid. 702.  Given that Violette has no experience in banking, lending, mortgages, loan modifications, finance or any other professional background, testified that he is unfamiliar with even the most basic terminology (Forbearance, TPP & Permanent) that alone demonstrates that he is not qualified to render his opinions.  In his Rule 26 Report and further discussed during deposition, Violette was asked to provide the following expert opinions: (1) The number of account names who were customers of defendants (2) The number of customers who obtained loan modifications [sic] (3) The number of customers who made at least one payment to Defendants before obtaining a loan modification.  The total absence of professional experience only cast further doubts over Violettes qualifications.  As mentioned, the defendant's business was built upon defendant Jonathan Hanley 20+ years of mortgage, loan securitization and commercial banking experience.  Violette lacks all of the above with respect to this industry and the accounting background needed to qualify him to examine the defendants accounting.  During his deposition Violette admits that he has never worked with any loan modification companies and has never been tasked with reviewing any loan modification companies.[2]  Violette further concedes that he has:[3]

(a) No background in the banking industry
(b) No experience in the loan modification business
(c) When asked "what is the definition, to you, of a loan modification?", he replied " It is whether there's a yes or no in these columns".
(d) When asked what he understood the term 'forbearance' to be, his reply was "I don't know.  I didn't wasn't requested to analyze that data, and I'm not an expert in mortgage terminology."
(f) When asked if he knew what "TPP" stands for he replied "I do not".

---

[2] Ex. 8 Violette Depo. 16:18-17:3
[3] (a) *Id*. 33:10-12, (b) *Id*. 33:13-15 (c) *Id*. 34:2-5 (d) *Id*. 35:1-8 (f) *Id*. 35:17-21

15

"When analyzing the relevance of proposed testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Ford Motor Co.*, 215 F.3d at 718.  Almost all of the concerns of Rule 403 apply because Violette's testimony, which represent the opinions of a non-expert as those of the expert, would create unfair prejudice, mislead the jury, and waste time.  Violettes' opinions are not supported by a solid basis of known facts; they are supported only the by presumptions that he was given solid data.  "Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403." *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996).  Nothing that Violette is qualified to testify to bears on any of the issues in this case.  Accordingly, any testimony from Violette is not relevant to any issue in this case.  Because there is no relevance to any issue, the court need not even apply Rule 403 balancing.

## VII.  CONCLUSION

After a review of the evidence, facts, testimony and records herein defendants believe there will be no question that it is well within the Courts discretion to impose it's "gate keeping" scrutiny as required by Federal Rule of Evidence, Rule 702 and *Daubert v. Mearle Dow Pharmaceuticals, Inc.*, 509 U.S 579 (1993.)

For these reasons Hanley respectfully requests a hearing to determine whether the testimony of proposed FTC expert William Violette is both reliable and relevant and the entry of the attached proposed order striking the ECF's 255-12, 255-13, 255-20, 255-21 & 255-22.

Dated: November 6th 2019                                       Respectfully Submitted,

                                                                               /s/ Jonathan Hanley
                                                                               Jonathan P. Hanley

16

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 6th 2019 I electronically filed a true and correct copy of DEFENDANTS MOTION FOR HEARING PURSUANT TO DAUBERT/KUMHO TIRE TO EXCLUDE ALL OPINION TESTIMONY OF FTC EXPERT WILLIAM VIOLETTE AND STRIKE COORESPONDING DECLARATIONS and delivered same to all parties of interest *via* ecf:

GREGORY A. ASHE
JASON SCHALL
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20850
Telephone: 202-326-3719
Facsimile: 202-326-3768
E-mail: gashe@ftc.gov; jschall@ftc.gov

DAYLE ELIESON
United States Attorney
BLAINE T. WELSH
Assistant United States Attorney
Nevada Bar No. 4790
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787
E-mail:blaine.welsh@usdoj.gov

Attorneys for Plaintiff Federal Trade Commission

ANDREW ROBERTSON
EDWARD CHANG
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, CA 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401
E-Mail: arobertson@mcnamarallp.com, echang@mcnamarallp.com

Attorneys for Thomas McNamara, Court-Appointed Receiver

Dated:  November 6th 2019            /s/ Jonathan Hanley_____
                                     Jonathan Hanley, Defendant

17