ALDEN F. ABBOTT
General Counsel
GREGORY A. ASHE
JASON SCHALL
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Telephone: 202-326-3719 (Ashe)
Telephone: 202-326-2251 (Schall)
Facsimile: 202-326-3768
Email: gashe@ftc.gov, jschall@ftc.gov

NICHOLAS A. TRUTANICH
United States Attorney
BLAINE T. WELSH
Assistant United States Attorney
Nevada Bar No. 4790
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | **Case No. 2:18-cv-00030-JCM-BNW** |
| Plaintiff, | |
| v. | **FTC'S OPPOSITION TO DEFENDANT JONATHAN HANLEY'S MOTION TO EXCLUDE TESTIMONY OF FTC EXPERT WILLIAM VIOLETTE** |
| **CONSUMER DEFENSE, LLC,** *et al.,* | |
| Defendants. | |

1

**TABLE OF CONTENTS**

I.    BACKGROUND ....................................................................................... 1

A.  Procedural History ........................................................................... 1

B.  Background on Dr. William Violette's Expert Report ................................. 2

  1.  Random Sample of the First Data Set—The Loan Post Database ......................... 3

  2.  Random Sample of the Second Data Set—Defendants' "Exhibit A" in Opposition to Entry of a Preliminary Injunction ..................................................... 5

II.   THE LEGAL STANDARD .......................................................................... 7

III.  DR. VIOLETTE'S TESTIMONY IS RELEVANT AND RELIABLE AND, THEREFORE, ADMISSIBLE PURSUANT TO RULE 702 AND *DAUBERT* ............... 8

A.  Dr. Violette Is Qualified to Provide Expert Opinion Regarding Random Samples and the Statistical Inferences Derived Therefrom .............................................. 8

B.  Dr. Violette's "Specialized Knoweldge" of Statistics Will Assist the Court "to Understand the Evidence or to Determine a Fact in Issue" ......................................... 10

C.  Dr. Violette's Testimony Is "Based on Sufficient Facts or Data" ............................ 11

  1.  Under Ninth Circuit Law, Experts Do Not Need to Verify Independently Underlying Data ................................................................................ 11

  2.  Underlying Data upon Which Dr. Violette Relied Is Accurate ............................ 12

D.  Dr. Violette's Statistical Conclusions Are the Product of "Reliable Principles and Methods" ...................................................................................... 15

E.  Dr. Violette Has "Reliably Applied" the Relevant Mathematical and Statistical Principles to the Facts of the Case ...................................................... 16

IV.   DEFENDANT HANLEY'S PROCEDURAL COMPLAINTS ARE WITHOUT MERIT ............................................................................................ 17

V.    CONCLUSION ...................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*In re Chevron U.S.A.*,
　　109 F.3d 1016 (5th Cir. 1997)..............................................................................15

*In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig. v. Countrywide Fin. Corp.*,
　　984 F. Supp. 2d 1021 (C.D. Cal. 2013) ...............................................................15

*Daubert v. Merrell Dow Pharm., Inc.*,
　　509 U.S. 579 (1993)..........................................................................................7, 10

*Daubert v. Merrell Dow Pharm., Inc.*,
　　43 F.3d 1311 (9th Cir. 1995)................................................................................10

*FTC v. BurnLounge, Inc.*,
　　753 F.3d 878 (9th Cir. 2014)..................................................................................8

*FTC v. Connelly*,
　　2006 U.S. Dist. LEXIS 98263 (C.D. Cal. Dec. 20, 2006) ..................................13

*FTC v. OMICS Grp. Inc.*,
　　374 F. Supp. 3d 994 (D. Nev. 2019) ..............................................................12, 17

*Hangarter v. Provident Life & Acc. Ins. Co.*,
　　373 F.3d 998 (9th Cir. 2004)...............................................................7, 12, 16, 17

*Kumho Tire Co. v. Carmicheal*,
　　526 U.S. 137 (1999)................................................................................................7

*Mighty Enters. v. She Hong Indus. Co.*,
　　745 Fed. Appx. 706 (9th Cir. 2018)...........................................................12, 16, 17

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
　　752 F.3d 807 (9th Cir. 2014)...................................................................................7

*Shore v. Mohave Cnty., Ariz.*,
　　644 F.2d 1320 (9th Cir. 1981)................................................................................8

*S. Nev. Operating & Maint. Eng'rs Apprenticeship v. Brady Linen Servs., LLC*,
　　2018 U.S. Dist. LEXIS 164963 (D. Nev. Sep. 26, 2018) ....................................8

*State of Ga. Dep't of Human Res. v. Califano*,
　　446 F. Supp. 404 (N.D. Ga. 1977) ..................................................................15, 16

*TC Systems, Inc. v. Town of Colonie, New York*,
    213 F. Supp. 2d 171 (N.D.N.Y. 2002) ....................................................................9

*Thomas v. Newton Int'l Enters.*,
    42 F.3d 1266 (9th Cir. 1994)..........................................................................8, 9

*United States v. Haig*,
    2019 U.S. Dist. LEXIS 112361 (D. Nev. Jul. 8, 2019)........................................8

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) ...........................................................................7

*United States v. Ruvalcaba-Garcia*,
    923 F.3d 1183 (9th Cir. 2019)............................................................................8

*United States v. Sandoval-Mendoza*,
    472 F.3d 645 (9th Cir. 2006).......................................................................7, 10

*United States ex rel. Martin v. Life Care Ctrs. Of Am.*,
    2014 U.S. Dist. LEXIS 142657 (E.D. Tenn. Sep. 29, 2014) .............................15

## STATUTES, REGULATIONS, & RULES

15 U.S.C. § 45 ....................................................................................................1

28 U.S.C. § 1746 .................................................................................................2

12 C.F.R. Part 1015..............................................................................................1

Fed. R. Evid. 702 ...............................................................................7, 8, 10, 20

Fed. R. Evid. 1006 .............................................................................................11

Fed. R. Civ. P. 26(a)(2)(B)(ii)...........................................................................18

Fed. R. Civ. P. 26(a)(3)(B)..................................................................................4

Fed. R. Civ. P. 26(e)(2)....................................................................................2, 4

Local Rule 78-1...................................................................................................8

75 FR 48458 (Aug. 10, 2010) ...........................................................................13

Plaintiff, the Federal Trade Commission ("FTC"), through its undersigned counsel, respectfully submits its opposition to Defendant Jonathan Hanley's *Daubert* motion to exclude the testimony of FTC Expert William Violette (ECF No. 310.) Defendant Hanley's motion is premised on his misunderstanding of what Dr. Violette's opinions actually are and the bases for those opinions. He also appears to confuse Dr. Violette's statistical opinions with the factual statements made by FTC paralegal Emilie Saunders. Finally, Defendants Hanley fails to demonstrate why Dr. Violette is not qualified to testify as a statistical expert in this case. Accordingly, the FTC respectfully requests that the Court deny Defendant Hanley's motion.

I.      BACKGROUND

  A.  Procedural History

The Federal Trade Commission ("FTC") filed its complaint (ECF No. 1) on January 8, 2018, to halt an unlawful mortgage assistance relief services operation that has bilked consumers out of more than $18 million. Defendants targeted distressed homeowners with false promises that they would obtain mortgage modifications that would make consumers' mortgages more affordable. Defendants also represented that they were affiliated with or endorsed by the government or consumers' lenders. In addition, Defendants instructed consumers to not pay their mortgages and not contact or respond to their lenders, failed to make required disclosures, and collected hefty illegal advance fees from consumers. Despite their lofty promises and the extraction of thousands of dollars from individual consumers, many victimized consumers found themselves worse off, with months of penalties, interest, and missed payments added to their mortgages, and in some cases, have faced foreclosure, bankruptcy, and the loss of their homes. The FTC alleged that these practices violate Section 5 of the FTC Act, 15 U.S.C. § 45, and multiple provisions of the CFPB's Regulation O, 12 C.F.R. Part 1015.

On January 10, 2018, on motion by the FTC, the Court entered an *ex parte* temporary restraining order with asset freeze, appointment of a receiver, and other equitable relief. (ECF No. 12.)  On February 20, 2018, after a hearing held on February 15, 2018, the Court entered a preliminary injunction continuing the terms of the temporary restraining order.  (ECF No. 55.)

On July 15, 2019, the FTC filed its motion for summary judgment.  (ECF No. 255.)  The represented Defendants filed their opposition on September 30, 2019.  (ECF No. 294.)  Defendant Hanley filed his opposition on October 4, 2019.  (ECF No. 295.)  The FTC filed its reply on November 5, 2019.  (ECF No. 309.)

**B.  Background on Dr. William Violette's Expert Report**

As Defendant Hanley admits (ECF No. 310 at 8), the FTC timely served its Report of FTC Expert William Violette on May 3, 2019.  (*See* ECF No. 171 at 2 (initial expert disclosures due on or before May 4, 2019).)[1]  Dr. Violette is an economist in the FTC's Bureau of Economics.[2]  He received a BA *magna cum laude* in Economics and History from Cornell University, and a Masters and Ph.D. in Economics from Brown University.  (ECF No. 255-20 at 3 ¶ 3, Att. A at 12.)  Dr. Violette's mathematical and statistical expertise was sought to assist in conducting random samples on two data sets (*id.* at 3 ¶¶ 6-8, 8 ¶¶ 26-27) and to provide statistical analyses of the results of those random samples, in particular to make projections about the frequencies of occurrence in those data sets based upon observations within smaller subsets of those data sets.  (*Id.* at 4-7 ¶¶ 9-25, 9-10 ¶¶ 29-32; ECF No. 310-11 at 7 (18:12-17).)

---

[1] As part of its evidence in support of summary judgment and pursuant to Federal Rule of Civil Procedure 26(e)(2), the FTC resubmitted Dr. Violette's expert report in the form of a declaration (SJX19, ECF No. 255-20) that complies with 28 U.S.C. § 1746.

[2] The role of the FTC's Bureau of Economics, among other things, is to provide "neutral economic analysis on cases that are suggested or brought by the consumer protection legal side." (ECF No. 310-11 at 5 (12:17-19).)  FTC economists look at cases brought by the FTC "from an economic perspective and think about how this case is going to impact the efficiency of markets and how it's going to impact social welfare from an economic point of view."  (Id. (13:4-8).)

### 1.   Random Sample of the First Data Set—The Loan Post Database

The first data set from which a random sample was conducted and analyzed was Defendants' customer relationship management database, Loan Post. (ECF No. 255-20 at 3 ¶ 6.) Loan Post contains records for every consumer having any interaction with Defendants. Loan Post contains 7,645 account files representing 7,645 consumers. (ECF No. 255-21 at 8-9 ¶ 28.) Dr. Violette randomly selected 200 consumer names from the list of 7,645 and provided those names to FTC paralegal Emilie Saunders who then reviewed all of the documents contained in the subfolders in Loan Post associated with those 200 names. (ECF No. 255-20 at 3 ¶ 7; ECF No. 255-21 at 9 ¶¶ 29-30.)

When Ms. Saunders finished her review, she provided Dr. Violette with a spreadsheet containing her results for the 200 consumer names that he randomly selected. (ECF No. 255-20 at 4 ¶ 9, Att. B at 14-17.) Using his economics and statistics background and relying on long-standing and widely-used mathematical and statistical principles, Dr. Violette performed a statistical analysis to see what conclusions can mathematically be drawn from Ms. Saunders' analysis of the random sample drawn. He determined that the following statistical observations regarding the Loan Post database as a whole result from the analysis of the random sample:

- Dr. Violette observed that 163 out of the 200 sample names were coded as customers of Defendants, which implies an 81.5% incidence rate for the sample. He determined that the 95% confidence interval for the frequency of this occurrence across the population of 7,645 account files in the Loan Post database is 76.1% to 86.9%. He concluded that this suggests that Defendants had approximately 6,231 customers (the rest being leads that did not become customers). (*Id.* ¶ 12.)

- Dr. Violette observed that 64 out of the 200 sample names were coded as obtaining some form of loan modification, which implies a 32.0% incidence rate for the sample. He determined that the 95% confidence interval for the frequency of this occurrence across the population of 7,645 account files in the Loan Post database is 25.5% to 38.5%. He concluded that this suggests that approximately 2,446 customers of Defendants obtained some form of loan modification. (*Id.* ¶ 13.)[3]

---

[3] The FTC then used Dr. Violette's results to calculate Defendants' approximately success rate:

- Dr. Violette observed that 139 out of the 200 sample names were coded as making at least one payment to Defendants before obtaining some form of loan modification, which implies a 69.5% incidence rate for the sample. He determined that the 95% confidence interval for the frequency of this occurrence across the population of 7,645 account files in the Loan Post database is 63.1% to 75.9%. He concluded that this suggests that approximately 5,313 customers of Defendants made at least one payment to Defendants before obtaining some form of loan modification.  (ECF No. 255-20 at 4 ¶ 13.)[4]

- Dr. Violette observed that 29 out of the 200 sample names had information regarding the customer's interest rate before and after modification.  (ECF No. 255-20 at 5-6 ¶ 18.)  Of those names, 25 out of the 200 sample names had changes in their interest rates that were less than zero, *i.e.*, a decrease in interest rate, which implies a 12.5% incidence rate for the sample.  He determined that the 95% confidence interval for the frequency of this occurrence across the population of 7,645 account files in the Loan Post database is 7.9% to 17.1%.  He concluded that this suggests that approximately 955 customers who obtained a loan modification that reduced their interest rate.  (*Id.* at 6 ¶ 19.)

- Dr. Violette observed that 56 out of the 200 sample names had information regarding the customer's monthly payment amount before and after modification.  (*Id.* ¶ 20.)  Of those names, 40 out of the 200 sample names had changes in their monthly payment amount that were less than zero, *i.e.*, a decrease in monthly payment, which implies a 20.0% incidence rate for the sample.  He determined that the 95% confidence interval for the frequency of this occurrence across the population of 7,645 account files in the Loan Post database is 14.4% to 25.6%.  He concluded that this suggests that approximately 1,529 customers who obtained a loan modification that reduced their monthly payment.  (*Id.* ¶ 21.)

- Dr. Violette observed that 45 out of the 200 sample names had either (a) a decrease in monthly payment or (b) a decrease in interest rate, which implies a 22.5% incidence rate for the sample.[5]  He determined that the 95% confidence interval for the frequency of this

dividing the approximate number of customers who obtained some form of loan modification (2,446) by the approximate number of customers (6,231), or 39.2%.  (ECF No. 255 at 24 (SMF 47).)

[4] Dividing this number (5,313) by the approximate number of customers (6,231) allows one to approximate the percentage of customers for whom Defendants charged illegal advance fees: 85.3%.  (ECF No. 255 at 31 (SMF 70).)

[5] Dr. Violette's original report dated May 3, 2019, included the separate observations regarding the number of consumers who obtained loan modifications that decreased their interest rates and the number of consumers who obtained loan modifications that decreased their monthly payments discussed above.  In the report submitted with summary judgment, Dr. Violette, in addition to including those observations, also included the combined observation of the number of consumers who obtained loan modifications that either decreased their monthly or their monthly payment.  SJX19, then, can be considered a supplement pursuant to Federal Rule of Civil Procedure 26(e)(2), which can be made any time before 30 days before trial.  Fed. R. Civ. P. 26(a)(3)(B), and was submitted well in advance of his deposition.

occurrence across the population of 7,645 account files in the Loan Post database is 16.7% to 28.3%. He concluded that this suggests that approximately1,720 customers obtaining a loan modification that either reduced their monthly payment or their interest rate. (*Id.* at 6-7 ¶ 22.)[6]

Dr. Violette based his conclusions upon the statistical principles of a binomial distribution, which permits projections about frequencies of occurrence in a larger set of data based upon observations within a small subset of that data. He further based his conclusions upon two-sided confidence intervals for the normal approximation of the binomial distribution, using a 95% confidence interval. Dr. Violette used statistically sound methods that are widely used by people with expertise in the field of statistics. (ECF No. 255-20 at 5, 7 ¶¶ 15-16, 23-25.)

### 2. Random Sample of the Second Data Set—Defendants' "Exhibit A" in Opposition to Entry of a Preliminary Injunction

In their opposition to the FTC's motion for a preliminary injunction, Defendants submitted a thumb drive ("Exhibit A") containing 464 separate PDF files, each file containing on average approximately 70 pages. (ECF No. 255-21 at 12 ¶ 38.) Defendants represented to the Court that "Exhibit A" evidenced 3,294 successful loan modifications (ECF No. 44 at 8), and contained "a copy of each successful loan modification located so far in the electronic data." (*Id.* at 9 n.6.)

When the FTC reviewed Defendants' "Exhibit A," it noted that "Exhibit A" contained multiple duplicate records. (ECF No. 255-12 at 3-4 ¶¶ 6-8; ECF No. 255-13 at 3-4 ¶¶ 5-6.) Removing those duplicates, the FTC found that "Exhibit A" contained records for 2,059 unique names. (ECF No. 255-12 at 3-4 ¶ 8.) The FTC wanted to determine whether Defendants' "Exhibit A," in fact, evidenced "successful loan modifications" for all 2,059 unique names as

---

[6] The FTC then used Dr. Violette's results to calculate Defendants' approximate success rate for consumers who obtained a loan modification that either reduced their interest rate or reduced their monthly payment: dividing 1,720 by 6,231 to get 27.6%. (ECF No. 255 at 24 (SMF 47).)

claimed by Defendants.  Accordingly, the FTC asked Dr. Violette to conduct a random sample of the 2,059 unique names in Defendants' "Exhibit A." (ECF No. 255-20 at 8 ¶ 26.)

Dr. Violette randomly selected 200 names from the list of 2,059 names contained in "Exhibit A" and provided those names to Ms. Sauders who then reviewed all of the documents associated with those names in Defendants' "Exhibit A." (ECF No. 255-20 at 8 ¶ 27; ECF No. 255-21 at 12 ¶ 40.)  When Ms. Saunders finished her review, she provided Dr. Violette with a spreadsheet containing her results for the 200 consumer names that he randomly selected.  (ECF No. 255-20 at 9 ¶ 29, Att. D at 23-27.)  Dr. Violette observed that there was one duplicate name in the analysis of the 200 randomly selected names and four duplicate names in the "Exhibit A" population, so he concluded that the random sample was actually 198 non-duplicate customer names out of a population of 2,055.  (*Id.*)

Using his economics and statistics background and relying on long-standing and widely-used mathematical and statistical principles, Dr. Violette performed a statistical analysis to see what conclusions can mathematically be drawn from Ms. Saunders' analysis of the random sample drawn.  He determined that the following statistical observation regarding Defendants' "Exhibit A" as a whole result from the analysis of the random sample:

- Dr. Violette observed that 145 out of the 198 sample names were coded as having documents in "Exhibit A" evidencing that the customer obtained a loan modification, which implies a 73.2% incidence rate for the sample.  He determined that the 95% confidence interval for the frequency of this occurrence across the population of 2,055 unique names in "Exhibit A" is 67.1% to 79.5%.  He concluded that this suggests that "Exhibit A" contains documents evidencing that approximately 1,504 customers obtained a loan modification.  (*Id.* ¶ 30.)

Dr. Violette based his conclusions upon the statistical principles of a binomial distribution, which permits projections about frequencies of occurrence in a larger set of data based upon observations within a small subset of that data.  He further based his conclusions upon two-sided confidence intervals for the normal approximation of the binomial distribution, using a 95%

confidence interval.  Dr. Violette used statistically sound methods that are widely used by people with expertise in the field of statistics.  (*Id.* at 9-10 ¶¶ 31-32.)

## II.   THE LEGAL STANDARD

Federal Rule of Evidence 702 provides that expert opinion evidence is admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.  Fed. R. Evid. 702; *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014).  To assess the admissibility of expert testimony under *Daubert*, the Court must determine whether the expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  Reliability means the expert witness has "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).  In the Ninth Circuit, a district court has broad latitude in determining whether an expert's testimony is reliable and in deciding how to determine the testimony's reliability.  *United States v. Hankey*, 203 F.3d 1160, 1167-68 (9th Cir. 2000).

Rule 702 is generally construed liberally in considering the admissibility of expert testimony based on some "other specialized knowledge." *Hankey*, 203 F.3d at 1168.  "When evaluating specialized or technical expert opinion testimony, 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) (quoting *Kumho Tire*, 526 U.S. at 150); *see Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016-18 (9th Cir. 2004) (qualifying expert on industry practices on

the basis of industry experience); *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269-70 (9th Cir. 1994) (same). Further, "[w]hen we consider the admissibility of expert testimony, we are mindful that there is less danger that a trial court will be 'unduly impressed by the expert's testimony or opinion' in a bench trial." *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) (citing *Shore v. Mohave Cnty., Ariz.*, 644 F.2d 1320, 1322-23 (9th Cir. 1981)).

### III.    DR. VIOLETTE'S TESTIMONY IS RELEVANT AND RELIABLE AND, THEREFORE, ADMISSIBLE PURSUANT TO RULE 702 AND *DAUBERT*

As discussed, Dr. Violette's declaration sets forth his testimony regarding certain statistical conclusions derived from observations from a random sample of Defendants' Loan Post database and a random sample of Defendants' "Exhibit A." Examining the five factors of Rule 702, Dr. Violette's expert testimony is clearly admissible. Moreover, the Court can rule on Dr. Violette's admissibility without the need of a hearing. The Ninth Circuit does not require courts to conduct a *Daubert* hearing to evaluate the admissibility of an expert. *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019); *United States v. Haig*, 2019 U.S. Dist. LEXIS 112361, at *13-14 (D. Nev. Jul. 8, 2019) ("courts retain discretion in the procedure they use to determine whether expert testimony is admissible under Rule 702"). And Local Rule 78-1 states that "[a]ll motions may be considered and decided with or without a hearing." Here, Defendant Hanley's motion fails to establish how Dr. Violette's declaration testimony should not be admissible. Accordingly, oral argument is "unnecessary to resolve the motion[]," and the Court can decide this motion on the papers. *See S. Nev. Operating & Maint. Eng'rs Apprenticeship v. Brady Linen Servs., LLC*, 2018 U.S. Dist. LEXIS 164963, at *8 n.1 (D. Nev. Sep. 26, 2018).

#### A.    Dr. Violette Is Qualified to Provide Expert Opinion Regarding Random Samples and the Statistical Inferences Derived Therefrom

To admit expert testimony, a court must find that the expert witness is qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Rule 702

"contemplates a broad conception of expert qualifications" and "is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Thomas*, 42 F.3d at 1269. Defendant does not argue—nor could he—that Dr. Violette is not qualified to offer statistical opinions regarding frequencies of occurrence in large data sets. Dr. Violette holds a Ph.D. in economics from Brown University; he also has a Master's degree in Economics from Brown and a Bachelor's degree in Economics and History from Cornell University. (ECF No. 255-20 Att. A at 12.). He has taught applied research methods as a teaching fellow at Brown. (*Id.*) Defendant Hanley offers no evidence (expert or otherwise) suggesting that Dr. Violette is not qualified as an expert in statistics.

Rather than challenging Dr. Violette's credentials in statistics, Defendant Hanley argues that Dr. Violette has not worked in the loan modification business. (ECF No. 310 at 15-17.) When determining whether an expert witness is qualified, the court must "compare the expert's area of expertise with *the particular opinion the expert seeks to offer*." *TC Systems, Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002) (emphasis added). Here, Dr. Violette is offering expert testimony regarding the use of random samples to make statistical observations about several large data sets. He is not offering any opinions regarding Defendants' loan modification operation. The appropriate comparison, then, is *not* (as Defendant Hanley suggests) Dr. Violette's expertise in the loan modification business, but statistics. And Defendant Hanley nowhere suggests that Dr. Violette is not qualified to opine regarding statistics. Instead, Dr. Violette's opinions are squarely within his expertise in statistics. Accordingly, Dr. Violette is qualified to provide the statistical opinions set forth in his declaration.

### B. Dr. Violette's "Specialized Knowledge" of Statistics Will Assist the Court "to Understand the Evidence or to Determine a Fact in Issue"

In assessing whether an expert's opinion will "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, the Court must determine whether the expert's testimony is "relevant to the task at hand." *Daubert*, 509 U.S. at 580. To be relevant, expert testimony must "assist the trier of fact to understand or determine a fact in issue." *Id*. at 591-92. In other words, the evidence must "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311, 1315 (9th Cir. 1995); *Sandoval-Mendoza*, 472 F.3d at 654 ("Expert opinions are relevant if the knowledge underlying them has a valid connection to the pertinent inquiry") (internal quotations removed).

Dr. Violette's testimony is relevant and probative to the facts alleged in Counts I, III, and V of the FTC's Complaint. Counts I and V.a allege that Defendants represented that they would obtain loan modifications for consumers that will make consumers monthly payments substantially more affordable and that those representations were false or not substantiated. (ECF No. 1 at 18, 23.) And Count III alleges that Defendants charged illegal advance fees. (*Id*. at 22.) As described above, Dr. Violette makes statistical observations regarding the number of consumers in Defendants' customer relationship management database who were customers, who obtained loan modifications, and who were charged an illegal advance fee.

Significantly, Defendant Hanley does not dispute that Dr. Violette's testimony, if true, would be relevant to these issues. In particular, Defendant Hanley offers not evidence (expert or otherwise) to suggest that conclusions regarding the number of consumers for whom Defendants obtained mortgage modifications and who made at least one payment to Defendants before obtaining a loan modification would not be relevant in this case. Accordingly, Dr. Violette's

10

knowledge of statistics and the opinions set forth in his declaration will be helpful to the Court in determining whether Defendants violated the FTC Act and Regulation O.

## C. Dr. Violette's Expert Testimony Is "Based on Sufficient Facts or Data"

As discussed in Section I.B.1 above, Dr. Violette provides testimony regarding the number of consumers who were customers of Defendants, the number of customers who obtained a loan modification (including the number who experienced a decrease in interest rate or monthly payment as a result of their modification), and the number of customers who made at least one payment to Defendants before obtaining a loan modification. As discussed, Dr. Violette's testimony regarding these numbers was based on a spreadsheet provided by Ms. Saunders that contained the results of her review of the random sample of Loan Post previously selected by Dr. Violette. (ECF No. 255-20 at 4 ¶ 9, Att. B at 14-17.)[7] And as discussed in Section I.B.2, Dr. Violette provides testimony regarding for how many customers Defendants' "Exhibit A" contained evidence of obtaining a loan modification. This testimony was based on a spreadsheet provided by Ms. Saunders that contained the results of her review of the random sample of "Exhibit A" previously selected by Dr. Violette. (*Id.* at 9 ¶ 29, Att. D at 23-27.)

Defendant Hanley attempts several arguments to support his claim that that Dr. Violette's opinions were not based on sufficient data but were "beyond being unreliable." (ECF No. 310 at 9-15.) All of his attempts, however, fall short.

### 1. Under Ninth Circuit Law, Experts Do Not Need to Verify Independently Underlying Data

First, Defendant Hanley bemoans that Dr. Violette himself did not review the underlying Loan Post or "Exhibit A" documents but instead relied upon the results of Ms. Saunders' review of those documents, and that Dr. Violette did "no quality control" on Ms. Saunders' review.

---

[7] Ms. Saunders' results are summaries of voluminous documents, admissible under Federal Rule of Evidence 1006.

(*Id.*) But the Ninth Circuit holds that "[e]xperts can rely on data provided to them without independent verification." *Mighty Enters. v. She Hong Indus. Co.*, 745 Fed. Appx. 706, 709 (9th Cir. 2018); *see also FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994, 1011 (D. Nev. 2019) (court granted summary judgment in part on declaration testimony of FTC economist whose analysis of a random sample was similar to that of Dr. Violette in that the economist relied on underlying data provided to him by an FTC paralegal without independent verification). Thus, the fact that Dr. Violette only relied upon Ms. Saunders' results has no effect on the admissibility of his testimony.

### 2.  Underlying Data upon Which Dr. Violette Relied Is Accurate

Next, Defendant Hanley complains that the underlying data relied upon by Dr. Violette was "riddled with confirmed errors." (ECF No. 310 at 13.) But the Ninth Circuit holds that the "factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Mighty Enters.*, 745 Fed. Appx. at 709 (citing *Hangarter*, 373 F.3d at 1017 n. 14). Thus, to the extent any errors in the underlying facts did exist, they would, at best, effect credibility not admissibility. In any event, Defendant Hanley's piecemeal attacks on the factual support for Dr. Violette's opinions all fail.[8]

First, with respect to Dr. Violette's observations as to the number Loan Post accounts that represent clients, Defendant Hanley claims that "approximately 50% of the 163 'clients' are incorrectly dispositioned." (ECF No. 310 at 5.) To support his claim, Defendant Hanley relies on the declaration of his employee Bobbi Collins who stated that 45 consumers were wrongly

---

[8] Defendant Hanley mistakenly couches his attacks on the underlying factual data in terms of "methodology." (ECF No. 310 at 9.) But, as discussed, the methodology at issue in Dr. Violette's opinion is not the manner in which one determines whether a particular consumer was a client of Defendants or whether that consumer obtained a loan modification, rather it is the method by which projections about the frequencies of occurrence in a larger data set can be derived from observations within a smaller subset of that data.

coded by Ms. Saunders as clients.  (*Id.*; ECF No. 295 at 10-11; ECF No. 310-7 at 7-15.)  But in

her declaration, Ms. Collins admits that all 45 consumers were, in fact, clients, albeit some for

only a short period of time.  (ECF No. 310-7 at 7-15 (of the 45 consumers for whom Defendant

Hanley claims were not clients, Ms. Collins admits that 31 "engaged the services of defendants,"

that 4 were "a client," that for 5 consumers, their "file was open," "was active," or "was closed"

by Defendants, that for 3 consumers, they simply did not submit all required documents, that 1

passed away during the process, and 1 changed his mind.)  These are not factual disputes with

the underlying data upon which Dr. Violette relied; at best, Defendant Hanley is making the

unsupported legal argument that consumers, who either terminated their client status after

signing up or failed to submit all of the documents demanded by Defendants, should not be

included in the denominator of the success rate calculation.[9]

Second, with respect to Dr. Violette's observations as to the number of Loan Post accounts

for which the consumer obtained some form of loan modification, Defendant Hanley, relying on

the same declaration of Ms. Collins, claims numerous purported errors.  (ECF No. 295 at 10.)

Out of the 200 Loan Post accounts in the random sample, however, Ms. Collins could only point

to three instances where Ms. Saunders supposedly incorrectly coded as "no" accounts that

perhaps should have been coded "yes."  (ECF No. 310-7 at 3-4.)  Moreover, as discussed above,

Dr. Violette calculated an incidence rate of Loan Post accounts for which the consumer obtained

---

[9] Defendant Hanley made the same argument in his opposition to the FTC's motion for summary judgment.  (See ECF No. 295 at 10-11; DX03 at 7-15.)  There as here, Defendant Hanley offers no legal argument to support his attempt to inflate artificially Defedants' success rate by limiting the denominator to only those consumers who completed the process. *See FTC v. Connelly*, 2006 U.S. Dist. LEXIS 98263, at *34-36 (C.D. Cal. Dec. 20, 2006) (holding that for analogous debt relief operation, denominator is all consumers not just those completing the program); 75 FR 48458, 48501 (Aug. 10, 2010) (Statement of Basis and Purpose to amendments to FTC's Telemarketing Sales Rule regarding success rates for unsecured debt relief states "a provider must take into account the experience of all of its customers, including those who dropped out or otherwise failed to complete the program").

some form of loan modification as 32.0% with a 95% confidence interval of 25.5% to 38.5%. (ECF No. 255-20 at 4 ¶ 13.)  Assuming Ms. Collins was correct (and 67 instead of 64 account names obtained a loan modification), the incidence rate would only rise to 33.5%, well within the margin of error.

Finally, with respect to Dr. Violette's opinion as to the "Exhibit A" data set, Defendant Hanley trots out the same tired argument he has made several times already, namely that Ms. Saunders failed to review the "Exhibit A" random sample against the Loan Post database.  (ECF No. 310 at 5-6.)  But as has been explained before, Defendant Hanley does not understand the purpose of the random sample of the "Exhibit A" data set.  As described above, the purpose of the random sample of the "Exhibit A" data set was to determine whether Defendants' representations to the Court during the preliminary injunction hearing that "Exhibit A" evidenced 3,294 successful loan modifications was accurate, not as a separate determination of Defendants' success rate.  Because "Exhibit A" and "Exhibit A" alone was represented by Defendants as evidencing 3,297 successful loan modifications, only documents contained in Exhibit A were relevant to the results of the second random sample.  Accordingly, the fact that "[Ms.] Saunders never reviewed these clients against LoanPost" (ECF No. 310 at 5) or that Defendant Hanley may have found documents *not contained* in "Exhibit A" to support his assertion that those consumers had obtained a loan modification (ECF No. 310-9 at 2-4, 15-32) is irrelevant for purposes of the second random sample.[10]

The FTC notes that Defendant Hanley does not dispute the factual bases for Dr. Violette's opinions as to (1) the number of Loan Post accounts for which the consumer obtained a loan

---

[10] And to the extent that Defendant Hanley tries to imply that Dr. Violette's results of the random sample of the "Exhibit A" data set apply to Defendants' entire customer database (the Loan Post data set), Dr. Violette clearly stated that they could not.  (ECF No. 310-11 at 10 (32:10-12 ("The statistical statements that I make from a random population are only going to be relevant for that population.")).)

modification that lowered his or her interest rate, (2) the number of Loan Post accounts for which the consumer obtained a loan modification that reduced his or monthly payment, (3) the number of Loan Post accounts for which the consumer obtained a loan modification that either lowered his or her interest rate or reduced his or monthly payment, or (4) the number of Loan Post accounts for which the consumer made one or more payment to Defendants before obtaining a loan modification. Neither does Defendant Hanley dispute the accuracy of Ms. Saunders' review of the "Exhibit A" random sample itself.

In sum, Dr. Violette's opinions are based on sufficient facts and data, and, accordingly, admissible.

**D. Dr. Violette's Statistical Conclusions Are the Product of "Reliable Principles and Methods"**

As discussed above, Dr. Violette's testimony is based on the mathematical and statistical principles that observations about a large data set can be made from a representative sample of that data set. "Statistical methods and analysis" are "well recognized as reliable and acceptable evidence in determining adjudicative facts." *United States ex rel. Martin v. Life Care Ctrs. of Am.*, 2014 U.S. Dist. LEXIS 142657, at *41-42 (E.D. Tenn. Sep. 29, 2014); *In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig. v. Countrywide Fin. Corp.*, 984 F. Supp. 2d 1021, 1035 (C.D. Cal. 2013) ("Because most statistical methods relied on in court are described in textbooks or journal articles and are capable of producing useful results when properly applied, these methods generally satisfy important aspects of the 'scientific knowledge' requirement in *Daubert [I]*.") (quoting FJC Ref. Guide on Statistics at 214); *see also In re Chevron U.S.A.*, 109 F.3d 1016, 1020 (5th Cir. 1997) ("The applicability of inferential statistics have long been recognized by the courts"); *State of Ga., Dep't of Human Res. v. Califano*, 446 F. Supp. 404, 409 (N.D. Ga.

15

1977) ("mathematical and statistical methods are well recognized as reliable and acceptable evidence in determining adjudicative facts").

Significantly, Defendant Hanley does not dispute these mathematical and statistical principles. In particular, Defendant Hanley offers no evidence (expert or otherwise) to suggest that observations about a large data set cannot be made from a representative sample of that data set.[11]  Accordingly, Dr. Violette's testimony is based on reliable principles and methods.

### E.  Dr. Violette Has "Reliably Applied" the Relevant Mathematical and Statistical Principles to the Facts of the Case

Finally, as noted above, Dr. Violette used his statistical expertise to construct a random sample of the Loan Post database and a separate random sample of the unique names contained in Defendants' "Exhibit A." Dr. Violette then used his statistical expertise to marked observations regarding the Loan Post database and Defendants' "Exhibit A" based upon the results of Ms. Saunders' review of the Loan Post and "Exhibit A" random samples.

Defendant Hanley does not dispute the methodology by which Dr. Violette selected the two random samples. In particular, Defendant Hanley offers no evidence (expert or otherwise) to suggest that the random samples were not representative samples of the larger data sets. Neither does Defendant Hanley dispute that Dr. Violette's statistical conclusions, *based upon Ms. Saunders' results*, were not accurate. In particular, Defendant Hanley offers no evidence (expert or otherwise) to suggest that the incidence rates, confidence intervals, and projections were calculated incorrectly. Again, as discussed above, Defendant Hanley's only dispute is to the underlying data not the results, which the Ninth Circuit has held goes only to the weight of testimony, not admissibility. *Mighty Enters*., 745 Fed. Appx. at 709; *Hangarter*, 373 F.3d at

---

[11] Moreover, Dr. Violette's testimony goes beyond "simply plug[ing] numbers into tools." (ECF No. 310 at 14.)  The fact that Dr. Violette made use of statistical software to assist in his opinions does not undermine his expertise.

1017 n. 14.  In short, Defendant Hanley fails to demonstrate that Dr. Violette has not reliably applied the relevant mathematical and statistical principles to the relevant facts.  Accordingly, Dr. Violette's testimony is admissible.

## IV.   DEFENDANT HANLEY'S PROCEDURAL COMPLAINTS ARE WITHOUT MERIT

Defendant Hanley also makes several "procedural" complaints, none of which have merit or warrant striking Dr. Violette's testimony or Ms. Saunders' declarations.

First, Defendant Hanley complains that the Declaration of Emilie Saunders that was attached to Dr. Violette's report as Attachment C (ECF No. 255-20 at 26 ¶ 26, Att. C at 18-22) did not lay out the methodology by which Ms. Saunders reviewed the random sample from "Exhibit A." (ECF No. 310 at 9-15.)[12]  But Dr. Violette never relied on that declaration or her "methodology" when formulating his statistical opinions regarding "Exhibit A."  As discussed above, the Ninth Circuit does not require, as a condition of admissibility, that an expert giving opinions on statistical observations independently verify the underlying data on which those statistical observations are derived.  See *Mighty Enters.,* 745 Fed. Appx. at 709; *OMICS Grp.*, 374 F. Supp. 3d at 1011.[13]

Dr. Violette reviewed this declaration for the sole purpose of understanding why he was creating a random sample of a data set containing 2,059 unique names when Defendants' claimed their "Exhibit A" had 3,294 different consumers.  In the declaration attached as Attachment C, Ms. Saunders describes how she observed that "Exhibit A" contained multiple

---

[12] The FTC notes that, as the FTC paralegal assigned to this case, Ms. Saunders has submitted numerous declarations in this case on a variety of factual matters.  (*See, e.g.*, ECF No. 163-1; ECF No. 164-1; ECF No. 190-1; ECF No. 212-1; ECF No. 220-2; ECF No. 255-21—255-22; ECF No. 284-1; ECF No. 286-1; ECF No. 309-1.)

[13] The manner in which Ms. Saunders reviewed the random sample accounts was set forth in her declaration submitted with the FTC's motion for summary judgment.  (ECF No. 255-21 at 9-13 ¶¶ 28-42.)

duplicate entries, and states that after removing duplicate entries it contained only 2,059 unique names. Because Rule 26 requires an expert to list all "facts or data considered by the witness," Fed. R. Civ. P. 26(a)(2)(B)(ii), Dr. Violette included the declaration in his of facts and data considered in formulating his opinions. Accordingly, Defendant Hanley's complaint can be ignored.

Next, Defendant Hanley takes issue with three declarations of Ms. Saunders (SJX11, SJX12, and SJX20) that were filed as part of the FTC's summary judgment evidence. He complains that the FTC tried to "supplement the Expert opinion on July 15 2019 by slipping in additional declarations from Saunders," which he complains were produced "2 and a half months after the report was due." (ECF No. 310 at 7-8.) Defendant Hanley's complaint is without merit. First, the FTC notes that SJX11 (ECF No. 255-12) and SJX12 (ECF No. 255-13) were both previously filed with the Court, and were only attached as summary judgment exhibits for the Court's convenience. SJX11 was originally filed on December 17, 2018, and SJX12 was originally filed on February 5, 2019. The FTC is at a loss, then, how either declaration should come as a surprise to Defendant Hanley. Moreover, except for the limited purpose discussed above, Dr. Violette did not rely on either declaration when formulating his opinions.

With respect to SJX20 (ECF Nos. 255-21 and 255-22), the FTC notes that Ms. Saunders is not an expert and the FTC has no obligation to submit a "report" anticipating her declaration testimony.[14] The FTC listed Ms. Saunders in its August 9, 2018 initial disclosures noting that

---

[14] The FTC also notes that, aside from attachments, Ms. Saunders' summary judgment declaration was 28 pages long and contained 60 separate paragraphs; only 15 paragraphs dealt with Ms. Saunders' review of the two random samples. (ECF No. 255-21 at 9-13 ¶¶ 28-42.) The remainder included summaries of interviews of former employees (*id.* at 4-9 ¶¶ 4-27), certifications (as document custodian for the FTC in this case) of documents obtained from third parties during discovery (*id.* at 13-18 ¶¶ 43-56), and calculations of damages. (*Id.* at 19-30 ¶¶ 57-60.) Nothing in Defendant Hanley's motion provides any basis to strike these portions of her declaration that have nothing to do with the random samples.

she "is likely to have information regarding the FTC's investigative findings concerning Defendants' business practices." (Ex. 1 at 3 ¶ 2.)  And in the FTC's opposition to Defendants' emergency motion to vacate, filed February 5, 2019, after discussing Ms. Saunders' cursory review of "Exhibit A," the FTC stated that it was "currently undertaking a more systematic review of Exhibit A and Defendants' entire LoanPost database." (ECF No. 190 at 3 n.2.)  If Defendant Hanley truly wanted to know what Ms. Saunders might say in her declaration testimony, he had every opportunity to depose Ms. Saunders regarding her investigative efforts but chose not to.  Defendant Hanley's regret as to the discovery choices he made is no basis to strike Ms. Saunders' declaration testimony.   In any event, Dr. Violette did not rely on SJX20 in formulating his opinions.  Accordingly, Defendant Hanley's complaint can be ignored.

## V.     CONCLUSION

Dr. Violette provides reliable expert testimony that will "assist the [Court] to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  Accordingly, the FTC respectfully requests that this Court deny Defendant Hanley's motion.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  November 20, 2019          */s/ Gregory A. Ashe*
GREGORY A. ASHE
JASON SCHALL
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Telephone: 202-326-3719 (Ashe)
Telephone: 202-326-2251 (Schall)
Facsimile: 202-326-3768
Email: gashe@ftc.gov, jschall@ftc.gov

NICHOLAS A. TRUTANICH
United States Attorney
BLAINE T. WELSH
Assistant United States Attorney
Nevada Bar No. 4790
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787

*Attorneys for Plaintiff*
FEDERAL TRADE COMMISSION

**CERTIFICATE  OF SERVICE**

The undersigned hereby certifies that on November 20, 2019, true and correct copies of **FTC'S OPPOSITION TO DEFENDANT  JONATHAN HANLEY'S  MOTION TO EXCLUDE TESTIMONY OF FTC EXPERT WILLIAM  VIOLETTE** was filed electronically with the United States District Court for the District of Nevada using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

> */s/Gregory A. Ashe*
> Attorney for Plaintiff Federal Trade Commission