1  Maria A. Gall (NV 14200)
   gallm@ballardspahr.com
2  BALLARD SPAHR LLP
   1980 Festival Plaza Drive, Suite 900
3  Las Vegas, Nevada 89135-2958
   Tel.:   702-471-7000
4  Fax:   702-471-7070

5  Sanjay Bhandari (*Pro Hac Vice*)
   sbhandari@mcnamarallp.com
6  MCNAMARA SMITH LLP
   655 West Broadway, Suite 900
7  San Diego, California 92101
   Tel.:   619-269-0400
8  Fax:   619-269-0401
   *Attorneys for Court-Appointed Receiver,*
9  *Thomas W. McNamara*

10                    UNITED STATES DISTRICT COURT

11                          DISTRICT OF NEVADA

12 | FEDERAL TRADE COMMISSION,          | Case No. 2:18-cv-00030-JCM-BNW

13 |                   Plaintiff,       | **NOTICE OF RECEIVER'S FINAL
   |        v.                          | REPORT AND APPLICATION FOR:**
14 |                                    | **(1) DISCHARGE OF RECEIVER, AND**
   | CONSUMER DEFENSE, LLC, et al.,     | **(2) APPROVAL OF FINAL FEE**
15 |                                    | **APPLICATION**
   |                   Defendants.
16

Thomas W. McNamara, as the Court-appointed Receiver ("Receiver"), by and through his undersigned counsel, submits this Final Report for the Court's consideration, and applies for discharge of the Receiver and approval of the Receiver's Final Fee Application for the period of April 1, 2020 through September 30, 2021. This Application is made pursuant to Sections XIV.E and XX of the Preliminary Injunction ("PI," ECF No. 55) and is based upon this Final Report and Application, the Declaration of Thomas W. McNamara, and upon such other pleadings and oral and documentary evidence as may be presented at or before the time of the hearing on the Application.

## INTRODUCTION

On January 8, 2018, the Federal Trade Commission ("FTC") initiated this lawsuit against corporate defendants Consumer Defense, LLC ( a Nevada LLC); Consumer Link, Inc.; Preferred Law, PLLC; American Home Loan Counselors; American Home Loans, LLC; Consumer Defense Group, LLC; Consumer Defense, LLC (a Utah LLC); Brown Legal, Inc.; AM Property Management, LLC; FMG Partners, LLC; and Zinly, LLC; and individual defendants Jonathan P. Hanley; Benjamin R. Horton; and Sandra X. Hanley for alleged violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45, and numerous provisions of the Mortgage Assistance Relief Services Rule ("MARS Rule (Regulation O)"). *See* ECF No. 1.

On January 10, 2018, the Court appointed Mr. McNamara as the Receiver of the Receivership Entities[1] pursuant to entry of its Temporary Restraining Order with Asset Freeze, Appointment of Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue. *See* ECF No. 12 ("TRO"). The Receiver's appointment was confirmed, and the temporary designation removed, by the Preliminary Injunction entered February 20, 2018. *See* ECF No. 55 ("PI").

---

[1] Receivership Entities are defined in the TRO to mean the "Corporate Defendants [Consumer Defense, LLC (a Nevada LLC); Consumer Link, Inc.; Preferred Law, PLLC; American Home Loan Counselors; American Home Loans, LLC; Consumer Defense Group, LLC; Consumer Defense, LLC (a Utah LLC); Brown Legal, Inc.; AM Property Management, LLC; FMG Partners, LLC; Zinly, LLC; and each of their subsidiaries, affiliates, successors, and assigns] as well as any other entity that has conducted any business related to mortgage assistance relief services, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant." *See* TRO Definitions, paragraph N, page 6.

1

The Receiver was given a number of duties under the PI including, but not limited to:

- Taking custody and control of the Receivership Entities' assets and documents, PI § XIV.B;
- Preserving the value of the Receivership Entities' assets, PI § XIV.C;
- Preventing the loss of the Receivership Entities' documents, PI § XIV.D;
- Securing and taking exclusive custody of the Receivership Entities' business locations, PI § XIV.G;
- Providing both the FTC and Defendants with access to the Receivership Entities' documents, PI § XIV.P; and
- Suspending the Corporate Defendants' business operations if, in the Receiver's judgment, they could not continue lawfully and profitably, PI § XIV.R.

As described in greater detail below, and in line with his duties, the Receiver secured the sites Defendants used for their business; prepared a preliminary report assessing whether the business could continue to operate lawfully and profitably and ultimately concluding that it could not; suspended consumer payments to Defendants; initially communicated with mortgagees on behalf of consumers facing pending foreclosure sales, requesting postponements to allow consumers to secure legal or other assistance; maintained and serviced mortgage loans held by Receivership Entity American Home Loans, LLC ("AHL"); provided notice to consumers about the case on an ongoing basis; and liquidated receivership assets, including vehicles, real property, jewelry, and artwork.

The case is therefore now resolved as to the Receivership Entities.[2] Having fulfilled his duties under the PI, the Receiver now presents this Final Report and requests discharge from his duties and final payment of fees and expenses.

///

---

[2] On December 5, 2019, the Court entered an Order for Permanent Injunction and Monetary Judgment as to the Receivership Entities and Individual Defendants. ("Permanent Injunction," ECF No. 320.) Defendants Sandra Hanley and Jonathan Hanley appealed the Permanent Injunction against them however, on February 3 (ECF No. 328) and February 4, 2021 (ECF No. 330), respectively. Those appeals remain pending but do not present a hinderance to the conclusion of the Receivership as none of the Receivership Entities appealed the Permanent Injunction and they are not parties to the ongoing appellate proceedings.

...

# FINAL REPORT

## I. Commencement of the Receivership

### A. Immediate Access and Preliminary Report

On Thursday, January 11, 2018, the Receiver and his team implemented the immediate access provisions of the TRO (Section XXIII) by taking possession of the offices of Receivership Entities at 41 West 9000 South, Sandy, Utah 84070 ("Sandy Office"). A secondary business location at 8180 South 700 East, Suite 110, Sandy, Utah 84070 was inspected, though it was confirmed that no active business was being conducted there and those offices had been vacated. Service of the TRO was also executed on four virtual office locations in Nevada and Utah where Receivership Entities had received mail.

When the Receiver arrived at the Sandy Office on-site personnel, including Mr. Hanley, were interviewed. After confirming that all hard copy documents were secure, the computer forensics firm retained by the Receiver supervised the forensic imaging (which was principally conducted by IT personnel from the FTC) of selected desktop computers, the telephone server, and Mr. Hanley's smartphone. A locksmith was employed to change the locks on the exterior doors to the building.

Onsite, we identified two cloud-based data storage programs: LoanPost (the CRM database used to maintain customer information and accounts) and Smartsheet (an online spreadsheet collaboration program used to track account financial activity). The business utilized Google G Suite accounts for email communications and document sharing and maintained multiple email domains. As the Receiver later confirmed, new domains were created when the business would need to change names (which happened frequently) after consumer complaints became too numerous.

### B. Consumer Protection Efforts

After the premises were secured and initial employee interviews were completed, the Receiver suspended all "intake" sales activities by excusing sales personnel, temporarily deactivating the telephone system, and updating the outgoing telephone greeting to include a "notice to consumers" to alert callers to the suspension of operations, provide them with the

address for the Receiver's website, and recommend that they contact their lender, a government-sponsored non-profit loan modification service, or a local attorney. The website to which consumers were directed had information about the FTC action, pertinent Court filings, and information about alternative resources for consumers seeking loan modifications. The Receiver also sent an email message to all customers with active accounts with Defendants to provide them with notice of the case.

After suspending all loan modification processing, the Receiver identified files with imminent foreclosures sale dates. The Receiver's team contacted those borrowers and their lenders to apprise them of the FTC action and the TRO directly, and to request that the lenders extend the sale dates by at least 60 days.

### C. Obstruction by Defendants Jonathan Hanley and Sandra Hanley

From the onset, Defendants Jonathan Hanley and Sandra Hanley were uncooperative and impeded the Receiver's efforts to execute his duties under the terms of the TRO:

- When the Receiver effected immediate access, Mr. Hanley told employees that they were not required to speak to the Receiver and instructed them to leave;

- Mr. Hanley refused to provide accurate administrative passwords to the Google G Suite accounts, thus preventing the Receiver from securing and reviewing that data;

- Mr. Hanley attempted to secure funds through a condominium in Park City, Utah owned by Receivership Entity AM Property Management LLC, either through selling the property or obtaining loans secured by it;

- Mrs. Hanley accessed her email accounts after being served with the TRO and sent instructions to property rental agencies in charge of leasing the Park City condominium to change the contact information and payment arrangements;[3]

- Mrs. Hanley also forwarded emails to her private email account and deleted others;

- Mr. Hanley ignored instructions from the Receiver to deliver three vehicles[4] titled in the name of Receivership Entities to the Receiver for storage; Mr. Hanley even

---

[3] By acting quickly, the Receiver's team was able to give notice of the TRO to the rental agencies and payment processor in time to freeze approximately $6,000 that would have otherwise been diverted to the Hanleys.

[4] The three vehicles were a 2007 Chevy Suburban owned by Brown Legal, Inc., a 2014 Porsche 911 Carrera 4S owned by AM Property Inc., and a 2015 Forest River Viking V-Trec camping trailer owned by AM Property LLC. Mr. Hanley did deliver a fourth vehicle, a 2008 Mercedes Benz S550 owned by Brown Legal, Inc. to the Receiver on time as instructed.

attempted to sell one of the three (a 2014 Porsche 911), though the Receiver was able to thwart his plans and secure the three vehicles within a week;

- Mr. Hanley confirmed that his business maintained four separate storage units (mostly for personal property and furniture), but refused to provide the Receiver with the locations of the units and the necessary access information (the Receiver was finally permitted to inspect the units on January 18, 2018 after the Hanleys' counsel advised them to cooperate).

### D.     The Receiver's Preliminary Report

The Complaint in this matter alleged that from at least October 2011, the Defendants, through operation of a common enterprise, engaged in an unlawful course of conduct to advertise, market, sell, provide, offer to provide, or arrange for others to provide mortgage assistance relief services (MARS), including mortgage loan modification services, loan document audits, and services to stop or avoid foreclosure.  It was alleged Defendants preyed on financially distressed homeowners by luring them into signing contracts for MARS services with deceptive and false promises that Defendants will stop homeowners from going into foreclosure and modify their mortgage loans to make their payments more affordable.

Following his initial investigation, and as set forth in detail in his Preliminary Report, the Receiver concluded that Defendants' business could not operate legally and profitably going forward.  Deceptive and illegal practices were ingrained in, and central to, the profitable operation of the business.  Even if Defendants had been able to completely overhaul their business practices, they lacked the operating income to allow them to build the volume of business necessary to succeed.  Without collecting advance fees, the business would have required substantial capital to fund operations while remaining compliant with the provisions of the MARS Rule.

## II.     Assets of the Receivership Estate

### A.     Real Property

#### 1.     Sandy Office Building

The Sandy Office Building, located at 41 West 9000 South, Sandy, Utah, is a two-story stand-alone building with approximately 5,820 square feet of useable space in a suburban office park.  Receivership Entity Zinly, LLC ("Zinly") purchased the Sandy Office Building from

Olmsted Capital, LLC ("Olmsted") on October 5, 2016 for $700,000. Olmsted provided financing for Zinly's purchase and held a promissory note with a principal amount of $510,000.[5]

On January 18, 2019, the Court granted the Receiver's motion for authorization to sell the Sandy Office Building and ordered him to submit a proposed order appointing three appraisers (ECF No. 182 at 12-13), which the Receiver did on January 25, 2019 (ECF No. 185). The Court entered the Receiver's proposed order on April 30, 2019 and directed the Receiver to engage the three appraisers to prepare appraisal reports. The April 30, 2019 Order also authorized the Receiver to employ a real estate agent and to file a motion for an order confirming any subsequent proposed sale of the Sandy Office Building. ECF No. 205. The appraisals were obtained, and the property was listed on or about May 14, 2019. While the Receiver received offers for the property, Olmsted, the holder of the promissory note, issued a payoff demand in excess of the highest offer received.

A dispute ensued between the Receiver and Olmsted concerning (i) whether Zinly had defaulted on the loan prior to the commencement of the instant action and appointment of the Receiver, and (ii) the amount of the current balance owed under the promissory note. Recognizing that litigating these issues was likely to be costly and time-consuming, the Receiver and Olmsted endeavored to resolve the matter through extensive pre-litigation settlement discussions, which resulted in a settlement agreement. The terms of the settlement agreement provided that Olmsted would pay the Receiver $80,000 and the Receiver would then transfer the Sandy Office Building to Olmsted by deed in lieu of foreclosure. Both parties complied with the terms of the agreement, and after paying delinquent property taxes ($22,719.74), delinquent HOA fees and assessments ($23,345.31), and prorated property taxes ($3,634.05), net proceeds to the Receivership Estate were $30,300.90.

2.   Park City Condo

In September 2014, Receivership Entity AM Property Management, LLC ("AM Property") acquired the property located at 8165 Royal Street East, No. 9, Park City, Utah

---

[5] The note required monthly interest-only payments of $4,675. Until January 11, 2018, Zinly paid the monthly interest payments. Zinly also paid $5,100 to extend the maturity date from January 3, 2018 to April 3, 2018.

6

("Park City Condo") for $1.3 million.  The Park City Condo was a five-bedroom, six-bath residence with approximately 4,005 square feet in Deer Valley, which the Hanleys mainly used as a vacation rental offered via Airbnb and VRBO.  To finance the purchase of the Park City property, AM Property had obtained a $700,000 loan; at the time the Receiver took possession of the property, the outstanding principal balance of the loan was nearly $690,000 and had become delinquent.  The Park City Condo was also subject to quarterly association dues of approximately $4,000 which had also become extremely delinquent, and also owed the association a fine of $10,000 related to an improperly built deck on the property.

Prior to the imposition of the receivership, the Park City Condo had been used as rental property.  With the assistance of a local property management company, the Receiver was able to continue generating funds for the estate by using the condominium as a vacation rental.  In addition to generating approximately $190,000 in net rental fees, the Receiver was also able to use the rental fees to ensure that the property was properly maintained, which normally would have been at a significant cost to the estate.

The Court's January 18, 2019 Order (ECF No. 182), which authorized the Receiver to sell the Sandy Office Building, also authorized the Receiver to sell the Park City condominium pursuant to a similar procedure (the filing of a proposed order that explicitly appointed three proposed appraisers by name, followed by the listing and sale of the property).  On April 30, 2019, the Court entered the proposed order provided by the Receiver.  The order directed him to engage the three appraisers to prepare appraisal reports and authorized him to employ a real estate agent and file a motion for an order confirming any subsequent proposed sale of the Park City condominium.  ECF No. 205.

The Park City condominium was listed on or about May 24, 2019.  After substantial marketing through various national real estate websites, local newspapers, and other print publications, seven private showings were held for potential buyers.  Four individuals submitted offers; two of the offers were immediately rejected (one was too low and the other involved a property trade).  The other two offers were closer to the listing price and came in around the

///

same time.  The Receiver informed both parties of competing bids and ultimately accepted an offer of $1,900,000 for the property.

On August 30, 2019, the Receiver filed a motion for an order approving and confirming the sale of the Park City condominium.  ECF No. 270.  Although the FTC found the Receiver's request to approve the sale of the Park City condominium reasonable,[6] Mr. Hanley filed an opposition to the sale.  ECF No. 278.  On October 9, 2019, the Court entered an order approving and confirming the sale.  ECF No. 298.  Mr. Hanley appealed the Order (ECF No. 311), but the appeal was dismissed for failure to prosecute on March 19, 2020.  Fortunately, this delay tactic did not impact the sale: the parties agreed to extend the escrow until the appeal was decided (ECF No. 324), and on May 13, 2020 escrow closed.

During the pendency of the escrow, a dispute arose between the Receiver and the holder of the 1st deed of trust on the property concerning the lender's entitlement to approximately $64,000 in "default interest."  The disputed amount was ultimately held back in escrow by the escrow officer so as not to impede the closing of the sale.  After significant subsequent negotiations and settlement discussions between the Receiver and the lender, the parties entered into a confidential settlement agreement pursuant to which the Receivership Estate received roughly 84% of the disputed amount and the lender received the balance.  In all, the Receivership Estate's net proceeds from the sale of the Park City condo were $853,595.82.

**B.      Vehicles**

Receivership Entities owned three automobiles and one camping trailer: (1) 2014 Porsche Carrera 4S; (2) 2008 Mercedes Benz S550; (3) 2007 Chevrolet Suburban; and (4) 2015 Forest River Viking V-Trec Camping Trailer (collectively, the "Vehicles").  After the Receiver took possession of the Vehicles, he arranged for them to be secured at storage facilities in Utah.  On April 16, 2018, the Receiver filed a motion requesting an order authorizing the sale of real property and vehicles.  ECF No. 101.  The Court entered the order as requested, authorizing the

///

---

[6] FTC'S Non-Opposition to Receiver's Motion for Order Approving Sale of Park City Property (ECF No. 277).

Receiver to sell the Vehicles employing commercially reasonable sales methods, on January 18, 2019. ECF No. 182.

The Receiver determined that the Chevy and the Mercedes would have required substantial repairs in order to sell them at retail and so, after researching local consignment and other sales channel options, he entered into a consignment arrangement with a local dealer in Salt Lake City, Utah to sell the Vehicles. The Mercedes had more than 110,000 miles and required at least $5,000 in repairs. Considering the estimated retail value was only $8,000, it was sold "as-is" for $4,500, minus the 5% commission to the consignment dealer. The Chevy was also a high-mileage vehicle, with over 200,000 miles, significant cosmetic issues (including areas of rust), and also required mechanical repairs of approximately $1,500. It sold "as-is" for $1,500, minus the 5% commission.

As referenced above, Mr. Hanley attempted to sell the 2014 Porsche 911 Carrera 4S to a local Porsche dealer in violation of the TRO. Upon demand, the dealer turned the Porsche over to the Receiver when provided a copy of the TRO. *See* ECF No. 26 at 11. Once the Court authorized the Receiver to sell the Vehicles, the same local dealer made an offer to purchase the Porsche. Because the dealer's offer was below retail, the Receiver arranged for the Porsche to be sold through the consignment dealer. It sold for $77,500, minus the 5% commission and cost of emissions testing.

The 2015 Forest River Viking V-Trec Camping Trailer was a pop-up tent trailer and did not generate much interest, but eventually sold in June 2020 for $6,000, minus the 5% commission and vehicle reconditioning costs.

The sale of the Vehicles netted the Receivership Estate a total of $84,222.63 ($1,425.00 for the 2007 Chevrolet Suburban; $4,275.00 for the 2008 Mercedes Benz; $73,463.75 for the 2014 Porsche 911; and $5,058.88 for the 2015 V-Trec Camping Trailer).

    **C.**    **Jewelry**

In response to the temporary restraining order, JPMorgan Chase ("Chase") identified three safe deposit boxes leased by Sandra Hanley. Following entry of the Order for Permanent Injunction and Monetary Judgment (ECF No. 320), the FTC contacted Chase, directing the bank

9

to turn over the contents of the safe deposit boxes to the Receiver as the Court's designated agent. The contents of the safe deposit boxes revealed $26,741 in cash in addition to jewelry (a ring, earrings, and gemstone), among other things. Personal papers (Social Security card, Certificate of Marriage, citizenship papers) were returned to the Hanleys, as well as a sapphire ring that Sandra Hanley claimed was a family heirloom. After obtaining multiple appraisals, the earrings and the loose 1.70 carat diamond were liquidated for $2,750.

### D. Artwork

The Receiver determined that artwork (a piece of limited-edition fine art photography) originally installed at the Park City Condo had been acquired with funds from Receivership Entities. The print was purchased in 2017 for approximately $6,450. The Receiver's team contacted the original photographer at his gallery, other local galleries, and listed the piece on eBay for almost a year, gradually dropping the price to generate some interest. During this time Mr. Hanley offered to purchase the piece on multiple occasions, with the Receiver declining each time. Because other offers never materialized, however, the Receiver ultimately accepted Mr. Hanley's offer of $1,500 for the print on or around April 12, 2021.

### E. AHL Mortgage Loan Portfolio

AHL played the role of substitute lender for a limited number of homeowners, which resulted in a small portfolio of 24 mortgage loans identified in AHL's records as "AHL Fundings."[7] *See* ECF No. 26 at 11-12, 20-21; *see also* ECF No. 26-2 at 68-87 (Receiver's Preliminary Financial Report). The bulk of these loans belonged to homeowners who were unable to secure a loan modification, and as a consequence, the loans usually involved lower-end, distressed homes. AHL negotiated and funded a "short payoff" for these homeowners with the lender and simultaneously entered into a First Trust Deed mortgage with the homeowner, by which AHL became the secured lender. In two instances, one in Iowa and one in Mississippi, AHL actually purchased the homeowner's property as a short sale and then later entered into loan arrangements with the homeowners. Because the loans were assets of the Receivership

---

[7] The Receiver has previously referenced the AHL portfolio consisting of 25 mortgages. In fact, further investigation revealed one mortgage was paid in full through a home sale which occurred almost a year prior to the Receiver's appointment – thus there were actually only 24 mortgages.

10

Estate, the Receiver continued to manage those loans (corresponding with homeowners, servicing the loans, and preparing statements (including Form 1098 Mortgage Interest Statements) as necessary) and collect payments from homeowners who submitted them.

In September 2020, the Receiver's office contacted all 24 homeowners with settlement proposals which were developed based upon a number of factors: (i) the amount of the mortgage; (ii) the total amount paid to date (a combination of payments made directly to AHL and payments made to the Receiver after he took control of AHL); and (iii) the amount that Hanley paid for the mortgage. Over the subsequent months, the Receiver spent considerable time and effort following up with homeowners regarding these potential settlements. He was ultimately able to successfully negotiate settlements with 18 of the 24 homeowners, all of which resulted in allowing the borrowers to retake ownership of their homes free and clear. These settlements and mortgage payments resulted in aggregate funds of $279,520.55 to the receivership.

Of the six remaining mortgages for which the Receiver was unable to reach a settlement with the borrower, three of the six involved small and unsecured promissory notes for which AHL had failed to properly record deeds of trust. Because of the low value of the notes and the title issues, the Receiver elected to abandon these three mortgages. With respect to the final three remaining homeowners with whom the Receiver was either unable to make contact or settle, the Receiver elected to sell the mortgages. The Receiver interviewed and obtained offers from various asset purchase companies but ultimately elected to sell the final three mortgages to WPB Partners, LLC, entering into a Loan Purchase and Sale Agreement on July 26, 2021. Following the close of a due diligence period, this transaction closed on September 30, 2021, resulting in a payment of $80,000 to the Receivership Estate.

III.     **Receivership Accounting**

Attached as Exhibit A is a Receipts and Disbursements Summary for the receivership period through October 1, 2021. It shows aggregate receipts of $1,570,141.57, less disbursements of $454,125.00, for net cash as of this Final Report of $1,116,016.57.

///

///

## APPLICATION FOR DISCHARGE AND
## APPROVAL OF FINAL FEE APPLICATION

On December 5, 2019, the Court entered an Order for Permanent Injunction and Monetary Judgment as to the Receivership Entities and Individual Defendants (ECF No. 320), resolving the case as to the Receivership Entities.

With the case now resolved as to the Receivership Entities and all asset issues resolved, Mr. McNamara files this Application for Discharge on the grounds that he has completed his duties as defined in the PI. Individual Defendants Sandra and Jonathan Hanley filed an appeal which remains pending before the Ninth Circuit. While the Receiver would normally suggest destruction of the Receivership Entities' business records 90 days after discharge, given the pendency of Sandra and Jonathan Hanley's appeal, the Receiver suggests the records be maintained until the appeal and further proceedings, if any, in this Court (the "appeal") are resolved.

The Final Fee Application seeks approval to pay fees and expenses for services during the 18-month period April 1, 2020 through September 30, 2021 as follows: $53,641.50 fees and $827.64 expenses to the Receiver and his staff payable to TWM Receiverships, Inc. dba Regulatory Resolutions; $83,125.00 fees and $212.49 expenses to Receiver's counsel McNamara Smith LLP; and $141.52 fees to Receiver's local counsel Ballard Spahr LLP.

The Final Fee Application also seeks authorization to hold back $10,000 as a reserve for final administrative costs, *e.g.*, document and electronics storage costs through the resolution of Sandra and Jonathan Hanley's appeal, removal and destruction of computer hard drives, and document destruction costs, which may be expended without further order of the Court. Ninety (90) days following resolution of Sandra and Jonathan Hanley's appeal, any unexpended funds from that reserve shall be disbursed to Plaintiff Federal Trade Commission. If the invoices in this Final Fee Application are approved for payment in full, and the requested reserve of $10,000 is approved, net cash for immediate transfer to the FTC will be $968,068.42.

The Final Fee Application is made pursuant to Section XIV.E of the PI, which authorizes the Receiver to, "[c]hoose, engage, and employ attorneys, accountants, appraisers, and other

independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;" and Section XX of the PI, which provides that the Receiver "and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by, in the possession or control of, or which may be received by, the Receivership Entities."

The Application is based upon the Final Report, the Declaration of Thomas W. McNamara, and the proposed Order filed concurrently with this Application, the pleadings in this matter, and such other oral and documentary evidence that may be presented at or before the time of the hearing on the Application.

Dated:  October 6, 2021                    MCNAMARA SMITH LLP


By:    /s/ Maria A. Gall
　　　Maria A. Gall (NV 14200)
　　　BALLARD SPAHR LLP
　　　1980 Festival Plaza Drive, Suite 900
　　　Las Vegas, NV 89135-2958
　　　Tel.:    702-471-7000
　　　Fax:    702-471-7070

　　　Sanjay Bhandari (*Pro Hac Vice*)
　　　McNamara Smith LLP
　　　655 West Broadway, Suite 900
　　　San Diego, California 92101
　　　Tel.:    619-269-0400
　　　Fax:    619-269-0401

　　　*Attorneys for Court-Appointed Receiver,*
　　　*Thomas W. McNamara*

# CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of October, 2021, pursuant to Fed. R. Civ. P. 5(b), I served via CM/ECF or delivered by email and mailing in the U.S. Mail, a true and correct copy of the foregoing **NOTICE OF RECEIVER'S FINAL REPORT AND APPLICATION FOR: (1) DISCHARGE OF RECEIVER, AND (2) APPROVAL OF FINAL FEE APPLICATION**, postage prepaid and addressed to the following:

**VIA CM/ECF**
Gregory A. Ashe
Federal Trade Commission
600 Pennsylvania Ave. NW
Washington, DC 20580
Tel.:  202-326-3309
Fax:  202-326-2558
gashe@ftc.gov
*Attorneys for the Federal Trade Commission*

**VIA CM/ECF**
Blaine T. Welsh
U.S. Attorney's Office
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, NV 89101
Tel.:  702-388-6336
Fax:  702-388-6787
blaine.welsh@usdoj.gov
*Attorneys for the Federal Trade Commission*

**VIA CM/ECF**
D. Brian Boggess
Boggess Law Group
7495 West Azure Drive, Suite 211
Las Vegas, NV 89130
Tel.:  385-248-5700
Fax:  855-675-2674
bboggess@boggesslawgroup.com
*Attorney for Defendants Consumer Defense LLC; Consumer Link, Inc.; American Home Loan Counselors; American Home Loans, LLC; Consumer Defense Group, LLC f/k/a Modification Review Board, LLC; Brown Legal, Inc.; FMG Partners, LLC; Zinly, LLC; and Sandra X. Hanley*

**VIA CM/ECF**
Jonathan Hanley
2339 Lindsay Wood Lane
Sandy, UT 84092
Tel.:  385-414-0037
Jonathanhanley22@gmail.com
*Pro Se*

  /s/ Maria A. Gall
Maria A. Gall
*Attorneys for the Court-Appointed Receiver, Thomas W. McNamara*